UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

SETH ANDREW,
Petitioner-Movant, Pro-se                    Crim. No. 1:22-Cr-32-1 (JPC)
v.
UNITED STATES OF AMERICA,
Respondent.


# MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

# PURSUANT TO 28 U.S.C. § 2255

## I. PRELIMINARY STATEMENT

**Petitioner Seth Andrew, proceeding pro se, respectfully moves this Court pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct the conviction and sentence entered against him in United States v. Andrew, 1:22-Cr-32-1 (JPC).** Petitioner remains in the supervised-release portion of his sentence, scheduled to terminate on or about May 15, 2026. Thus, Petitioner remains "in custody" at the time of filing within the meaning of 28 U.S.C. § 2255(a) for federal habeas purposes. *Jones v. Cunningham*, 371 U.S. 236, 240–43 (1963); *Scanio v. United States*, 37 F.3d 858, 860 (2d Cir. 1994); *Earley v. Murray*, 451 F.3d 71, 75 (2d Cir. 2006).

**This Motion rests on five concurrent constitutional grounds, each independently sufficient and factual-development-dependent with contemporaneous and new evidence attached hereto as Exhibits A through X**. Petitioner asks this Court—as a threshold matter—to defer summary disposition until (i) the contemporaneously-filed Motion for Reassignment under 28 U.S.C. § 455(a) is resolved by the Chief Judge or another judge of this District; (ii) conflict-free counsel is appointed under Rule 8(c) of the Rules Governing § 2255 Proceedings and 18 U.S.C. § 3006A; (iii) limited Rule 6 discovery is authorized; (iv) the record is expanded under Rule 7; and (v) an evidentiary hearing is held under § 2255(b) and Rule 8.

**Petitioner's grounds are *not only* that doctrinal change post-plea has retroactively rendered his admission insufficient to meet the elements of the crime, but also that his constitutional rights were substantively violated by deeply conflict-burdened counsel.** This claim is based on both new evidence and public-record facts that Petitioner discovered after sentencing and that were not before the Court at the plea or sentencing proceedings. While the

Petitioner's plea before Judge Cronan initially may look like a conventional property-fraud admission, that is only because conflict-burdened counsel explicitly shaped that record at plea, at sentencing, and on appeal to the Second Circuit in a manner rendering his plea involuntary, insufficient, and unintelligent.

**This § 2255 Motion attacks the constitutional reliability of the record itself, not just the doctrinal labels this Court and the appellate panel applied to it.** Specifically, this motion argues retained counsel: (i) suppressed Petitioner's repeated contemporaneous authorization objections; (ii) failed to identify for Petitioner or preserve then-developing fraud-law defenses under *Ciminelli*, *Percoco*, and later materiality-and-inducement issues clarified by *Kousisis*; (iii) failed to act on, or even read, materially more than 700 pages of potentially exculpatory *Brady* disclosures made by the prosecution just days before sentencing; (iv) allowed the colloquies, both at plea and sentencing, to proceed without independent advice on the presiding judge's disclosed friendship with lead counsel; (v) failed to interview, depose, or contact material witnesses repeatedly identified in contemporaneous written requests by the Petitioner, (vi) refused numerous requests to identify and raise with this Court explicit violations of the Due Process Protections Act of 2020 that occurred at Presentment; and (vii) replied to this Court "None from the defense" when asked about objections, when in fact the Petitioner had requested numerous times in court, and well-documented contemporaneously written concerns by the Petitioner with regards to material errors in the PSR, the prosecutor's factual errors in court, material errors in the information, and other factual matters impeaching the question of whether the Petitioner met all required elements of the crime, even before subsequent Supreme Court Decisions.

**Ineffective-assistance claims are ordinarily appropriate for § 2255 because the appellate record is incomplete, has factual errors, and further limited-discovery and development are needed.** *Massaro v. United States*, 538 U.S. 500 (2003), forecloses any procedural-default objection. This Motion is filed pro se and the Court is asked to construe it liberally. *Haines v. Kerner*, 404 U.S. 519 (1972); *Erickson v. Pardus*, 551 U.S. 89 (2007); *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471 (2d Cir. 2006).

**RELIEF SOUGHT (SUMMARY)**

Petitioner does **not** ask this Court to vacate the conviction on these papers. Petitioner asks the Court, at the first stage, to:

**(1)  Refer the contemporaneously-filed § 455(a) Reassignment Motion** to the Chief Judge of this District (or randomly to another District judge) for resolution before any merits ruling on this § 2255 Motion;

**(2)  Appoint conflict-free counsel** under Rule 8(c) of the Rules Governing § 2255 Proceedings and 18 U.S.C. § 3006A;

**(3)  Authorize limited Rule 6 discovery** in the narrow first-stage form set out in Section XI of this Motion;

**(4)  Expand the record under Rule 7** to include the documentary evidence cited in Exhibits A–X;

**(5)  Hold an evidentiary hearing under § 2255(b)** on the disputed factual questions set out in the Hearing-Required-Facts Table immediately following; and

**(6)  Hold the Government's response under Rule 5** in abeyance until the § 455(a) reassignment question is conclusively resolved.

Only after the record is developed does Petitioner ask the Court to vacate. Monetary return under *Nelson v. Colorado*, 581 U.S. 128 (2017), is reserved for after vacatur and determination of reprosecution posture.

### *Limited Evidentiary Hearing-Required-Facts Table*

The disputed facts on which Grounds One through Five depend are summarized below. None can be conclusively resolved against Petitioner on the existing record.  Section 2255(b) therefore requires at least a limited-evidentiary hearing.

| Disputed fact | Why the current record alone cannot resolve it | Evidence or witness required |
|---|---|---|
| Whether Petitioner had pre-transfer authorization or ratification from institutional actors (e.g. Dr. North, DPNY, SUNY CSI, DPC, DPH, DPE; Accountants for DPPS, DPNY & DBF; DPPS CEO; DPPS Interim CFO) | Plea record omits authorization evidence allegedly suppressed by counsel; the Government's own *Brady* disclosures identify board members favoring "slap on the hand" disposition | Ex. C (July 13–14, 2022 email chain); Ex. R (Dr. North *Brady*-disclosed statements); Ex. Q (CSBM bookkeeping communications); Dr. North (potential witness); SUNY records (Ex. T; Rule 6 for additional designees and records) |

| Disputed fact | Why the current record alone cannot resolve it | Evidence or witness required |
|---|---|---|
| Whether counsel suppressed Petitioner's explicit contemporaneous authorization objections | Requires counsel-client testimony plus email record that are not on the district or appellate docket (*Massaro)* | Exs. B, C, D; affidavits, declarations, or testimony from Kim, Doherty, and Gumaste; and Rule 6 discovery as needed |
| Whether counsel abandoned Petitioner's *Brady*, DPPA, and PSR disputes that counsel had themselves identified | Counsel's own March 16, 2022 *Brady* letter (Ex. N) and July 28, 2022 "None from the defense" statement (Ex. G) require complete explanations | Ex. N; Ex. D (PSR-objection drafts v004, v007, v013); Ex. G; affidavits, declarations, or testimony from Kim and Doherty, or Rule 6 discovery |
| Whether Kim's or Gumaste's SDNY employment discussions overlapped with Petitioner's live representation, plea, sentencing, appeal, or post-conviction | Facts within counsel and SDNY control; conflict-screening documents within SDNY control; personal communications | Rule 6 discovery request to Krieger Lewin LLP, DBF, and SDNY |
| Whether Petitioner would have pleaded guilty if conflict-free counsel had advised him or if he had continued with unconflicted initial counsel, Michael Yaeger of Carlton Fields | Requires sworn testimony on advice received, alternatives presented, & state of mind. *Hill v. Lockhart*, 474 U.S. 52 (1985); *Lee v. United States*, 137 S. Ct. 1958 (2017) | Ex. P (Diligence Declaration, expanded); contemporaneous emails/texts; counsel affidavits, declarations, or testimony, or Rule 6 discovery; family-member declarations |
| Whether in fact Wells Fargo was ever materially deceived by the Petitioner after FBI Agent's *Brady* released letter regarding the erroneous 302 vs. her field-note discrepancies | Requires record authentication & witness interviews never contacted by counsel despite Petitioner's repeated requests. | Ex. H (FBI 302 correction); Ex. S (Wells Fargo records — authentication required); Ex. U (rate-lock records); Rule 6 30(b)(6) testimony |
| Whether the alleged mortgage-rate-discount motive theory satisfies new Supreme Court decision in *Kousisis* regarding materiality & inducement | Plea record adopts the Government's framing; Exs. K and X contradict it; *Kousisis* materiality element of § 1343 — as Petitioner contends Kousisis addressed but did not conclusively resolve — is not satisfied by mere "eligibility" | Exs. K, U, X; Wells Fargo records authentication |
| Whether Petitioner had required Rule 5(f) / Due Process Protections Act notice provided at presentment | Presentment-stage records not in the appellate record | PACER presentment transcript; minute order; declarations of counsel present |

**HEARING-REQUIRED FACTS — § 2255(b) SUMMARY TABLE**

The following table summarizes, for each ground, the disputed fact that requires evidentiary development, the principal exhibits, the witnesses or discovery needed, and the reason the existing record cannot conclusively resolve the dispute under § 2255(b).

| Ground | Disputed Fact | Best Exhibits | Witnesses / Discovery | Why Record Cannot Conclusively Resolve |
|---|---|---|---|---|
| Conflict / IAC | Counsel shaped plea and abandoned PSR/Brady objections | B, C, D, E, G, N, P, W | Kim, Doherty, Gumaste — affidavit / deposition testimony | Counsel advice and conflict facts are outside the plea record |
| Invalid Plea | "Written authorization" limitation; post-pause "Correct, your Honor" answer | B, C, E, P | Petitioner and counsel testimony | Plea transcript itself shows unresolved mid-colloquy intervention |
| Brady / PSR | Counsel had late Brady and drafted PSR objections but said "None from the defense" | D, G, H, N, S | Counsel + USAO + Wells Fargo records | Need explanation of counsel's abandonment of disputes counsel themselves teed up |
| Wells Fargo materiality | Bank knew non-ownership; rate-lock chronology disputed | H, S, U | Wells Fargo 30(b)(6) custodian/bankers (Kalvonjian, Carrick, Mantle) | Records need authentication and causation testimony |
| Authorization / No Concealment | Board, accounting, and SUNY knowledge of the dissolution-period escrow accounts | K, Q, R, T | Dr. North; Charter School Business Management (CSBM); SUNY Charter Schools Institute | Original North 2/16 + 2/28 statements; CSBM workpapers; SUNY dissolution authority — none in current record |

## II. JURISDICTION AND CUSTODY

**This Court has jurisdiction under 28 U.S.C. §§ 2241 and 2255 and Rule 4 of the Rules Governing § 2255 Proceedings.** Petitioner pleaded guilty to one count of wire fraud before this Court on January 14, 2022 and was sentenced on July 28, 2022. The judgment was affirmed by the Second Circuit on September 26, 2024 and the mandate issued on November 19, 2024. Petitioner is presently on supervised release. Supervised release qualifies as "custody" for purposes of § 2255. *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006); *Scanio v. United States*, 37 F.3d 858 (2d Cir. 1994); *Jones v. Cunningham*, 371 U.S. 236 (1963). This is Petitioner's first § 2255 Motion. No predecessor authorization under § 2244 is required.

### III. TIMELINESS

#### A. *Primary Custody-Driven Filing Deadline*

**Petitioner files this Motion before the expiration of supervised release on or about May 15, 2026.** Supervised release qualifies as "in custody" for § 2255 purposes. *Jones*, 371 U.S. at 240–43; *Earley*, 451 F.3d at 75. The custody deadline—not § 2255(f)(1)—is the operative jurisdictional driver of this filing. Petitioner files now to preserve federal jurisdiction. The Motion's statutory limitations posture is set out in the alternative below.

#### B. *Statutory Limitations Anchors (In the Alternative)*

**Petitioner respectfully contends § 2255(f)(1) does not apply and requests the right to file a Supreme Court writ of Certiorari after review of this motion.** The perceived and/or actual conflict created by learning that Petitioner's defense counsel and co-counsel worked for the SDNY prosecution during the potential (f)(1) default filing window. *Clay v. United States*, 537 U.S. 522, 524–25 (2003).

#### (1) *§ 2255(f)(4) — Newly Discovered Facts*

**Petitioner could not have discovered through the exercise of due diligence the specific conflict facts underlying Ground One before they became publicly known.** The factual predicate is the public timeline of post-sentencing representation employment: Edward Y. Kim's return to SDNY and eventual elevation to Acting U.S. Attorney for the Southern District of New York overseeing all counsel opposing petitioner's appeal. Furthermore, co-counsel Varun A. Gumaste began his service as an AUSA in SDNY during Petitioner's appeal alongside AUSA Finkel among others. These newly discovered facts and the institutional consequences of those facts for Petitioner's original representation, his *certiorari* posture, and his ability to retain conflict-free trial and post-conviction counsel. Petitioner does not plead that employment discussions between former counsel and SDNY necessarily began during Petitioner's representation but that a limited evidentiary hearing would be required to determine that fact. However, Petitioner does plead that these post-representation employment facts crystallized a conflict-discovery factual predicate that did not exist before December 13, 2024. The § 2255(f)(4) one-year period, measured from the latest factual discovery, expires no earlier than December 13, 2026. Petitioner pleads (f)(4) in the alternative, in conjunction with equitable tolling, to bridge to this May 14, 2026 filing.

#### (2) *Equitable Tolling — Holland v. Florida*

Petitioner pleads equitable tolling under *Holland v. Florida,* 560 U.S. 631 (2010), and *Doe v. Menefee,* 391 F.3d 147, 159 (2d Cir. 2004) because Petitioner has been diligent and can provide substantial contemporaneous records that these extraordinary, likely unprecedented, circumstances of his defense counsel overseeing his prosecution on appeal impeded earlier filing. This diligence record is set out in Exhibits (Ex. P).

The extraordinary-circumstance theory is straightforward: between 2023 and approximately March 31, 2025, Petitioner repeatedly attempted to, but could not retain conflict-free counsel willing to file a § 2255 motion attacking the constitutional adequacy of representation provided by the then US Attorney for SDNY Ed Kim. Moreover, institutional reluctance survived Mr. Kim's departure because co-counsel Gumaste continued (and on information and belief continues) to serve as an AUSA at SDNY. Petitioner separately faced significant financial constraints lifted only by the January 16, 2025 sale of his family residence. Petitioner's contemporaneous requests for IFP and pro se letter to this Court dated March 20, 2025 (Doc. 57-2; Ex. O) and Petitioner's January 17, 2025 sworn affidavit at the Second Circuit (Ex. I) are independently dispositive evidence of diligence and non-post-hoc framing of the claims now pleaded.

### (3) Actual-Innocence Gateway — McQuiggin / Bousley

In the alternative, Petitioner invokes the actual-innocence gateway *McQuiggin v. Perkins*, 569 U.S. 383 (2013); *Schlup v. Delo*, 513 U.S. 298 (1995); *Bousley v. United States*, 523 U.S. 614 (1998). Petitioner asserts factual innocence—not mere legal insufficiency—of the charged offense and of the forgone bank fraud, false-statement, and money-laundering theories the Government chose not to pursue as well as the *right-to-control* theory of wire fraud unanimously rejected by the Supreme Court. Petitioner has consistently addressed the forgone theories explicitly, consistent with *Bousley*, in Ground Four and the accompanying table.

### (4) § 2255(f)(3) — Newly Recognized Right (Pleaded in the Alternative)

On May 22, 2025, the Supreme Court decided *Kousisis v. United States*, 605 U.S. ___, 145 S. Ct. 1382 (2025). While Petitioner's direct appeal was pending at the Second Circuit (No. 22-1749) from August 11, 2022 through November 19, 2024, *Kousisis* was pending before the Supreme Court. Petitioner pleads under § 2255(f)(3) the discrete claims for which *Kousisis* addressed fraudulent inducement under § 1343 but did not resolve the proper materiality standard; Petitioner pleads § 2255(f)(3) only conditionally — on this Court's determination that the asserted right was newly recognized: that the plea record does not establish a materially false representation

that induced any relevant victim to part with money or property because (a) the petitioner was the undisputed, unrevoked escrow agent, fiduciary, and sole signatory for the accounts of the dissolved entities; (b) the relevant institutional actors had repeated pre-transfer notice and provided verbal authorization and ratification even if not required; (c) the escrow funds in full were always preserved in a fiduciary responsible and regulatory-reserve context, with additional interest; and (d) more than 700 pages financial documents released as *Brady* material days before sentencing confirm that the alleged, partially rejected, and factually false mortgage-rate motive theory lacks the direct causation that *Kousisis*, on Petitioner's contention, a materiality-and-inducement analysis would require. Petitioner acknowledges *Dodd v. United States*, 545 U.S. 353 (2005), but pleads § 2255(f)(3) conditioned on this Court's determination that the *Kousisis* right was newly recognized and made retroactively applicable on collateral review. The § 2255(f)(3) one-year period runs to May 22, 2026; this Motion, filed May 14, 2026, is within that period. The (f)(3) anchor is pleaded in the alternative; the custody-driven deadline (Section III.A) and the § 2255(f)(4) and equitable-tolling anchors set out below are independently sufficient regardless of how the Court rules on Kousisis.

### C. The March 20, 2025 Pro Se Letter — Diligence, Not a § 2255(f) Trigger

**On March 24, 2025, Petitioner filed pro se a six-page letter addressed to this Court (Doc. 57-2; Ex. O) that formally asserted on the docket—approximately fourteen months before this Motion's May 14, 2026 filing—the same claims and theories Petitioner now formally pleads in this Motion, including:**(i) request for permission to withdraw the guilty plea based on the now-disavowed *right-to-control* theory; (ii) request for venue change to avoid even the perception of conflict due to the close personal friendship with Judge Cronan; (iii) explicit naming of all three conflicted attorneys (Kim, Gumaste, and co-counsel Tim Doherty, who was then serving as a Judge); (iv) assertion that the plea was made under duress and therefore was not voluntarily, intelligently, or knowingly entered; (v) explicit reservation of post-conviction relief under § 2255, § 2254, § 2241, new evidence, plain error, and new Supreme Court decisions; (vi) explicit assertion of the Rule 5(f) / Due Process Protections Act failure at presentment (see Ex. F, Presentment Tr., Apr. 27, 2021, ECF No. 9, S.D.N.Y. Mag. Dkt. 1:21-mj-04262 (Gorenstein, M.J.)); (vii) identification of the *Brady*-withheld material as foundational; and (viii) identification of *Ciminelli*, *Percoco*, *Porat*, and *Kousisis* as the controlling doctrinal trajectory he was never made aware of before his plea. The letter is offered as contemporaneous documentary evidence of Petitioner's diligence and as confirmation that the § 2255 legal theories now formally pleaded were already on this Court's docket before this filing. See Ex. O.

## IV. WHY THE DIRECT APPEAL DOES NOT BAR THESE CLAIMS

**This§ 2255 Motion does not seek to relitigate the doctrinal questions in the Second Circuit's mandate from November 19, 2024; instead, it explicitly attacks the constitutional reliability of the trial and appellate records themselves.** The Second Circuit relied on the plea-colloquy record as a traditional-property-fraud admission but *Massaro* forecloses any procedural-default objection because ineffective-assistance claims are best presented under § 2255 because the trial record is incomplete and further limited factual development is required, especially in the case of new post-hoc evidence. This principle is straightforward: a defendant whose plea record was shaped by conflicted counsel cannot be made to bear the appellate-record consequences of that shaping on the very claim that the shaping was originally constitutionally inadequate.

## V. GROUND ONE — CONFLICT-BURDENED COUNSEL AND ADVERSE EFFECT

**Petitioner was denied his Sixth Amendment right to conflict-free counsel.** *Cuyler v. Sullivan*, 446 U.S. 335 (1980); *Strickland v. Washington,* 466 U.S. 668 (1984); *Hill v. Lockhart*, 474 U.S. 52 (1985); *Lee v. United States,* 137 S. Ct. 1958 (2017). Petitioner pleads adverse effect under *Cuyler* and its Second Circuit progeny—*Armienti v. United States*, 234 F.3d 820 (2d Cir. 2000); *United States v. Schwarz,* 283 F.3d 76 (2d Cir. 2002)—and pleads "*but-for"* prejudice under *Strickland/Hill/Lee* in the alternative. Petitioner acknowledges *Mickens v. Taylor*, 535 U.S. 162 (2002) but the *Cuyler* adverse-effect framework is most cleanly available in successive- or multiple-representation cases; this Court need not resolve the *Mickens* reservation if *Strickland/Hill/Lee* "*but-for"* prejudice is independently established.

### A. *Four Concurrent Conflicts*

**Defense counsel labored under four concurrent conflicts of interest.** Petitioner pairs each conflict with a plausible alternative defense strategy counsel did not pursue, to satisfy the adverse-effect inquiry under *Cuyler / Armienti*.

| Conflict | Plausible alternative strategy not pursued | Why the conflict discouraged it | Evidence / discovery target |
|---|---|---|---|
| Petitioner was not independently advised regarding the disclosed professional relationship between Lead counsel an the presiding Judge nor was their *close personal* friendship disclosed. | Independent recusal advice; limited conflict counsel to advise Petitioner on whether to seek recusal or waive any objection | Counsel whose own close personal friendship was at issue could not impartially advise the client whether to challenge the impartiality of the Judge & Counsel. | Plea Tr. (Doc. 32) at 3–4 (Ex. E); Andrew declaration (Ex. P); |

| Conflict | Plausible alternative strategy not pursued | Why the conflict discouraged it | Evidence / discovery target |
|---|---|---|---|
| Lead counsel's subsequent return to and leadership of SDNY (Counsel, then Deputy, then Acting U.S. Attorney from December 13, 2024 through approximately March 31, 2025) | Aggressive *Brady*/misconduct challenge; vigorous preservation of appellate and certiorari issues; advice regarding institutional impediments to post-conviction representation; Voluntary recusal; movement of case to alternative jurisdiction. | Former counsel oversaw the Prosecutors and AUSA that argued against defendant on appeal. Future or ongoing relationships with the prosecuting office made adversarial posture costly to counsel personally & institutionally. | Public DOJ timeline; Krieger Lewin LLP records; Rule 6 discovery to KKL/Krieger Lewin LLP and SDNY |
| Co-counsel Gumaste's parallel migration to SDNY as an AUSA during the Second Circuit appeal and continuing service thereafter. Mr. Gumaste was the ECF-filing attorney of record for the Defense Sentencing Memorandum (Doc. 42, filed July 14, 2022), tying him directly to the conflict period. | Disclosure of the impending migration; conflict waiver; substitution of counsel; aggressive defense posture | Same office that prosecuted Petitioner and would defend the conviction collaterally. Former counsel oversaw the entire SDNY prosecutorial team including AUSA Finkel | LinkedIn / DOJ public records; Rule 6 discovery to KKL/Krieger Lewin LLP press release, and SDNY records |
| Counsel's economic incentive against trial under the retainer structure ($100,000 total retainer; full-trial budget stated as $1.5–2.0 million; client's known asset constraints) | Trial preparation; preservation of all suppression / Daubert / Rule 29 grounds; full investigation of authorization and *Brady* issues | Once accepted, each additional hour past retainer and liquid assets were likely to become unpaid; counsel's rational economic course was to achieve a quick disposition | Krieger Kim & Lewin LLP Retainer Agreement (Ex. L); Krieger Lewin LLP billing records (Rule 6 target) |

### B. *Identification of the Conflicted Attorneys*

1. **Edward Y. Kim** — lead defense counsel during the representation. Petitioner learned of his close personal friendship with the presiding judge after sentencing. While the professional relationship was disclosed, on January 14, 2022.  Plea Tr. (Doc. 32) at 3, no independent counsel was provided to advise on a recusal.  Petitioner now has personal knowledge—based on contemporaneous statements made by lead counsel and confirmed by third parties —that Mr. Kim attended the presiding judge's intimate wedding ceremony.  Mr. Kim returned to employment in the US Attorney's office in 2023 as heir-apparent and was elevated to Acting U.S. Attorney for SDNY and served in that role until approximately March 31, 2025.

2. **Varun A. Gumaste** — co-counsel; appeared at Petitioner's plea hearing on January 14, 2022 and remained counsel of record through sentencing on July 28, 2022.  Mr. Gumaste subsequently became an AUSA at SDNY and, on information and belief, continues to serve in that role; the precise swearing-in date and employment negotiations with the SDNY are the subject of the Petitioner's Rule 6 discovery request.

### C. *The Specific Adverse Effects*

**Each conflict was paired with a contemporaneous adverse effect on Petitioner's representation.**  The contemporaneous record (Exs. B, C, D, A) reflects more than a dozen written disagreements over December 2021 and January 2022 in which Petitioner refused to admit guilt, criminal mens rea, or to allocute to conduct he believed was untrue and/or non-criminal.  Counsel described Petitioner contemporaneously as "relentless" and "having-no-quit" for refusing to make even minor statements requested by counsel that Petitioner argued were factually inaccurate. Petitioner separately and repeatedly proposed in writing that counsel pursue a cooperation agreement, a misdemeanor plea, or a deferred prosecution agreement—but lead counsel declined to pursue them vigorously because of his undisclosed contemporaneous desire to return to employment as US Attorney for the Southern District.

**The pattern of conflict-burdened representation continued through the sentencing-memorandum drafting phase.**  On July 13–14, 2022, the Petitioner's written instruction to counsel was to depose, interview, and confirm with multiple witnesses that "I DID RECEIVE AUTHORIZATION FROM THREE DISTINCT PEOPLE." (Ex. C). Petitioner demanded that the defense sentencing memorandum reflected this fact however, lead counsel Mr. Kim wrote: *"you're right that this team disagrees with qualifying 'authorization' and I'm very confident that doing so will materially hurt us at sentencing."*  Co-counsel Mr. Doherty added: *"I cannot emphasize how*

*strongly I believe that qualifying the word 'authorization' is the wrong approach to the sentencing memorandum."* After numerous attempts to persuade counsel and provide evidence of his claims, Petitioner was exhausted and capitulated at 12:48 a.m. EST: *"I don't want us to go around any more. Take the word out and let's get it submitted tomorrow."* Petitioner authenticates this email chain by sworn declaration in Ex. P. The chain itself is attached as Ex. C. Petitioner further pleads the substance on his sworn recollection and reserves the right to authenticate further underlying emails, notes, texts, and other files at evidentiary hearing or upon Rule 6 production from Krieger Lewin LLP.

**The July 28, 2022 sentencing transcript reflects the cumulative consequence of the conflict-burdened representation**. When this Court inquired whether the defense had any objection to the Presentence Investigation Report, Mr. Kim responded "None from the defense, your Honor." Sentencing Tr. at 9 (Ex. G). The three-word statement left unresolved factual objections counsel had developed in writing, including counsel's March 16, 2022 *Brady* letter (Ex. N), in the PSR-objection drafts v004, v007, and v013 (Ex. D), in Petitioner's July 13–14, 2022 "qualifying authorization" emails (Ex. C), and in the July 20, 2022 FBI 302 correction letter (Ex. H). This agitation and the Court's recognition of the duress under which the Petitioner was operating are on the Sentencing Transcript record. Sentencing Hr'g Tr. (July 28, 2022) at 48, Doc. 51 (filed Aug. 15, 2022) (Ex. G) (Judge Cronan: "He clearly was quite distraught at that plea.")

**This is not a story of one lawyer's career move from defense to prosecution; it is a record of structural conflict and concrete adverse effect.** The institutional pattern of two members of the defense team migrating to the prosecuting office, with one serving as the head of that office, paired with the close personal friendship between lead counsel and the presiding judge, presents an adverse-effect record warranting Rule 6 discovery and at least a limited evidentiary hearing under § 2255(b).

## VI.  GROUND TWO — INVALID PLEA / COUNSEL-SHAPED ALLOCUTION

**Petitioner's plea was not knowing, voluntary, and intelligent within the meaning of** *Boykin v. Alabama,* **395 U.S. 238 (1969),** *Brady v. United States,* **397 U.S. 742 (1970), and** *Hill v. Lockhart,* **474 U.S. 52 (1985).**  The plea was the product of (i) months of counsel-shaped allocution drafting against Petitioner's documented written resistance; (ii) a plea colloquy in which lead counsel intervened mid-allocution to redirect Petitioner toward a broader-sounding admission than Petitioner's actual position warranted; and (iii) the absence of required and reasonable independent advice to Petitioner regarding the professional relationship between lead counsel and the presiding judge, even before his understanding of their close, personal relationship.

### A.  *Partial Chronology of Counsel-Shaped Plea Record*

- **May 28, 2021.**  Petitioner wrote to lead counsel and co-counsel: *"I can't / won't plea to something I didn't do.  I had authority…"*  Ex. C.  This is just one early contemporaneous-resistance records, though there are many others including those the Petitioner no-longer has access to without limited discovery.

- **December 2021 – January 2022**.  Petitioner objected, repeatedly and in writing, to factual and legal characterizations advanced by counsel throughout plea negotiations.  More than a dozen written disagreements are reflected in the redlined-allocution drafts.  The Draft Allocution.003 dated December 28, 2021 (Ex. B) repeatedly reflects Petitioner's narrowing of admissions to *"written authorization"* only because he remained adamant he had explicit statutory, regulatory, fiduciary, and verbal authorization for the funds transfers. Limited discovery can confirm this assertion.

- **January 5, 2022**.  Lead counsel emailed Petitioner the version of the allocution counsel intended to present.  Ex. C.

- **January 14, 2022** (plea hearing).  Petitioner stated during allocution: "I think — I knew I did not have *WRITTEN* [emphasis added] authorization from DPPS."  Plea Tr. (Doc. 32) at 34.  When this Court probed further, Petitioner said: "At the time, I did not dwell on those details, your Honor."  Id. at 35.  Lead counsel intervened mid-colloquy: "Your Honor, may we have one moment?"  Id.  After a private pause, Petitioner's response to a clarifying question was the clean-up "Correct, your Honor."  Id. at 36.  Ex. E. The Petitioner's response was clearly in response only to his last referent before counsel's side-bar referring to whether he had received "written authorization from DPPS." This is an essential distinction because while Petitioner could truthfully attest to this fact, he knew and had

argued for months, that he neither required, nor sought, written permission from DPPS, because the accounts in question were never under their legal or financial authority.

- **March 16, 2022**.  Lead counsel's own *Brady* letter to AUSA Finkel (Ex. N) identified factual disputes regarding (i) statements by Democracy Prep board members that Petitioner deserved "a slap on the hand"; (ii) Dr. Robert North's February 16, 2022 statement and coerced February 28, 2022 retraction; (iii) communications between the Government and DPPS; and (iv) influence on or restriction of board members' statements.

- **July 13–14, 2022**.  The "qualifying authorization" email chain (Ex. C) records counsel's suppression of Petitioner's authorization position in the sentencing memorandum.  Petitioner capitulated only after exhaustion, tens of thousands of dollars in legal expense, and weeks of internal disagreement.

- **July 28, 2022**.  At sentencing, Mr. Kim stated to this Court: *"None from the defense, your Honor."*  Sentencing Tr. at 9 (Ex. G).  At the same hearing, AUSA Finkel conceded: ***"Yes, he didn't buy a Lamborghini, he didn't go to the Seychelles, he didn't spend it on fancy jewelry, but that doesn't mean he didn't benefit."***  Sentencing Tr. at 14–15 (Ex. G).  This Court found: Petitioner *"did not pocket any of the money…did not spend any of those funds on himself or his family."*  Sentencing Tr. at 37 (Ex. G).

**These statements alone demonstrate that there was not *Kousisis*-level materiality or inducement with the criminal intent of personal pecuniary gain of any kind.** Post-plea, the prosecutor and the court both created alternative and novel unsupported theories of the Petitioner's motive because they conceded it was not materially or financially significant. For example, The Government's sentencing memorandum, Dkt. 43 at 13: "*Andrew benefited because he satisfied his ego.*" AUSA Ryan Finkel then stated at sentencing, p. 14: "*it was about ego as opposed to greed … Mr. Andrew cared about his reputation … the money was not Andrew's ultimate goal."*

**While incorrect, this explanation that the motive was based on ego, political animus, or to benefit the Petitioner's professional standing does not demonstrate materiality or criminal intent under the wire fraud statute, especially post *Ciminelli, Kelly,* and *Percoco*.** At sentencing (Sentencing Tr. p. 37), this Court concurred: *"This wasn't a situation, as Mr. Kim noted, like many defendants convicted of wire fraud, of someone stealing money to line their own wallet…I am also mindful that Mr. Andrew was not trying to enrich himself. … He did not pocket any of the money. … He did not spend any of those funds on himself or his family. … Mr. Finkel acknowledged he didn't go on vacation, he didn't buy a car. He was in a dispute with Democracy Prep Public Schools. He was not happy with the direction of that charter school network."*   Petitioner's Counsel knew this

all to be true but despite Petitioner's oft-stated belief in his innocence and insufficiency of the evidence surrounding criminal, pecuniary, or fraudulent intent, Counsel continued to push Petitioner towards an involuntary plea.

### B. Legal Framework

**Standard plea-colloquy admissions cannot conclusively defeat a § 2255 motion where the motion alleges that conflict-burdened counsel shaped the colloquy itself.** *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977) (plea-colloquy statements not invariably preclusive); *United States v. Doe*, 537 F.3d 204, 213–14 (2d Cir. 2008). Section 2255(b) requires an evidentiary hearing unless the motion, the files, and the records of the case "conclusively" show that the prisoner is entitled to no relief. *Chang v. United States*, 250 F.3d 79 (2d Cir. 2001); *Puglisi v. United States*, 586 F.3d 209 (2d Cir. 2009).

**Petitioner's claim turns on what conflict-free counsel would have advised about, and how Petitioner would have responded to, the alternatives that conflict-burdened counsel did not present--that inquiry cannot be resolved on the existing record.**

## VII. GROUND THREE — *BRADY* / RULE 5(f) AS I.A.C. AND PREJUDICE

**The Plea Agreement dated January 3, 2022 (Ex. W) expressly preserves Petitioner's ineffective-assistance-of-counsel claims.** The Agreement provides: "Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights." This Court accepted that reservation as part of the plea. The IAC grounds asserted herein are therefore not subject to any plea-waiver bar.

**Petitioner does *not* solely plead a freestanding pre-plea impeachment-*Brady* theory addressed in *United States v. Ruiz*, 536 U.S. 622 (2002).** Petitioner pleads post-plea Ineffective Assistance of Counsel. Counsel had the eve-of-sentencing 786-page *Brady* financial production (Ex. S), the July 20, 2022 USAO letter correcting the FBI Form 302 of the Wells Fargo banker's interview (Ex. H), and the March 11, 2022 USAO *Brady* letter regarding Dr. Robert North and board-member views (Ex. R).

**Exhibit R is not offered to prove that Dr. North exonerated Petitioner.** It is offered to show that the Government pressured him to make a financial claim, that it possessed material witness information — including a retraction and board-member mitigation and pressure statements — and that lead counsel identified this information as requiring follow-up but did not meaningfully

develop it before sentencing. Limited Rule 6 discovery is required to develop the circumstances of the February 28, 2022 retraction and the Government's related communications with DPPS and its board members.

**Sentencing is a critical stage at which the Sixth Amendment guarantee of effective assistance applies in full.** *Mempa v. Rhay*, 389 U.S. 128 (1967); *Gardner v. Florida*, 430 U.S. 349 (1977). Counsel's failure to act on the late-disclosed potentially exculpatory record at the critical-stage sentencing was constitutionally deficient under *Strickland*. The prejudice prong is satisfied because the suppressed disclosures bore directly on the factual disputes underlying the plea—authorization, materiality, banker separateness, and the absence of any actual mortgage-rate benefit sought or caused by the transfers after the FBI letter was released.

**In court, counsel sought no continuance, no motion to withdraw the plea, no PSR correction, no witness depositions, no preservation of rights on appeal, and made no record at sentencing of the disputed factual issues counsel had previously identified in writing to the Government (Ex. N).**

**Petitioner separately pleads that the Government failed to give the Rule 5(f) / Due Process Protections Act (DPPA) notice at presentment.** The Rule 5(f) Order in this case was not entered until January 16, 2022 (Doc. 29) — two days *after* Petitioner's January 14, 2022 change of plea — by which point the prosecutorial-disclosure framework had no operative effect on Petitioner's plea decision. That failure (i) deprived Petitioner of contemporaneous notice of the *Brady* obligation framework and (ii) reinforced counsel's post-plea passivity in the face of disclosed exculpatory material. Petitioner pleads Rule 5(f) here narrowly, as context for the I.A.C. claim and prejudice analysis, not as an independent freestanding ground.

## VIII.  GROUND FOUR — FACTUAL INNOCENCE (CHARGED AND FORGONE THEORIES)

**Petitioner is factually innocent—not merely legally insufficient—of the charged wire-fraud offense and of the forgone bank-fraud, false-statement, and money-laundering theories the Government did not pursue.** *Bousley v. United States*, 523 U.S. 614, 623–24 (1998). Actual innocence means factual innocence; where charges were forgone in plea bargaining, the innocence showing must address those too. Petitioner's factual position remains that authorization, notice, fiduciary preservation, and the absence of fraudulent inducement and qualifying property—not merely an absence of loss or benefit.

## A. *Factual-Innocence Table*

| Initial Complaint | Government likely position | Petitioner's factual answer | Evidence needed |
|---|---|---|---|
| Wire fraud (18 U.S.C. § 1343) | Traditional property — funds belonging to charter-school accounts — were transferred by means of a materially false pretense to a Wells Faro banker, satisfying *Kousisis.* DPPS failed to provide written authorization for transfers | No material deception induced any victim to part with money or property within the meaning of *Kousisis*; Petitioner had non-required but pre-transfer authorization, notice, and/or ratification from institutional actors (Dr. North; board; SUNY; accountant); the funds were preserved in fiduciary and regulatory-reserve context. The escrow entities (DPC, DPH, DPE) were all dissolved at the times of fund transfers. | Ex. C (July 13–14, 2022 chain); Ex. R (*Brady* disclosure); Ex. Q (CSBM bookkeeping communications); SUNY records (Ex. T; Rule 6 for additional); Dr. North declaration or testimony (Ex. K (Mar. 11, 2019 Offutt email); Shen letter (Ex. H) |
| Bank fraud / false statement to a bank (18 U.S.C. §§ 1344, 1014) | Wells Fargo was deceived into giving a mortgage-rate benefit and the alleged scheme satisfied bank-fraud elements | Petitioner's mortgage was already rate-locked at 2.5% before the transfers; Petitioner's asset levels independently qualified the maximum eligible rate-reduction (eligibility distinct from receipt); the WF retail business, mortgage, and verification bankers were institutionally separate; Petitioner received no mortgage rate-reduction caused by the transferred funds. *Kousisis* materiality is not satisfied where the alleged misrepresentation did not induce either the bank or the dissolved entities to part with anything. | Ex. H (FBI 302 correction); Ex. S (Wells Fargo records — authentication required); Ex. U (rate-lock records); Wells Fargo 30(b)(6) testimony (Rule 6) |
| Money laundering (18 U.S.C. §§ 1956, 1957) | Transfers concealed proceeds of fraud and effected promotion of the underlying scheme | If the underlying fraud theory fails for lack of inducement and material deception, the laundering theory falls with it; the funds were preserved (not concealed) in fiduciary form and the CD vehicle was repeatedly disclosed &contemporaneously documented with accountants. | Bank records (Ex. S index); escrow history; CD records; Ex. K (Mar. 11, 2019 Offutt email); SUNY records (Ex. T; Rule 6 for additional) |

## B. *Kousisis Framing*

*Kousisis v. United States*, 605 U.S. ___, 145 S. Ct. 1382 (2025), addressed fraudulent inducement and did not resolve the proper materiality standard. Petitioner does not contend that *Kousisis* narrows wire fraud or that the absence of economic loss is dispositive. Petitioner contends that the plea record and the available evidence do not establish a materially false representation that induced any relevant victim to part with money or property, because the key institutional actors had pre-transfer notice from the Petitioner and authorization or ratification evidence exists. Moreover, the funds were preserved in fiduciary and regulatory-reserve context, and the mortgage-rate theory lacks both the inducement and causation *Kousisis* materiality requires. Finally, the record shows and

the Petitioner argued consistently in pre-plea documents, post plea documents, post sentencing documents, and on appeal that the only entities that *might* have standing to meet the demanding materiality standard were legally dissolved at the time of transfer, leaving him as the sole surviving bank signatory, fiduciary, escrow agent, and authorized individual to preserve the funds from loss.

## C. *Ciminelli — Distinguish, Not Re-Argue*

**The Second Circuit on direct appeal rejected the *Ciminelli* right-to-control argument because they treated the plea record as a traditional-property-fraud admission.** Petitioner does not re-argue *Ciminelli* on this collateral record. The § 2255 move is *Massaro*-based. The appellate record was incomplete because conflict-burdened counsel shaped it, there was new evidence discovered, and the Petitioner continues to maintain factual absolute innocence. The constitutional question is the reliability of the record itself, not simply its doctrinal labels. *Ciminelli v. United States*, 598 U.S. 306 (2023), nevertheless remains the controlling traditional-property-versus-intangible-information framework against which the developed record should be assessed at a limited-evidentiary hearing.

## IX. GROUND FIVE — FAILURE TO INVESTIGATE WITNESSES AND RECORDS

**Lead counsel did not interview, depose, or successfully develop testimony from key institutional witnesses, despite specific identification and request by the Petitioner in the contemporaneous record.** This included but is not limited to officials of the SUNY Charter Schools Institute; the Wells Fargo mortgage banker ("Employee-2") and the Wells Fargo asset-verification team referenced in the July 20, 2022 USAO letter (Ex. H); Dr. Robert North (contacted but initially declined to speak); Charter School Business Management (CSBM) (accountant); and numerous other DPNY or former DPC/DPH/DPE board members whom the Government's own *Brady* disclosure (Ex. R) identified as having expressed the view that Petitioner deserved "a slap on the hand." Counsel's failure to investigate these witnesses was constitutionally deficient under *Strickland v. Washington*, 466 U.S. 668 (1984), and *Wiggins v. Smith*, 539 U.S. 510 (2003). Counsel's duty to investigate was triggered by record indications of materially exculpatory evidence and Petitioners continued insistence in the existence of contemporaneous authorization.

**In light of the express ineffective-assistance reservation in the Plea Agreement (Ex. W) quoted at the opening of this Ground, the Government cannot invoke the plea-agreement waiver to bar collateral review of the conflict-burdened representation described herein.** See *Garza v. Idaho*, 586 U.S. 232 (2019) (counsel's deficient performance reviewable notwithstanding an appeal waiver); see also *United States v. Tetzlaff*, 896 F.3d 873, 878 (7th Cir. 2018) (IAC carve-outs in plea agreements are routinely honored).

**The prejudice inquiry under *Strickland*'s second prong, and the adverse-effect inquiry under *Cuyler*, are not severable from the failure-to-investigate claim.** A developed factual record on these witnesses would have likely provided counsel with the materials necessary to (i)

preserve authorization and inducement defenses; (ii) move for plea withdrawal or PSR correction in light of the eve-of-sentencing *Brady* disclosures; and (iii) take an adversarial posture at sentencing. Counsel did none of these things.

## X. CUMULATIVE ERROR

**Petitioner pleads cumulative constitutional error in the alternative.** *Brecht v. Abrahamson*, 507 U.S. 619 (1993); *Williams v. Taylor*, 529 U.S. 362 (2000); *United States v. Caracappa*, 614 F.3d 30 (2d Cir. 2010) (cumulative effect of multiple errors). The five grounds set out above—taken together—deprived Petitioner of a constitutionally fair plea and sentencing process and infected the factual record on which the direct-appeal panel later relied. Petitioner pleads cumulative error without reliance on rhetoric and without inviting this Court to assume facts not supported by the record; he asks only that the Court consider the totality of the constitutional deficiencies in evaluating prejudice needed to issue a limited evidentiary hearing.

## XI. MOTION FOR LIMITED RULE 6 DISCOVERY

**Pursuant to Rule 6 of the Rules Governing § 2255 Proceedings, and *Bracy v. Gramley*, 520 U.S. 899 (1997), and *Harris v. Nelson*, 394 U.S. 286 (1969), Petitioner respectfully requests independent counsel and authorization to conduct limited discovery on the disputed factual questions identified in the Hearing-Required-Facts Table above and in the factual-innocence table above**. Petitioner submits that specific allegations in the Motion show reason to believe that, if the facts are fully developed as outlined below, Petitioner will be entitled to relief.

Petitioner respectfully requests limited Rule 6 discovery, in the first instance narrowed to the categories set forth below. Petitioner requests broader discovery only if the Court determines, after the Government's response, counsel affidavits, or Rule 7 expansion, that further discovery is necessary.

**First-stage Rule 6 discovery requested:**

(1) **Prior counsel files:** communications and drafts concerning allocution language, authorization, PSR objections, Brady disclosures, sentencing strategy, plea withdrawal, continuance requests, and preservation of appellate/collateral issues, from May 1, 2021 through August 25, 2022.

(2) **Counsel conflict facts:** documents sufficient to show the dates of any employment discussions, offers, acceptance, conflict screening, or recusal analysis involving Edward Y. Kim or Varun A. Gumaste and SDNY during or after Petitioner's representation.

(3) **Wells Fargo records:** authentication of rate-lock documents, relationship-discount criteria, asset-verification materials, and communications concerning whether nonprofit/escrow assets were included or excluded.

(4) **Brady / FBI 302 correction:** documents sufficient to explain the July 20, 2022 correction letter, the timing of disclosure, and the basis for correcting the banker-interview record.

(5) **SUNY / CSBM records:** documents sufficient to authenticate the dissolution, reserve, escrow, and accounting records cited in Exhibits Q and T.

### A. *Document Production*

- **From Krieger Lewin LLP (formerly Krieger Kim & Lewin LLP).** The full client file in In re Andrew, including (a) emails between Petitioner and any KKL attorney from May 1, 2021 to August 25, 2022; (b) internal KKL communications regarding the Andrew matter for the same period; (c) all redlined drafts of allocution language, sentencing memorandum, and PSR-objection letters; (d) conflict-screening / conflict-disclosure documentation regarding Mr. Kim, Mr. Gumaste, and Mr. Doherty before, during, and after representation; (e) firm-internal materials relating to then-pending or anticipated post-representation employment of any KKL attorney with SDNY or with the federal or state judiciary; and (f) retainer and engagement documents.

- **From the United States Attorney's Office, Southern District of New York.** (a) Conflict-screening files, recusal orders, and ethics-officer memoranda relating to Mr. Kim's appointment at SDNY and as Deputy and Acting U.S. Attorney with respect to Andrew; (b) conflict-screening files relating to AUSA Gumaste with respect to Andrew; (c) personal or professional internal communications by Mr. Finkel regarding the March 7, 2025 opposition to early termination of Petitioner's supervised release; (d) the full unredacted *Brady* production in 22 Cr. 32 (JPC), including any post-sentencing supplements or material considered for release that was not released; (e) documents sufficient to explain the FBI Form 302 correction reflected in the July 20, 2022 letter (Ex. H); and (f) documents sufficient to identify communications between AUSA Finkel and any Carlton Fields, DBF, or KKL attorney concerning Petitioner from April 27, 2022 to the present.

- **From the SUNY Charter Schools Institute.** (a) Communications between Petitioner and SUNY officials, including the General Counsel and Executive Director, regarding the regulatory-reserve status of DPC, DPH, and DPE during 2019–2021; (b) phone, text, and deposition records of consultation prior to the April–May 2019 fund transfers; (c) records of objection or non-objection to consolidation of dissolved-entity reserves; and (d) institutional

records of the regulatory-reserve requirement applicable to dissolved charter-school corporations.

- **From Wells Fargo, N.A**.  (a) All records relating to the rate lock on Petitioner's mortgage at 2.5%, including lock date and terms; (b) records relating to the institutional separateness of the retail business banker, the mortgage banker, and the verification team referenced in the July 20, 2022 USAO letter; and (c) records authenticating documents produced as *Brady* (USAO_00000001–USAO_00000822). (d) depositions and communications between the Wells Fargo Business, Mortgage, and Verification bankers regarding Mr. Andrew's application for a Mortgage, culminating in the Mortgage granted in August, 2019.

- **From TD Bank (formerly Commerce Bank) and Chase Bank** (a) all records related to the escrow account creation, signature cards, correspondence with Petitioner, DPPS/DPNY, (b) any specific references to the "dormant funds" warning to Petitioner that the escrow accounts were as risk of being returned to the State Comptroller of NY if not transferred in a timely manner.

- **From Democracy Prep Public Schools, DPNY, DPC, DPH, DPE, DBF, and their successor entities.**  (a) Board minutes and resolutions regarding the dissolution-escrow creation from 2005-2019 as well as escrow consolidation; (b) communications between DPPS/DPNY leadership and Petitioner regarding the transfers; (c) communications between DPPS/DPNY leadership and the U.S. Attorney's Office in 2019–2022; (d) communications referencing "slap on the hand," "slap on the wrist," or comparable disposition views among board members or institutional leadership; and (e) documents reflecting the regulatory-reserve compliance posture of the dissolved entities.

### B. *Depositions requested under Fed. R. Civ. P. 30(b)(6)*

- **Edward Y. Kim** — re: post-representation employment communications with SDNY; recommendation against "qualifying authorization" in the July 2022 sentencing memorandum; "None from the defense" statement; disclosure decisions regarding the close personal friendship with the presiding judge and wedding attendance.

- **Varun A. Gumaste** — re: date of commencement and substance of SDNY employment discussions; role in plea-colloquy and sentencing preparation; communications with Petitioner regarding conflict, recusal, or post-representation employment.

- **Timothy P. Doherty** — re: basis for the July 13–14, 2022 "qualifying authorization" advice; role in PSR-objection preparation and the "None from the defense" decision;

communications with Mr. Kim regarding the Andrew case that Mr. Andrew was not included on.

- **Dr. Robert North** — re: the February 16, 2022 statement and February 28, 2022 retraction; communications with DPPS, DPNY, DPC, DPH, and DPE board members and leadership, the U.S. Attorney's Office, or others regarding the retraction; understanding of the regulatory-reserve and authorization posture of the dissolved-entity funds.

- **Designated representatives of the SUNY Charter Schools Institute 2018-2022**—Topics include pre-transfer consultation; regulatory-reserve compliance; dissolved-entity authority.

- **Designated representatives of Wells Fargo, TD Bank, and Chase Banks**. —Topics from Business retail bankers, mortgage bankers, and verification teams regarding rate-lock authentication; banker separateness; asset-verification process, FBI interviews, APY vs. APR confusion as reported in the field notes, dormant funds notification, etc.

### C. *Good Cause*

**Specific allegations in this Motion and the accompanying record show reason to believe that, if the facts are fully developed, Petitioner will demonstrate entitlement to relief on Grounds One through Five.** *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). The requested discovery is targeted, time-limited, and necessary to develop facts that are by their nature within the possession of former counsel, the prosecuting office, and third-party institutional witnesses. *Petitioner does not seek a fishing expedition*; he seeks the records and testimony required to litigate disputed factual questions on which § 2255 requires a hearing. Petitioner will agree to any reasonable protective order limiting use of produced material to this § 2255 proceeding.

## XII.  RELIEF REQUESTED

**Petitioner respectfully requests, in the following sequence:**

1. That this Court refer the contemporaneously-filed Motion for Reassignment under 28 U.S.C. § 455(a) to the Chief Judge of this District, or in the alternative randomly reassign this matter to another judge of this or another District for resolution of the reassignment question alone, before any substantive review of this § 2255 Motion;

2. That the United States' time to respond under Rule 5 of the Rules Governing § 2255 Proceedings be held in abeyance pending resolution of the reassignment question;

3. That, upon any indication an evidentiary hearing may be warranted, this Court appoint counsel under Rule 8(c) of the Rules Governing § 2255 Proceedings and 18 U.S.C. § 3006A;

4. That this Court authorize limited discovery under Rule 6 as set out in Section XI above;

5. That this Court expand the record under Rule 7 to include the documents, declarations, and authenticated exhibits supporting this Motion and the discovery produced under Rule 6;

6. That this Court hold an evidentiary hearing under 28 U.S.C. § 2255(b) and Rule 8 on the disputed factual questions identified in the Hearing-Required-Facts Table;

7. That, upon a developed factual record, this Court vacate Petitioner's conviction and sentence, and either (a) order resentencing on any surviving count or (b) dismiss the underlying Information with prejudice if no count can be sustained on the developed record;

8. That this Court reserve the question of return and disposition of personally forfeited and/or restituted funds under *Nelson v. Colorado,* 581 U.S. 128 (2017), until after the vacatur and re-prosecution-posture questions are resolved; and

9. Such other and further relief as this Court deems just.

**Paragraphs 1 through 6 require no factual finding on the merits of this § 2255 Motion; they require only this Court's determination that the Motion is not summarily defeated by the existing record. Petitioner's principal first-stage ask is that the Court not deny without counsel, discovery, and a hearing.**

## XIII. VERIFICATION

I, Seth Andrew, hereby declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that I have reviewed this Motion, that the factual averments are true and correct to the best of my knowledge, information, and belief, and that the legal arguments are made in good faith. I incorporate by reference all past Declarations of Seth Andrew in the District Court and Second Circuit court dockets.

Respectfully submitted,

_____

/S/ Seth Andrew, pro se
2020 Forest Hill Trace
Coralville, Iowa 52241
Telephone: 212-865-7617
Email: sethaarongrossandrew@gmail.com
Dated: May 14, 2026

### CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2026, I electronically served a true and correct copy of the foregoing Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 on the United States Attorney's Office, Southern District of New York, Attention: Chief, Criminal Division, 26 Federal Plaza, 37th Floor, New York, New York 10278, and by FedEx Priority mail.

_____

/S/ Seth Andrew, pro se
2020 Forest Hill Trace
Coralville, Iowa 52241
Telephone: 212-865-7617
Email: sethaarongrossandrew@gmail.com
Dated: May 14, 2026

# UNITED STATES v. SETH ANDREW

No. 1:22-Cr-32-1 (JPC) (S.D.N.Y. Cronan, J.)

Petitioner's § 2255 Filing Package • Filed Pro Se by Seth Andrew • Coralville, Iowa 52241 • May 14, 2026

## FILING INDEX & ROADMAP

## WHAT PETITIONER ASKS FOR (FIRST STAGE)

■ Refer § 455(a) Reassignment Motion to the Chief Judge
■ Appoint conflict-free counsel (Rule 8(c) / 18 U.S.C. § 3006A)
■ Authorize limited Rule 6 discovery (5 narrow categories — Motion § XI)
■ Expand the record under Rule 7 using Exhibits A–X
■ Hold an evidentiary hearing under § 2255(b) on the Hearing-Required-Facts disputes
■ Hold the United States' Rule 5 response in abeyance pending reassignment

### PETITIONER DOES NOT ASK FOR VACATUR ON THESE PAPERS ALONE.

## ROADMAP FOR THE COURT

**STEP 1 (priority).** Determine § 455(a) reassignment (Doc. 01) before any merits ruling.
**STEP 2.** Appointment of conflict-free counsel under Rule 8(c) / 18 U.S.C. § 3006A.
**STEP 3.** Limited Rule 6 discovery (5 narrow categories — Motion § XI).
**STEP 4.** Rule 7 record expansion using Exhibits A–X.
**STEP 5.** Evidentiary hearing under § 2255(b) on the disputed facts (Motion § II Table).
**STEP 6.** Vacatur on a developed record — not on these papers alone.

## CORE FILINGS

| # | Document | Pages |
|---|---|---|
| 01. | Motion for Reassignment Under 28 U.S.C. § 455(a) | 7 |
| 02. | Motion to Vacate Under 28 U.S.C. § 2255 | 24 |
| 03. | Memorandum of Law in Support | 14 |

## INDEX OF EXHIBITS (A–X)

| | | | | | | |
|---|---|---|---|---|---|---|
| **A.** | Comprehensive Case Timeline | 13 | **M.** | SDNY Press Releases (3) + 10-point factual response | 12 |
| **B.** | Draft Allocution.003 — Citation Reference | 1 | **N.** | KKL Brady Letter to AUSA Finkel (March 16, 2022) | 3 |
| **C.** | Contemporaneous Email Correspondence with Counsel | 2 | **O.** | Petitioner's March 20, 2025 Pro Se Letter (Doc. 57-2) | 7 |
| **D.** | PSR Objection Letters (v004, v007, v013) | 15 | **P.** | Petitioner's Sworn Declaration (28 U.S.C. § 1746) | 7 |
| **E.** | Plea Hearing Transcript — Excerpts (Doc. 32) | 1 | **Q.** | Reserved / Rule 6 Target — Bookkeeper/Accountant Records | 1 |
| **F.** | Presentment Transcript — Excerpts (Apr. 27, 2021) | 1 | **R.** | Dr. North Brady-Disclosed Statements — Both Finkel Letters | 4 |
| **G.** | Sentencing Hearing Transcript — Excerpts (Doc. 51) | 1 | **S.** | Wells Fargo Financial Records — Factual Dispute | 34 |
| **H.** | USAO Letter Correcting FBI Form 302 (July 20, 2022) | 3 | **T.** | SUNY Charter Schools Institute Records — Verbatim Excerpts | 3 |
| **I.** | Petition for Rehearing En Banc (Jan. 17, 2025) | 7 | **U.** | Wells Fargo Emails — Petitioner's Disclaimer of Ownership | 3 |
| **J.** | BOP-Monitored CorrLinks Correspondence — Excerpts | 3 | **V.** | Probation Form 35 + USAO Opposition + Cronan Order | 14 |
| **K.** | March 11, 2019 Email — Petitioner to DPPS Board | 1 | **W.** | Plea Agreement (Jan. 3, 2022) — with IAC Carve-Out | 7 |
| **L.** | KKL Retainer Agreement (May 1, 2021; $100,000 total) | 5 | **X.** | Reserved / Rule 6 Target — IRS Form 990 Records | 1 |

**TOTAL FILING:** 196 pages across 27 PDFs (+ this Index).

# EXHIBIT B

## Draft Allocution.003 — Citation Reference

December 28, 2021 (Redlined Draft Allocution Word Document)

This Exhibit B references the December 28, 2021 redlined draft allocution Word document — version 003 — in which Petitioner manually inserted the word "written" before "authorization from Democracy Prep," the limiting modifier that lead counsel Edward Y. Kim coached Petitioner away from at the January 14, 2022 plea colloquy.

The original Word document with tracked changes is no longer in Petitioner's accessible files. The substance of the document, the date of its creation, and Petitioner's contemporaneous insertion of the qualifying word "written" are attested to in Petitioner's sworn declaration (Ex. P).

The chain of allocution revisions and counsel's contemporaneous pressure to broaden the admission is documented in Ex. C (Contemporaneous Counsel Emails May 2021 – July 2022), in particular the January 5, 2022 Kim email re-sending "the version focused on DBF, which I think you felt more comfortable with."

### Materiality

**Material to:** § 2255 Motion Grounds One, Two, and Five; Memorandum §§ IV, V, VIII. Reserved for Rule 6 production from Krieger Lewin LLP.

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit B • Filed pro se pursuant to Rules Governing § 2255 Proceedings

# EXHIBIT C

## Contemporaneous Email Correspondence with Counsel

May 2021 – July 2022 • Krieger Kim & Lewin LLP

This Exhibit C is a chronological compilation of three contemporaneous email exchanges between Petitioner and his defense team at Krieger Kim & Lewin LLP ("KKL") — lead counsel Edward Y. Kim and co-counsel Timothy P. Doherty and Varun A. Gumaste — concerning Petitioner's repeated resistance to admissions of "authorization" beyond "written authorization." Authenticated by Petitioner's sworn declaration (Ex. P ¶ 28(b),(h)).

### Part 1 — May 28, 2021 Email (Andrew to Kim and Doherty)

Part 1 of this Exhibit C is the May 28, 2021 email from Petitioner to lead counsel Edward Y. Kim and co-counsel Timothy C. Doherty, Jr. It is the earliest documented anchor of Petitioner's contemporaneous resistance to the plea narrative — seven months before the January 14, 2022 plea hearing.

**May 28, 2021 (Petitioner to Kim and Doherty) — verbatim:**

*"The plea narrative isn't good for me. The disposition narrative is better. I can't / won't plea to something I didn't do. I had authority and I had other funds to put in for $1m AUM…"*

### Part 2 — January 5, 2022 Email (Kim to Andrew re Allocution Draft)

Part 2 is the January 5, 2022 email from Edward Y. Kim to Petitioner re-sending the draft allocution, dated approximately seven months before the January 14, 2022 plea hearing. The phrase "you felt more comfortable with" is counsel's own contemporaneous concession that Petitioner had been resisting alternative versions counsel had sought to advance.

**January 5, 2022 (Kim to Petitioner) — verbatim:**

*"I also wanted to resend the draft allocution. I've included below the version focused on DBF, which I think you felt more comfortable with."*

### Part 3 — July 13–14, 2022 "Qualifying Authorization" Email Chain

Part 3 reflects the substance of the July 13–14, 2022 email chain among Petitioner, Edward Y. Kim, Timothy P. Doherty, and Varun A. Gumaste regarding the "qualifying authorization" language ultimately removed from the defense sentencing memorandum (Doc. 42).

**1. Petitioner to KKL Team — July 13, 2022:**

*"I DID RECEIVE AUTHORIZATION FROM THREE DISTINCT PEOPLE." (Capitalization in original.)*

**2. Lead Counsel Edward Y. Kim to Petitioner — July 14, 2022:**

*"you're right that this team disagrees with qualifying 'authorization.' And I'm very confident that doing so will materially hurt us at sentencing."*

**3. Co-Counsel Timothy P. Doherty to Petitioner — July 14, 2022:**

*"I cannot emphasize how strongly I believe that qualifying the word 'authorization' is the wrong approach to the sentencing memorandum."*

**4. Petitioner's Capitulation — July 14, 2022, 12:48 a.m. EST:**

*"I don't want us to go around any more. Take the word out and let's get it submitted tomorrow."*

### Effect at Sentencing

As a direct consequence, the defense sentencing memorandum (Doc. 42) did not reflect Petitioner's contemporaneous, written, emphatic claim of authorization. At the July 28, 2022 sentencing hearing, lead counsel told this Court "None from the defense, your Honor" (Sentencing Tr. at 9; Ex. G), abandoning the factual disputes counsel had themselves identified in counsel's March 16, 2022 Brady letter to AUSA Finkel (Ex. N) and in the

PSR-objection drafts v004, v007, v013 (Ex. D).

## Authentication, Reservation, and Materiality

Petitioner authenticates the substance of these three exchanges by sworn declaration (Ex. P ¶ 28(b),(h)). Petitioner reserves the right (a) to supplement this Exhibit C with the underlying .eml files upon production from Krieger Lewin LLP or upon further retrieval from his own archives; (b) to call Edward Y. Kim, Timothy P. Doherty, and Varun A. Gumaste as fact witnesses at evidentiary hearing under § 2255(b); and (c) to introduce any responsive communications produced under Rule 6 discovery (Section XI of the Motion). **Material to:** Motion Grounds One, Two, Three, and Five; Memorandum §§ IV, V, VI, VIII.

***United States v. Andrew***, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT D

## PSR Objection Letters

Versions 004, 007, and 013 • March 2022 – July 2022

This Exhibit D comprises three Presentence Investigation Report (PSR) objection-letter drafts prepared by Petitioner's lead defense counsel Edward Y. Kim and co-counsel at Krieger Kim & Lewin LLP ("KKL"), dated March, June, and July 2022 (versions 004, 007, and 013).

The drafts identify specific factual objections to the PSR, including objections to (i) loss-amount calculations; (ii) the characterization of ownership and control; (iii) the personal-benefit narrative; and (iv) other factual matters bearing on sentencing.

## Use of This Exhibit

Counsel's preparation of these objections — followed by the subsequent statement "None from the defense, your Honor" at sentencing (Ex. G, p. 9) — **supports Petitioner's claim that counsel's sentencing performance and abandonment of factual objections cannot be resolved against him on the existing record**.

## Materiality

**Material to:** Motion Grounds One, Three, and Five; Memorandum §§ IV, V, VI. Supports first-stage Rule 6 discovery as to counsel's contemporaneous file.

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit D • Filed pro se pursuant to Rules Governing § 2255 Proceedings

# KRIEGER KIM & LEWIN LLP

500 Fifth Avenue
New York, NY 10110

Telephone: (212) 390-9550
www.KKLllp.com

April 15, 2022

<u>By E-Mail</u>

U.S. Probation Officer Michelle Millan
Southern District of New York
500 Pearl St.
New York, NY 10007

**Re:** *United States v. Seth Andrew,* 22 Crim. 32

Dear Officer Millan:

As you know, we represent Mr. Seth Andrew in the above-captioned case. As set forth below, we write to respectfully submit our comments to the first draft of the Presentence Investigation Report (PSR) filed on March 10, 2022.

- <u>Page 1</u>: Michael Yaeger no longer represents Mr. Andrew in this matter and should be removed from the list of counsel. Additionally, there are two typos in the name/address of Mr. Doherty and his law firm. First, "Timothy Doherty, II" should be revised to "Timothy C. Doherty, Jr." and second, "Litigation Goup" should be revised to "Litigation Group". Finally, sentencing has been adjourned to June 29, 2022.

- <u>Page 2</u>: Two court orders are missing from the description of Mr. Andrew's release status: (1) On July 8, 2021, Judge Cott granted Mr. Andrew permission to travel to Massachusetts, Connecticut, and New York for periodic day trips with prior approval from his Pretrial Services Officer, and (2) on August 26, 2021, Judge Fox granted Mr. Andrew permission to travel to Washington, D.C. and Massachusetts for periodic overnight trips with prior approval from his Pretrial Services Officer. [SETH TO CONFIRM PRETRIAL'S KNOWLEDGE OF HIS TIME SPENT IN NY AND RI]

- <u>Page 3</u>: Mr. Andrew is described as having 4 dependents. He actually has 3 dependents – his three children.

- <u>Paragraph 4</u>: Sentencing is scheduled for June 29, 2022.

- <u>Paragraph 5C</u>: There is a typo in the third line of the second paragraph – "heroin" should be revised to "herein".

- <u>Paragraph 9</u>: There is a typo in the fourth line – "back" should be revised to "bank". Additionally, Mr. Andrew did not spend any of the funds transferred from Democracy Prep Public Schools (DPPS) for personal gain. Instead, the funds were ultimately transferred to the account of another non-profit, Democracy Builders Fund (DBF), which had a mission dedicated to promoting civic engagement and educational initiatives and

was specifically focused on supporting DPPS alumni and others traditionally ignored in the education system.  Mr. Andrew had also been providing financial support to this organization with several hundreds of thousands of dollars in loans.

- *Paragraph 10: Mr. Andrew ultimately transferred the funds to DBF, but his actions were not intended to conceal the source of the transferred funds or disguise them as the property of DBF.*

- Paragraphs 11, 47 and 48: Contrary to the descriptions in paragraphs 11, 47 and 48, we have seen no evidence that Bank-2 determined that the DPPS funds entitled Mr. Andrew, or made him eligible, to obtain an interest rate deduction on his mortgage.  Moreover, there is evidence that suggests that Mr. Andrew subsequently transferred other funds that were independently sufficient to meet the asset threshold required for the interest rate deduction in question.

- Paragraph 21: As described in paragraph 115, Mr. Andrew is no longer associated with Democracy Builders Fund.  Accordingly, we propose revising paragraph 21 as follows: "As of the date of the complaint, Andrew was associated with Civic Network-1."

- Paragraph 33: There is a typo in the first line – "from in 2008" should be revised to "from in or about 2008".

- Paragraph 42: There is a typo in the first line – "Fraud CD matured earned" should be revised to "Fraud CD matured earning".  Additionally, given that Mr. Andrew is no longer associated with Democracy Builders Fund, we suggest describing his control of the operating account for DBF in the past tense (i.e., ". . . which ANDREW controlled at the time.").

- Paragraphs 53 and 139: On February 1, 2022, Mr. Andrew fulfilled his restitution obligation to DPPS.

- Paragraph 77: There is a typo in footnote 8 – "Venus, Florida" should be revised to "Venice, Florida".  There is also a typo in the tenth line – "Juno, Alaska" should be revised to "Juneau, Alaska".

- Paragraph 80: Mr. Andrew and Ms. Zak's marriage license was issued by the state of Massachusetts.  They separately had a public ceremony in Providence, Rhode Island.

- Paragraph 82: Ms. Zak does not work for ABC.  Accordingly, we propose striking "for ABC" from the seventh line.

- Paragraph 83: From March 2020 to June 2020, only one au pair resided with Mr. Andrew and Ms. Zak.  Additionally, Mr. Andrew resided in Barcelona, Spain for a five-month period in 2019, not 2020.

- Paragraph 92: We believe that Mr. Andrew's prescription for Escitalopram is for 20mg, not 5mg. [SETH TO CONFIRM]

- Paragraph 103: Mr. Andrew started consulting for Follow Your Dream in [XXXX]. Additionally, Mr. Andrew has not charged Follow Your Dream for his work to date. Accordingly, we propose striking the language regarding Mr. Andrew's compensation and including the following sentence: "Andrew and Follow Your Dream have discussed compensation for his services, but Andrew has not billed the organization to date."

- Paragraph 104: Mr. Andrew started consulting for Digital Divide Data in [XXXX].  To date, Mr. Andrew has worked pro bono for Digital Divide Data.  Accordingly, we propose revising the last sentence as follows: "Andrew has worked pro bono to date; however, he and DDD are in discussions regarding his compensation going forward and DDD is considering a payment structure that is contingent on business development generated by Andrew."

- Paragraph 105: Mr. Andrew started consulting for Décor in [XXXX].

- Paragraph 108: There is a typo in the third line – "He was a member of the board chair member" should be revised to "He was a member of the board".

- Paragraph 110: Mr. Andrew was not on paternity leave for the entirety of 2014 and 2015. He recalls being on paternity leave from mid-2014 to early-2015.

- Paragraph 114: Mr. Andrew did not earn a salary of $275,000 from 2013 to 2016. During his service at the Department of Education and the White House (i.e., 2013 to 2016), Mr. Andrew earned $250,000 that was paid by DPPS through an Intergovernmental Personnel Act Agreement.  [SETH TO CONFIRM]  Additionally, there is a typo in the seventh line ("greater than national average" should be revised to "greater than the national average") and the last sentence should be revised to reflect that Mr. Andrew stepped down from his role as Superintendent of DPPS in 2013, not 2017.

- Paragraph 115: There is a typo in the second line – "served as an executive director and chairman" should be revised to "served as its executive director and chairman".

- Paragraph 116: There is a typo in the second line – "Democracy Prep High Schools" should be revised to "Democracy Prep Public Schools".

- Paragraph 117: Mr. Andrew was employed as a teacher from 2000 to 2004, not 2000 to 2005.  Additionally, he did not teach in Boston, Massachusetts.  [SETH TO CONFIRM]

- Paragraph 118: We propose adding a footnote explaining that the amounts listed on Mr. Andrew's personal financial statement are approximate values.  Additionally, we propose adding a footnote for Mr. Andrew's Self-Directed IRA that states: "Per the defendant, his self-directed IRA with Entrust is a ~20% share of a real estate holding company called

Greenhouse Investors LLC, which owns rights to develop 455 W 152nd Street, New York, NY.  Andrew recently discovered that in July 2021, Entrust resigned as the retirement account holder and distributed this asset.  According to Entrust, no cash was distributed and the ownership of the asset changed from being held within Andrew's IRA to now being owned and held by him."  Finally, we also propose adding a footnote for Mr. Andrew's Rental Income that states: "Per the defendant, rental income is expected as of March."  This is the rental income referred to in the last sentence of paragraph 123, which we believe can be struck if the proposed footnote is added.

- <u>Paragraph 119</u>: Given that Mr. Andrew is only entitled to a portion of the proceeds of the listed trust, we suggest revising the first sentence as follows: "In regards to trust assets, the defendant reported that he holds an interest in an irrevocable trust (RKA Irrevocable Trust), valued at approximately $430,000".

- <u>Paragraphs 123 and 143</u>: On February 11, 2022, Mr. Andrew fulfilled his forfeiture obligation to the Government.

We thank you for your consideration of our comments and are available to address any questions you may have at your convenience.

Very truly yours,
KRIEGER KIM & LEWIN LLP

By: _____
Edward Y. Kim
Varun A. Gumaste

cc:     AUSA Ryan B. Finkel

500 Fifth Avenue
New York, NY 10110

Telephone: (212) 390-9550
www.KKLllp.com

May 9, 2022

By E-Mail

U.S. Probation Officer Michelle Millan
Southern District of New York
500 Pearl St.
New York, NY 10007

**Re:** *United States v. Seth Andrew,* 22 Crim. 32

Dear Officer Millan:

As you know, we represent Mr. Seth Andrew in the above-captioned case.  As set forth below, we write to respectfully submit our comments to the first draft of the Presentence Investigation Report (PSR) filed on March 10, 2022.

- Page 1: Michael Yaeger no longer represents Mr. Andrew in this matter and should be removed from the list of counsel.  Additionally, "Timothy Doherty, II" should be revised to "Timothy C. Doherty, Jr." and "Litigation Goup" should be revised to "Litigation Group".  Finally, sentencing has been adjourned to June 29, 2022.

- Page 2: Two court orders are missing from the description of Mr. Andrew's release status: (1) On July 8, 2021, Judge Cott granted Mr. Andrew permission to travel to Massachusetts, Connecticut, and New York for periodic day trips with prior approval from his Pretrial Services Officer, and (2) on August 26, 2021, Judge Fox granted Mr. Andrew permission to travel to Washington, D.C. and Massachusetts for periodic overnight trips with prior approval from his Pretrial Services Officer.

- Page 3: Mr. Andrew is described as having 4 dependents.  He has 3 dependents – his three children.  He is also now 44 years old.

- Paragraph 4: Sentencing is scheduled for June 29, 2022.

- Paragraph 5C: In the third line of the second paragraph, "heroin" should be revised to "herein".

- Paragraph 9: In the fourth line, "back" should be revised to "bank".  Additionally, Mr. Andrew did not spend any of the funds transferred from Democracy Prep Public Schools (DPPS) for personal gain.  Instead, the funds were ultimately transferred to the account of another non-profit, Democracy Builders Fund (DBF), which had a mission dedicated to promoting civic engagement and educational initiatives and was specifically focused on supporting DPPS alumni and others traditionally ignored in the education system.  Mr. Andrew had also been providing financial support to this organization, through several hundreds of thousands of dollars in loans and/or donations.

- <u>Paragraph 10</u>: Mr. Andrew's actions were never intended to conceal the source of the transferred funds or disguise them as the property of DBF.  To the contrary, there is evidence that Mr. Andrew designated these funds as "escrow" funds.

- <u>Paragraphs 11, 47, and 48</u>: Contrary to the descriptions in paragraphs 11, 47, and 48, we have seen no evidence that Bank-2 determined that the DPPS funds entitled Mr. Andrew, or made him eligible, to obtain an interest rate deduction on his mortgage.  Moreover, there is evidence that suggests that Mr. Andrew subsequently transferred other funds that were independently sufficient to meet the asset threshold required for the interest rate deduction in question, far before the closing on the relevant property.

- <u>Paragraph 13</u>: In the second to last line, "young adult's" should be revised to "young adults'".

- <u>Paragraph 17</u>: In the third line, "Office of Educational Technology" should be revised to "Office of Science and Technology Policy".

- <u>Paragraph 18</u>: Mr. Andrew's employment – but not his relationship – with DPPS ended in January 2017.  Accordingly, in the first line, we propose replacing "relationship" with "employment".

- <u>Paragraph 20</u>: For similar reasons, in line four, we propose replacing "no longer part of" with "no longer employed by".

- <u>Paragraph 21</u>: As described in paragraph 115, Mr. Andrew is no longer associated with Democracy Builders Fund.  Accordingly, we propose revising paragraph 21 as follows: "As of the date of the complaint, Andrew was associated with Civic Network-1."

- <u>Paragraph 33</u>: In the first line, "from in 2008" should be revised to "from in or about 2008".

- <u>Paragraph 42</u>: In the first line, "Fraud CD matured earned" should be revised to "Fraud CD matured earning".  Additionally, given that Mr. Andrew is no longer associated with Democracy Builders Fund, we suggest describing his control of the operating account for DBF in the past tense (i.e., ". . . which ANDREW controlled at the time.").

- <u>Paragraphs 53 and 139</u>: On February 1, 2022, Mr. Andrew fulfilled his restitution obligation.

- <u>Paragraph 77</u>: In the third line, "Susanna" should be revised to "Susannah", in footnote 8, "Venus, Florida" should be revised to "Venice, Florida", in the seventh line, "he cared and supported her" should be revised to "he helped care for and support her", and in the tenth line, "Juno, Alaska" should be revised to "Juneau, Alaska".

- <u>Paragraph 78</u>: In the eighth line, "having a narcissistic personality disorder who was not helpful" should be revised to "likely having a narcissistic personality disorder who was not emotionally helpful".

- <u>Paragraph 80</u>: Mr. Andrew and Ms. Zak's marriage license was issued by the state of Massachusetts.  They separately had a public ceremony in Providence, Rhode Island.  Additionally, the couple's son, Zak, is now four years old.

- <u>Paragraph 82</u>: In the fourth line, "three season rooms" should be revised to "a three-season room".  Additionally, Ms. Zak does not work for ABC.  Accordingly, we propose striking "for ABC" from the seventh line.

- <u>Paragraph 83</u>: From January 2020 to February 2020 and March 2020 to June 2020, one au pair resided with Mr. Andrew and Ms. Zak.  Additionally, Mr. Andrew resided primarily in Barcelona, Spain for a five-month period in 2019, not 2020.

- <u>Paragraph 92</u>: Mr. Andrew's prescription for Escitalopram is for 20mg, not 5mg.  Additionally, he has a 30mg prescription for Adderall XR, not Adderall.

- <u>Paragraph 96</u>: Mr. Andrew did not drink alcohol once or twice a week during college.  We propose revising the third sentence as follows: "He reportedly drank sparingly."

- <u>Paragraph 103</u>: Mr. Andrew started informally consulting for Follow Your Dream in November 2021, not July.  Additionally, Mr. Andrew has not charged Follow Your Dream for his work to date.  Accordingly, we propose striking the language regarding Mr. Andrew's compensation and including the following sentence: "Andrew and Follow Your Dream have discussed compensation for his services, but Andrew has not billed the organization to date."

- <u>Paragraph 104</u>: Mr. Andrew started consulting for Digital Divide Data in November 2021, not March.  To date, Mr. Andrew has worked pro bono for Digital Divide Data.  Accordingly, we propose revising the last sentence as follows: "Andrew has worked pro bono to date; however, he and DDD are in discussions regarding his compensation going forward and DDD is considering a payment structure that is contingent on business development generated by Andrew."

- <u>Paragraph 105</u>: Mr. Andrew started consulting with Décor in August 2021, not November.

- <u>Paragraph 108</u>: In the third line, "He was a member of the board chair member" should be revised to "He was a member of the board".

- <u>Paragraph 109</u>: In the first sentence, "Office of Educational Technology" should be revised to "Office of Science and Technology Policy".

- Paragraph 110: Mr. Andrew was not on paternity leave for the entirety of 2014 and 2015. He recalls being primarily on paternity leave from Summer 2014 to early-2015.

- Paragraph 114: Mr. Andrew did not earn a salary of $275,000 from 2013 to 2016. During his service at the Department of Education and the White House (i.e., 2013 to 2016), Mr. Andrew recalls earning approximately $250,000 that was paid by DPPS through an Intergovernmental Personnel Act Agreement. Additionally, in the seventh line, "greater than national average" should be revised to "greater than the national average", and the last sentence should be revised to reflect that Mr. Andrew stepped down from his role as Superintendent of DPPS in 2013, not 2017.

- Paragraph 115: In the second line, "served as an executive director and chairman" should be revised to "served as its executive director and chairman".

- Paragraph 116: In the second line, "Democracy Prep High Schools" should be revised to "Democracy Prep Public Schools".

- Paragraph 117: Mr. Andrew was employed as a teacher from 2000 to 2004. He was a part-time teacher and fellowship recipient from 2004 to 2005.

- Paragraph 118: We propose adding a footnote explaining that the amounts listed on Mr. Andrew's personal financial statement are approximate values. Additionally, we propose adding a footnote for Mr. Andrew's Self-Directed IRA that states: "Per the defendant, his self-directed IRA with Entrust is a ~20% share of a real estate holding company called Greenhouse Investors LLC, which owns rights to develop 455 W 152nd Street, New York, NY. Andrew recently discovered that in July 2021, Entrust resigned as the retirement account holder and distributed this asset. According to Entrust, no cash was distributed and the ownership of the asset changed from being held within Andrew's IRA to now being owned and held by him." Finally, we also propose adding a footnote for Mr. Andrew's Rental Income that states: "Per the defendant, rental income is expected as of March." This is the rental income referred to in the last sentence of paragraph 123, which we believe can be struck if the proposed footnote is added.

- Paragraph 119: Given that Mr. Andrew is only entitled to a portion of the proceeds of the listed trust, we suggest revising the first sentence as follows: "In regards to trust assets, the defendant reported that he holds an interest in an irrevocable trust (RKA Irrevocable Trust), valued at approximately $430,000".

- Paragraphs 123 and 143: On February 11, 2022, Mr. Andrew fulfilled his forfeiture obligation to the Government.

We thank you for your consideration of our comments and are available to address any questions you may have at your convenience.

Very truly yours,
KRIEGER KIM & LEWIN LLP

By: _____
Edward Y. Kim
Varun A. Gumaste

cc:     AUSA Ryan B. Finkel

June 8, 2022

By E-Mail

U.S. Probation Officer Michelle Millan
Southern District of New York
500 Pearl St.
New York, NY 10007

**Re:** *United States v. Seth Andrew,* 22 Crim. 32

Dear Officer Millan:

As you know, we represent Mr. Seth Andrew in the above-captioned case. As set forth below, we write to respectfully submit our comments to the first draft of the Presentence Investigation Report (PSR) filed on March 10, 2022.

- Page 1: Michael Yaeger no longer represents Mr. Andrew in this matter and should be removed from the list of counsel. Additionally, "Timothy Doherty, II" should be revised to "Timothy C. Doherty, Jr." and "Litigation Goup" should be revised to "Litigation Group". Finally, sentencing has been adjourned to June 29, 2022.

- Page 2: Two court orders are missing from the description of Mr. Andrew's release status: (1) On July 8, 2021, Judge Cott granted Mr. Andrew permission to travel to Massachusetts, Connecticut, and New York for periodic day trips with prior approval from his Pretrial Services Officer, and (2) on August 26, 2021, Judge Fox granted Mr. Andrew permission to travel to Washington, D.C. and Massachusetts for periodic overnight trips with prior approval from his Pretrial Services Officer.

- Page 3: Mr. Andrew is described as having 4 dependents. He has 3 dependents – his three children. He is also now 44 years old.

- Paragraph 4: Sentencing is scheduled for June 29, 2022.

- Paragraph 5C: In the third line of the second paragraph, "heroin" should be revised to "herein".

- Paragraph 9: In the fourth line, "back" should be revised to "bank". Additionally, Mr. Andrew did not spend any of the funds transferred from Democracy Prep Public Schools (DPPS) for personal gain. Instead, the funds were ultimately transferred to the account of another non-profit, Democracy Builders Fund (DBF), which had a mission dedicated to promoting civic engagement and educational initiatives and was specifically focused on supporting DPPS alumni and others traditionally ignored in the education system. Mr. Andrew had also been providing financial support to this organization, through several hundreds of thousands of dollars in loans and/or donations. The following sentence

should be added to the end of paragraph 9: "Mr. Andrew ultimately transferred the funds to an account belonging to a non-profit organization that ANDREW founded, referred to herein as 'Civic Network-1,' which had a relationship with School Network-1 and a complementary mission. Mr. Andrew had already been providing financial support to Civic Network-1 through hundreds of thousands of dollars in loans and/or donations. Mr. Andrew did not spend any of the transferred funds for personal gain."

- Paragraph 10: Mr. Andrew's actions were never intended to conceal the source of the transferred funds or disguise them as the property of DBF. To the contrary, there is evidence that Mr. Andrew designated these funds as "escrow" funds. Therefore, paragraph 10 should be deleted.

- Paragraphs 11, 47, and 51: Contrary to the descriptions in paragraphs 11, 47, and 51, we have seen no evidence that Bank-2 determined that the DPPS funds entitled Mr. Andrew, or made him eligible, to obtain an interest rate deduction on his mortgage. Moreover, there is evidence that Mr. Andrew subsequently transferred other funds that were independently sufficient to meet the asset threshold required for the interest rate deduction in question, far before the closing on the relevant property. The third sentence of paragraph 11 should be revised as follows: "ANDREW deposited the funds at the bank in connection with an effort to obtain an interest rate deduction on a mortgage he used to purchase an apartment in Manhattan, New York. The bank declined to count these funds towards the total assets required to obtain the interest rate deduction, and ANDREW transferred other funds in order to meet the relevant threshold." Paragraph 47 should be revised as follows: "By April 2019, ANDREW deposited a total of approximately $1,007,716 with Bank-2. ANDREW ultimately became eligible to receive a 0.5% interest rate deduction – the largest deduction a customer can receive from Bank-2's promotion – in connection with ANDREW's mortgage on Property-1." In footnote 6 of paragraph 51, "for which he was not eligible" should be deleted. Additionally, Mr. Andrew did not earn any interest from the CD referenced in footnote 6. Any interest earned benefited DBF. In footnote 6 of paragraph 51, "ANDREW" should be deleted as well.

- Paragraph 13: In the second to last line, "young adult's" should be revised to "young adults'".

- Paragraph 17: In the third line, "Office of Educational Technology" should be revised to "Office of Science and Technology Policy".

- Paragraph 18: Mr. Andrew's employment – but not his relationship – with DPPS ended in January 2017. Accordingly, in the first line, we propose replacing "relationship" with "employment".

- Paragraph 20: For similar reasons, in line four, we propose replacing "no longer part of" with "no longer employed by".

- Paragraph 21: As described in paragraph 115, Mr. Andrew is no longer associated with Democracy Builders Fund.  Accordingly, we propose revising paragraph 21 as follows: "As of the date of the complaint, Andrew was associated with Civic Network-1."

- Paragraph 33: In the first line, "from in 2008" should be revised to "from in or about 2008".

- Paragraph 42: In the first line, "Fraud CD matured earned" should be revised to "Fraud CD matured earning".  Additionally, given that Mr. Andrew is no longer associated with Democracy Builders Fund, we suggest describing his control of the operating account for DBF in the past tense (i.e., ". . . which ANDREW controlled at the time.").

- Paragraphs 53 and 139: On February 1, 2022, Mr. Andrew fulfilled his restitution obligation.

- Paragraph 77: In the third line, "Susanna" should be revised to "Susannah", in footnote 8, "Venus, Florida" should be revised to "Venice, Florida", in the seventh line, "he cared and supported her" should be revised to "he helped care for and support her", and in the tenth line, "Juno, Alaska" should be revised to "Juneau, Alaska".

- Paragraph 78: In the eighth line, "having a narcissistic personality disorder who was not helpful" should be revised to "likely having a narcissistic personality disorder who was not emotionally helpful".

- Paragraph 80: Mr. Andrew and Ms. Zak's marriage license was issued by the state of Massachusetts.  They separately had a public ceremony in Providence, Rhode Island.  Additionally, the couple's son, Zak, is now four years old.

- Paragraph 82: In the fourth line, "three season rooms" should be revised to "a three-season room".  Additionally, Ms. Zak does not work for ABC.  Accordingly, we propose striking "for ABC" from the seventh line.

- Paragraph 83: From January 2020 to February 2020 and March 2020 to June 2020, one au pair resided with Mr. Andrew and Ms. Zak.  Additionally, Mr. Andrew resided primarily in Barcelona, Spain for a five-month period in 2019, not 2020.

- Paragraph 92: Mr. Andrew's prescription for Escitalopram is for 20mg, not 5mg.  Additionally, he has a 30mg prescription for Adderall XR, not Adderall.

- Paragraph 96: Mr. Andrew did not drink alcohol once or twice a week during college.  We propose revising the third sentence as follows: "He reportedly drank sparingly."

- Paragraph 103: Mr. Andrew started informally consulting for Follow Your Dream in November 2021, not July.  Additionally, Mr. Andrew has not charged Follow Your Dream for his work to date.  Accordingly, we propose striking the language regarding

Mr. Andrew's compensation and including the following sentence: "Andrew and Follow Your Dream have discussed compensation for his services, but Andrew has not billed the organization to date."

- Paragraph 104: Mr. Andrew started consulting for Digital Divide Data in November 2021, not March. To date, Mr. Andrew has worked pro bono for Digital Divide Data. Accordingly, we propose revising the last sentence as follows: "Andrew has worked pro bono to date; however, he and DDD are in discussions regarding his compensation going forward and DDD is considering a payment structure that is contingent on business development generated by Andrew."

- Paragraph 105: Mr. Andrew started consulting with Décor in August 2021, not November.

- Paragraph 108: In the third line, "He was a member of the board chair member" should be revised to "He was a member of the board".

- Paragraph 109: In the first sentence, "Office of Educational Technology" should be revised to "Office of Science and Technology Policy".

- Paragraph 110: Mr. Andrew was not on paternity leave for the entirety of 2014 and 2015. He recalls being primarily on paternity leave from Summer 2014 to early-2015.

- Paragraph 114: Mr. Andrew did not earn a salary of $275,000 from 2013 to 2016. During his service at the Department of Education and the White House (i.e., 2013 to 2016), Mr. Andrew recalls earning approximately $250,000 that was paid by DPPS through an Intergovernmental Personnel Act Agreement. Additionally, in the seventh line, "greater than national average" should be revised to "greater than the national average", and the last sentence should be revised to reflect that Mr. Andrew stepped down from his role as Superintendent of DPPS in 2013, not 2017.

- Paragraph 115: In the second line, "served as an executive director and chairman" should be revised to "served as its executive director and chairman".

- Paragraph 116: In the second line, "Democracy Prep High Schools" should be revised to "Democracy Prep Public Schools".

- Paragraph 117: Mr. Andrew was employed as a teacher from 2000 to 2004. He was a part-time teacher and fellowship recipient from 2004 to 2005.

- Paragraph 118: There have been a few material changes in Mr. Andrew's assets and liabilities since he filed his financial statements with Probation. Mr. Andrew's Personal Checking Account at USAA that he holds jointly with his wife has a current balance of approximately $29,000, not $100,000. Their joint USAA Visa credit card has a current balance of approximately $4,000 (not $8) and his wife's AMEX credit card has a current

balance of approximately $20,000 (not $16,000).  We also propose adding a footnote explaining that the amounts listed on Mr. Andrew's personal financial statement are approximate values.  Additionally, we propose adding a footnote for Mr. Andrew's Self-Directed IRA that states: "Per the defendant, his self-directed IRA with Entrust is a ~20% share of a real estate holding company called Greenhouse Investors LLC, which owns rights to develop 455 W 152nd Street, New York, NY.  Andrew recently discovered that in July 2021, Entrust resigned as the retirement account holder and distributed this asset.  According to Entrust, no cash was distributed and the ownership of the asset changed from being held within Andrew's IRA to now being owned and held by him."  Finally, though Mr. Andrew expected to receive monthly rental income beginning in March, that has not occurred.  Therefore, the Rental Income line item should be removed from his Monthly Income and the last sentence of paragraph 123 should be deleted.

- <u>Paragraph 119</u>: Given that Mr. Andrew is only entitled to a portion of the proceeds of the listed trust, we suggest revising the first sentence as follows: "In regards to trust assets, the defendant reported that he holds an interest in an irrevocable trust (RKA Irrevocable Trust), valued at approximately $430,000".

- <u>Paragraphs 123 and 143</u>: On February 11, 2022, Mr. Andrew fulfilled his forfeiture obligation to the Government.  Additionally, Mr. Andrew expects to have significant future expenses associated with necessary repairs to his apartment.  We propose adding the following sentences to paragraph 123: "Andrew also expects to have future expenses to address needed repairs to his apartment.  Though subject to change, those repairs have been assessed at a cost of approximately $54,000."

We thank you for your consideration of our comments and are available to address any questions you may have at your convenience.

Very truly yours,
KRIEGER KIM & LEWIN LLP

By: _____
Edward Y. Kim
Varun A. Gumaste

cc:     AUSA Ryan B. Finkel

**United States v. Andrew**, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT E

## Plea Hearing Transcript — Excerpts

Pages 3–4 and 34–36 • January 14, 2022 • Doc. 32 (filed Feb. 17, 2022)

This Exhibit E reproduces, as verbatim excerpts, the operative passages of the January 14, 2022 plea hearing transcript before the Honorable John P. Cronan, filed at Doc. 32 on February 17, 2022. The full transcript is available on the public docket; this Exhibit excerpts only the four passages on which the § 2255 Motion and the § 455 Reassignment Motion turn.

**Pages 3–4** record Judge Cronan's on-the-record disclosure of his close personal friendship with lead defense counsel Edward Y. Kim — the foundation of the § 455 Reassignment Motion. **Pages 34–36** capture Petitioner's mid-allocution attempt to limit his admission to "written authorization" only, lead counsel's mid-colloquy intervention, and the post-pause clean-up response.

## Key Excerpts

### Plea Tr. (Doc. 32) at 3 (Cronan, J., disclosure of friendship with Edward Y. Kim):

*"I did overlap with Mr. Kim for much, if not most, of my time at the U.S. Attorney's Office… We worked closely together on a large number of cases, including one trial, and we were in the same unit in the office for a period of time. We remained friends since he left the office."*

### Plea Tr. (Doc. 32) at 34 (Petitioner's allocution):

*"I think — I knew I did not have WRITTEN authorization from DPPS."*

### Plea Tr. (Doc. 32) at 35 (mid-colloquy intervention):

*Petitioner: "At the time, I did not dwell on those details, your Honor." Lead counsel: "Your Honor, may we have one moment?" — followed by a private pause.*

### Plea Tr. (Doc. 32) at 36 (post-pause clean-up):

*Petitioner: "Correct, your Honor."*

## Source and Materiality

Plea Hr'g Tr., *United States v. Andrew*, No. 1:22-cr-00032 (JPC), Doc. 32 (S.D.N.Y. Feb. 17, 2022) (Reporter: Andrew Walker). Full transcript at https://www.courtlistener.com/docket/62601943/united-states-v-andrew/

**Material to:** § 2255 Motion Grounds One (Conflict) and Two (Invalid Plea); § 455 Reassignment Motion; Memorandum §§ IV, V.

**United States v. Andrew**, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT F

## Presentment Transcript — Excerpts

April 27, 2021 • Magistrate Judge Gabriel W. Gorenstein • S.D.N.Y. Mag. Dkt. 1:21-mj-04262

This Exhibit F reproduces verbatim the operative excerpts of Petitioner's April 27, 2021 initial presentment before Magistrate Judge Gabriel W. Gorenstein on the sealed complaint (wire fraud, money laundering, false statements to a bank). Initial defense counsel: Michael L. Yaeger (Carlton Fields, former EDNY AUSA; later argued and won *Percoco v. United States*, 598 U.S. 319 (2023)).

These excerpts **support** Petitioner's Brady / Ineffective-Assistance-of-Counsel claims and the Rule 5(f) / DPPA point, pleaded as part of the Brady/IAC prejudice analysis rather than as a standalone dispositive ground.

## Key Excerpts

**Presentment Tr. at 3:23–25 (the only "Rule 5F" reference in the entire transcript — video-consent subsection, NOT Brady):**

*"…we are proceeding pursuant to Rule 5F of the Federal Rules of Criminal Procedure…"* (context: consent to remote video appearance).

**Presentment Tr. at 6:3–7 (Yaeger, only stated review of the complaint before declining adjournment):**

*"Briefly over the phone."*

**Presentment Tr. at 10:6–13 (Yaeger's only substantive intervention):**

*Logistical clarification about transit "points in between" the travel restriction.*

**Presentment Tr. at 12:1–9 (bail conditions imposed on non-defendant spouse):**

*Petitioner's spouse required to surrender her passport and make no new passport applications.*

**Petitioner's entire on-record participation (Tr. 3:17 and 4:10):**

*Two words — "Yes" and "Yes" — no allocution, no Brady waiver, no discovery question.*

## Source and Materiality

Presentment Hr'g Tr., *United States v. Andrew*, ECF No. 9, S.D.N.Y. Mag. Dkt. 1:21-mj-04262 (Gorenstein, M.J.) (filed June 7, 2021) (Reporter: Carole Ludwig). Disposition sheet ECF No. 4. Full transcript at https://www.courtlistener.com/docket/62601943/united-states-v-andrew/

**Material to:** Motion Grounds Three (Brady/IAC) and Five (Failure to Investigate); Memorandum §§ V, VI. Offered as supporting record evidence.

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit F • Filed pro se pursuant to Rules Governing § 2255 Proceedings

***United States v. Andrew***, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT H

## USAO Letter Correcting FBI Special Agent Melody Shen Form 302

July 20, 2022 • From AUSA Ryan B. Finkel to KKL

This Exhibit H is the United States Attorney's Office letter dated July 20, 2022, correcting the FBI Form 302 memorandum of interview of the Wells Fargo banker.

### Use of This Exhibit

The corrected record **supports a factual dispute over** whether Petitioner clearly communicated his unrevoked escrow-agent, signatory, and fiduciary status to Wells Fargo. The correction itself, and the timing of its disclosure, also support Petitioner's *Brady*-related claims.

### Materiality

**Material to:** Motion Grounds Three (*Brady* / IAC), Four (Factual Innocence), and Five (Failure to Investigate); Memorandum §§ V, VI, VIII. Authenticated by Petitioner under penalty of perjury in Ex. P.

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit H • Filed pro se pursuant to Rules Governing § 2255 Proceedings



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 20, 2022

**By Email**
Edward Young Kyu Kim, Esq.
Krieger Kim & Lewin LLP
500 Fifth Avenue, 34th Floor
New York, NY 10110
212-390-9550
edward.kim@kklllp.com

    **Re:** ***United States v. Seth Andrew*, 22 Cr. 32 (JPC)**

Dear Mr. Kim:

    As discussed, during our call on July 20, 2022, and in an abundance of caution, the Government writes to disclose the following:

    On or about April 14, 2021, the FBI and the Government interviewed the Wells Fargo Bank employee ("Employee-1") who opened "Fraud Account-1" for the defendant as that term is defined in the Complaint. During the interview, a FBI Special Agent took notes and then, days later, prepared a formal 302 memo of the interview.

    During the interview, Employee-1 explained, in substance and in part, that Andrew wanted his accounts at Wells Fargo to qualify for a particular promotional interest rate. This promotional interest rate was the money Wells Fargo paid to an account holder in exchange for the account holder depositing money at the bank. This promotional interest rate is separate from the mortgage interest rate deduction a Wells Fargo account holder would receive provided they maintained $1,000,000 in assets at Wells Fargo.

    The 302 memo for Employee-1 prepared by the FBI Agent states, with respect to Fraud Account-1, "[a]t the initial time of account opening, WFB did not give ANDREW the bonus. This account opening had nothing to do with mortgage discount. [Employee-1] clarified WFB was giving the promotional bonus interest rate to walk-in customers, not internal referrals." The FBI Agent's recollection is that the statement "[t]his account opening had nothing to do with mortgage discount" was an error. Rather it should have stated "the checking/savings interest rate promotion bonus at the time had nothing to do with the mortgage interest discount program." To be sure, an account opening by itself would not trigger the mortgage interest discount program; rather, what mattered was whether the assets a customer maintained crossed certain thresholds.

    Indeed, the underlying notes, which were created contemporaneous with Employee-1's interview corroborate the agent's understanding. The relevant portion of those notes states:

2021.09.20

"Checking/savings Bonus available: no. How's this related to SA's demand? (at the initial time of opening, WF didn't give him the bonus. Had nothing to do with mortgage discount. This was for someone who comes in and to give promo rate the bank was promoting.)" That is, the bonus which "WF didn't give" was the promotional interest rate on certain accounts and that promotion "[h]ad nothing to do with mortgage discount."

In a separate interview, Andrew's mortgage Banker ("Employee-2") confirmed that Andrew received the full .5% mortgage discount because he held assets in Wells Fargo of at least $1,000,000. Employee-2 did not, as it was not his responsibility, assess whether a client's assets qualified a client for the .5% interest rate discount. Instead, the mortgage banker would fill out a verification form and send it to the verification team, who would confirm whether the client had $1,000,000 or more in assets to take advantage of the promotion.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By: /s/ _____
Ryan B. Finkel
Assistant United States Attorney
(212) 637-6612

2021.09.20

*United States v. Andrew*, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT I

## Petition for Rehearing En Banc

January 17, 2025 • Second Circuit No. 22-1749 (Doc. 167)

This Exhibit I is Petitioner's January 17, 2025 sworn pro se affidavit / motion in support of rehearing en banc and/or T-1080 review filed with the United States Court of Appeals for the Second Circuit in *United States v. Andrew*, No. 22-1749.

### Use of This Exhibit

This filing preserves Petitioner's conflict-of-interest claim on the appellate record and expressly states Petitioner's then-intent to pursue post-conviction relief under § 2255. It is offered as contemporaneous documentary evidence of (i) Petitioner's diligence under *Holland v. Florida*, 560 U.S. 631 (2010); and (ii) preservation of the conflict-of-counsel and right-to-control claims now pleaded in this Motion.

### Materiality

**Material to:** Motion § III (Timeliness/Diligence); Memorandum § II.B(3) (*Holland* diligence); Ex. P ¶ 8 (sworn diligence record).

# 22-1749

AFFIDAVIT

# United States Court of Appeals

**FOR THE SECOND CIRCUIT UNITED STATES OF AMERICA,**

—v.—

*Appellee,*

**SETH ANDREW, also known as Sealed Defendant 1,**

*Defendant-Appellant.*

**ON APPEAL FROM THE U.S.DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NY**

**New York County in New York State**

**REGARDING T-1080 MOTION FOR REHEARING EN BANC:**

**January 17, 2025 Affidavit–The undersigned, Seth Andrew, hereby deposes and says:**

1. **I have personal knowledge of, and documents supporting, the facts herein.** If called as a witness, I will testify completely thereto, as to the best of my knowledge and belief, the information below is true, correct, and complete.

2. **Until yesterday, January 16th, 2025 when we sold our apartment, I was unable to afford counsel due to debt and illiquidity.** I spent two years unsuccessfully seeking pro-bono counsel and I was repeatedly denied *in forma pauperis* status. I now intend to retain paid counsel to help with future motions including a 2255. However, I ask that you treat this petition with the appropriate deference granted to a pro-se appellant, as I have drafted this without assistance of counsel.

3. **The Panel's decision conflicts with numerous decisions of the Second Circuit, The US Supreme Court, and additional pending decisions that require full review to maintain Circuit uniformity of the court's decisions including but not limited to:** *Ciminelli v. U.S., Kelly v. U.S., Percoco v. U.S., Kousisis v. U.S., Thompson v. U.S,* **and** *Citizens United v. FEC,*

4. **The Panel's decision is predicated on demonstrable _plain error_ found in the transcript at Oral Argument and _multiple fundamental procedural errors_ that amount to matters of exceptional constitutional importance stated below.**

5. **The Second Circuit should review the Panel's decision largely because of its own footnote #2 "_For purposes of our review, we assume without deciding that Andrew's guilty plea does not bar his challenge._"** Thus my procedural challenges below should be fully considered.

6. **The fundamental question that needs to be decided by the full Second Circuit: _If a defendant pleads guilty to something that the Supreme Court later determines is not a crime, what are the legal obligations due to that defendant?_** As I was considering my legal options prior to my plea, I discussed with my Counsel, now US Attorney, Ed Kim, the fact that I never intentionally committed any crime by moving the funds to a new bank. At that time the discussion was that ignorance of a crime does not excuse it. I was made to believe that I had unintentionally committed a crime by not fully notifying the entire management organization's board, DPPS, of the banking information of the escrow funds from the dissolved entities. It was to that now-discredited _right to control theory_ that I plead guilty. The Second Circuit should address this fundamental question of new law.

7. **The first pain error cited by the Panel decision is the statement at Oral Argument that funds were "stolen" from "charter schools," without any supporting evidence in the transcript.** Mr. Finkle erred in the Complaint, then intentionally confused the Trial Court, obfuscated in his briefs, omitted in the Information, and outright perjured himself at Oral Argument in front of the panel, by knowingly and intentionally changing the entity he cites as the purported "victim." At Oral argument he seemed to settle on the network Democracy Prep Public Schools (DPPS), IRS Employment Identification Number (EIN) EIN 20-2629354. However, The Panel makes a plain error by referring to "money belonging to charter schools" while Mr. Finkle knows he has identified DPPS, which is not, and has never been a school, it is, as his briefs show, an independent non-profit organization.

8. **The second plain error cited by the Panel is falsely citing an "admission" to stealing "money" from "charter schools."** In fact, my attorney, now Acting US Attorney Ed Kim and I explicitly crafted an allocution using the, then valid in this circuit, _Right to Control Theory_ of property fraud. In 2021, before **_Ciminelli_**, we decided it would allow me to accept a plea and honestly testify about the possibility of withholding some **_information_** from the management organization, DPPS. We chose the theory specifically because I never "stole" money or property. My allocution makes this distinction explicit. It indicates that I transferred escrow funds for dissolution accounts to a new bank, but I never stole any money. These funds were always accounted for and disclosed, audited by the exact same auditor and accountant that DPPS used. In fact, on the day of my arrest, the funds remained in escrow, with interest. The

management organization, DPPS, could only honestly claim they lacked the right to control all information about which bank held those funds.  Thus, *Ciminelli*, was the primary question of constitutional law that could have applied, and the Panel misinterpreted the Supreme Court's unanimous decision and its clear intent to limit and narrow the wire fraud statute.

9. **The third plain error cited by the Panel is their reliance on <u>U.S. v. Kousisis,</u> upon which they also erred in denying my motion to hold their decision in abeyance.** This gross error demands rehearing en banc, especially after oral arguments at the Supreme Court in Kousisis laid bare the danger of the Government's logic in prosecutions like mine.  In fact, my case is perhaps even more dangerous than the hypothetical "babysitter" prosecuted for Federal Wire Fraud for using earnings for different purposes than theorized in *Kousisis*. I was *actually* prosecuted and convicted for preserving the escrow funds for the explicit purposes of the low-income students of the schools I founded as stated in the bylaws. This overzealous and dangerous "find me the man and I'll find you the crime" prosecution was conducted even though it was undisputed in the record  that I was always the designated and authorized bank signer and fiduciary agent for the dissolution funds.

10. **The fourth plain error cited by the Panel requiring rehearing en banc is that they dismissed without consideration my *Brady* challenges, never addressing that my plea waiver was not, and could not have been, *knowing, voluntary, and intelligent* because it was signed before over 1,000 pages of *Brady* material were released, and before *Ciminelli* was unanimously decided by the US Supreme Court.** The Second Circuit should not deign to uphold this Panel's cursory and uncritical analysis of blanket and deeply coerced plea waivers like mine. Mr. Finkle had in his possession material he knew to be, pursuant to *Brady*, potentially exculpatory, but he withheld it from me, from my counsel Mr. Kim, and even a Grand Jury. He waited until after my *right to control* plea was crafted and submitted, after I ran out of funds for continued legal counsel, and after the professional damage from the press releases had been done to share the Brady materials. These are essential matters of constitutional fairness worthy of full Circuit review.

11. **The fifth plain error made by the Panel is that they refused to review my reply brief addressing matters of substantive error found in the trial record and incorrectly cited at Oral Argument**.  While seemingly pedantic, the legal question of which entities Mr. Finkle, Judge Cronan, and I were referring to at my plea hearing, my sentencing, and again at Oral Argument are fundamental questions of law that should be reviewed by the full Circuit because the Panel's decision did not address the question adequately or correctly of what was meant by "Democracy Prep." Judge Cronan seems to be referring to the management organization, DPPS (EIN 20-2629354) while Mr. Finkle seems to be referring to one of the schools, DPNY (EIN 06-1581474), but the transferred funds belonged to the dissolved entities DPH, DPE and DPC (EINs 45-3947399, 30-0624890, & 20-3683193). Here's why this is fundamentally important:

Imagine a legal world in which an AUSA identifies "J. Smith" as the victim of a crime, but never has to specifically identify which J. Smith he is referencing. Worse yet, when questioned by the defense, imagine if the prosecutor then repeatedly <u>changes</u> which J. Smith he is referring to in order to further the objectives of his prosecution.

12. **In *Citizens United v. FEC*, The Supreme Court upheld the notion of corporate personhood– *US v. Andrew* is a case of "mistaken identity."** This is an essential question of law for the full Second Circuit to address. *Should a dissolved entity (DPH, DPE, DPC) be granted standing as a corporate victim?* What are the implications for purposes of the Victim Notification Act or for my constitutional right to confront my accuser? This was the question I asked Mr. Finkle again at Oral Argument and that neither the Panel nor the Government has ever addressed.

13. **It is of exceptional 10th amendment importance that the full circuit review the Panel's decision because without a viable corporate entity as a purported victim, there couldn't be a federal crime, especially post *Ciminelli.*** Perhaps, the management entity DPPS could have filed an action in Civil Court, or the NY State regulator could have filed an action regarding the intended use of dissolved escrow funds, however without corporate standing, <u>there is no federal jurisdiction for a wire fraud crime</u>.

14. **The Circuit should review the Panel's decision as a matter of exceptional constitutional fairness, because at its essence, *the offense to which I plead guilty charged no crime.*** My sworn allocution was carefully drafted to be true, and remains so. However, it did not meet the elements of the wire-fraud statute at the time, and especially post ***Ciminelli,*** it does not meet those elements today, even if it is framed as a "guilty" plea. Because the US Supreme Court had not yet ruled unanimously on the illegality of the *Right to Control* theory, I was advised by counsel to craft language that was true, but in retrospect, not criminal. Hypothetically, if an electrician pleads guilty to a federal wire fraud charge for improperly "wiring" a socket, the Circuit should not uphold a Panel's decision supporting that plea, nor that plea waiver, because it simply does  not meet the elements of the offense.

15. **The US Supreme Court continues, at almost every opportunity, to narrow property fraud statutes, The Second Circuit should too.** My case is exceptional, because while money was transferred, all parties agree that it was a zero-dollar action. At no time was property personally used or misappropriated, nor was property the intent of any "scheme to defraud." Even my family's purchase of an apartment, falsely implicated in the initial complaint, as of yesterday, has now been sold and the mortgage cleared.  *Brady* material as well as both the plea and sentencing transcripts document these facts that the Panel ignores, however both the AUSA and Judge Cronan agreed, the case was "political" in nature, not financial.  This was, even at the time, not a traditional property crime. Escrow funds were transferred into a new non-profit

interest-bearing account only after the three former entities were dissolved. I believed then, and still believe today, that I had the full *"right to control"* the funds and the fiduciary duty to do so as the only designated escrow agent. It is true that I was a whistleblower. I admitted in court and in numerous emails that there were matters of political disagreement about controlling information between the parties–my intent and mens rea was always to benefit the alumni of the schools I founded, as a pro se appellant, I can uniquely swear to that again here.

16. **Even if the Circuit believes the Panel's decision was correct, Oral arguments this week in** *Thompson v. US***, laid bare the difficult question of the distinction between statements that are fraudulent or "false" under the statute or simply "misleading."** Thus, the Circuit needs to review the Panel's decision to determine whether the plea and allocution to which they refer could even meet the elements of the crime post *Ciminelli.* Thompson raises the question of whether The Circuit should remand my case to the Southern District to help clarify whether my statements were in fact "false" or simply "misleading," which might not be criminal either.

17. <u>**The Entire Circuit should review the Panel's decision to preserve both the reality and**</u> <u>***the perception***</u> <u>**of fairness and integrity of the Second Circuit and the reputation of our constitutional system. It is certainly unique, and potentially unprecedented, that I was so recently represented for 16 months by the now Acting United States Attorney for the Southern District of New York, Ed Kim.**</u> This means that dozens, if not hundreds, of current FBI agents, AUSAs, cooperating Attorneys, Judges, Magistrates, US Supervision Officials, US Probation Officials, Bureau of Prison Officials, SDNY Clerks Office Officials, Second Circuit Clerks Office Officials, and many others *currently report to, or work closely with, my former personal lawyer*–including but not limited to: AUSA Ryan Finkel, Won S. Shin, Danielle Renee Sassoon, Nathan Rehn, US Attorney Damian Williams, and Agent Melody Shen. In addition, to help prevent and ensure even the appearance of impropriety or conflict with Mr. Kim when he represented me in front of judges including Judge John Cronan, Judge James Cott, Judge Gabriel Gorenstein, Judge Robert Lehrburger, Judge Debra Freeman, Judge Sarah Netburn, Judge Kevin Fox, and Judge Barbara Moses, the the full Second Circuit of Judges should convene to demonstrate its judicial independence from the Acting US Attorney.

18. **Finally, the Second Circuit should review the Panel's decision for fairness and the perception of bias not only on the part of the Panel's judges, but also on the part of AUSA Finkle, who was both my prosecutor arguing across from Mr. Kim, and reporting up the SDNY chain of command into Mr. Kim during my appeal,** *including this very motion***.** Before my plea hearing, when Mr. Kim still served as my counsel, he made a point of meeting with dozens of his former, now once again current, colleagues within the SDNY on my behalf who are now still responsible for this appeal, and who he now again supervises. I'm aware that he met with at least a dozen lawyers in the Complex Fraud division, the Criminal Division, and the Deputy US Attorney's office itself. To be clear, I do not have any evidence or even

suspicion of wrongdoing. However, after I terminated Mr. Kim as my attorney, it is simply impossible as the defendant and now appellant to imagine that those who now work directly for him are not influenced by the knowledge of our former relationship, be that positive or negative.

**As such, I believe that clearly and obviously current law shows my substantial rights have been affected and that the fairness of both the district and Panel's proceedings were seriously affected. The integrity and reputation of the judicial processes should be reviewed for both plain and procedural error.**

Executed this 17th, day of January, 2025

/S/Seth Andrew,
Pro se

**United States v. Andrew**, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT J

## BOP-Monitored CorrLinks Correspondence — Excerpts

September 22, 2022 – December 8, 2022 • FCI Otisville

This Exhibit J compiles selected verbatim excerpts from Petitioner's contemporaneous Bureau-of-Prisons-monitored CorrLinks email correspondence during his custodial sentence at FCI Otisville (September 22 – December 8, 2022).

All emails were read by the Bureau of Prisons and were subject to prosecution review at the time of writing. That contemporaneous, prosecution-supervised character makes the correspondence probative of Petitioner's then-existing state of mind during the post-plea and pre-appeal period.

### Use of This Exhibit

These excerpts are offered as **diligence and state-of-mind evidence** — corroborating Petitioner's contemporaneous awareness of, and intent to preserve, the constitutional and post-conviction claims later pleaded in this § 2255 Motion, including conflict-of-counsel, Brady, and right-to-control issues. **Petitioner does not ask the Court to draw inferences of political prosecution or institutional animus from these excerpts.** The quoted language reflects Petitioner's then-existing state of mind during incarceration; it is not adopted here as a legal characterization for purposes of this Motion.

**The full CorrLinks source corpus (the "S.A.G.A. of Otisville" document, approximately 326 pages) is available for Rule 6 production or for in camera review if requested by the Court.** This Exhibit excerpts only the most probative passages, organized under three themes that bear on diligence and state of mind.

### Materiality

Material to Motion § III (Timeliness/Diligence) and Memorandum § II.B(3) (*Holland* diligence); Ex. P ¶¶ 2, 25–27 (sworn diligence record); Ground Four (Factual Innocence, as pleaded through plea-validity and prejudice).

### THEME 1 — DILIGENCE / STATE OF MIND ON FACTUAL DEFENSES

**September 25, 2022 (subject: "contacts I'm thinking about adding"):**

*"based on Kelly & Percocco appeals I mentioned, mine would have just as good a chance if not better of going to SCOTUS."*

**October 4, 2022 (Otisville advisors letter):**

*"My specific thoughts I can send later, but the FBI agent field notes, the funds available at Wells, the status of the corps as dissolved, the bob north letter, and the fact that the funds would have been lost if not for the transfers are all things that the Judge never saw or reviewed."*

**November 28, 2022 (subject: "IMPORTANT: SCOTUS ARGUMENTS TODAY"):**

*"I assert today that I, and sadly because of their incompetence, only I, had the 'right to control' the funds of the dissolved school escrow accounts, not DPPS, the management organization, even without 'written authorization.'"*

**November 28, 2022 (continuation):**

*"In my case, the actions were motivated out of explicitly positive intent to help the students and alumni of the organizations I founded, not myself… I was a whistleblower, attempting to help the board make better decisions for its use of funds that I had personally raised — not a political actor lining my own pockets."*

**October 11, 2022:**

*"I do think that I have a shot, not only at a reduced sentence, but on a returned 'forfeiture' and 'restitution' both of which were based on deeply flawed premises."*

## THEME 2 — FIRST-TIME LEARNING OF CIMINELLI / RIGHT-TO-CONTROL DOCTRINE WHILE INCARCERATED

**October 4, 2022 (Otisville advisors letter — first contemporaneous reference to right-to-control after incarceration began):**

*"because they are taking up the Percoco case in December, and I predict a 9-0 decision in favor of my position, I think I might have a good shot to get them to hear it and continue to hack away at the awful 'Elastic' doctrine the AUSA and 2nd circuit use for 'right to control' cases of quasi and non governmental officials…"*

**November 10, 2022 (appeal-extension request, framing the doctrinal trajectory):**

*"I want to outline for the judge the 'actual innocence' elements, the SCOTUS precedents including a new SCOTUS decision expected this December on 'Right-to-control' funds (especially public funds by non-public officials)…"*

**November 12, 2022 (Draft Letter Requesting Appeals Extension):**

*"I am awaiting a decision in the case of The United States vs. Percoco et al. that was granted Certiorari by the United States Supreme Court this term and which has already heard oral arguments… specifically with regards to the elastic interpretation of the 'right-to-control' funds and 'honest services fraud' when using public funds — two legal concepts which were central to the complaint in my case, my decision to plea, and my sentencing."*

**November 28, 2022 (subject: "IMPORTANT: SCOTUS ARGUMENTS TODAY — please help!"):**

*"The first is Louis Ciminnelli, who was convicted of 'wire-fraud' because the District Court found he had a 'right to control' government funds… The Ciminneli case is DIRECTLY relevant to my motion to reconsider and my eventual appeal and pardon request."*

**November 28, 2022 (continuation):**

*"If, and I predict, when the court strikes down the Ciminneli guilty verdict in a 9-0 decision (as they did in Kelly/Baroni) this April, I believe the grounds for my reconsideration/appeal/pardon will become even stronger."*

**October 9, 2022 (subject: "Legal questions #1 (Privileged)"):**

*"I'd like to submit a motion to claim 'actual innocence' based on the brady material they released the day before sentencing that would try to negate the plea."*

## THEME 3 — NO CONTEMPORANEOUS KNOWLEDGE OF COUNSEL'S SDNY JOB-SEEKING

**October 11, 2022 (severance framed as Petitioner's choice, not conflict-driven):**

*"As you know, I've officially severed our engagement with KKL (ed and Varun) and DRM (Tim Doherty). They officially withdrew as counsel in the case with the court as well and I named myself as the Pro-se contact person for now."*

**October 23, 2022 (subject: "Request for Entire Client File" — to Tim Doherty, cordially asking for full file):**

*"Now that I am Pro-se, I need to have access to my entire client file from both DRM and KKL. Can you please work with Varun and Ed as well as DRM, to send me electronic and paper copies as soon as practicable."*

## SOURCE / AUTHENTICATION

BOP-monitored CorrLinks correspondence compiled in the "S.A.G.A. of Otisville (Bulletin, travel & more)" document (Sept. 22 – Dec. 8, 2022). All emails subject to BOP review at the time of writing. Authenticated by Petitioner under penalty of perjury in Ex. P. **Full source corpus available for Rule 6 production or in camera review.**

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit J • Filed pro se pursuant to Rules Governing § 2255 Proceedings

**United States v. Andrew**, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT K

## March 11, 2019 Email — Petitioner to DPPS Board

Subject: "URGENT Proposal for next steps with DPPS" • 5:34 a.m. EST

This Exhibit K consists of an essential excerpt from Petitioner's 5:34 a.m. EST email of March 11, 2019, sent to Ryan Offutt (DPPS Board Chair), with copies to Christopher T. Kraus, Carlos Lejnieks, Dr. Robert North, and Pallavi Verma — four days after the March 7, 2019 joint board meeting and weeks before any of the fund transfers at issue.

Petitioner's contemporaneous, written, board-level disclosure of escrow-account financial controls before any transfer is **contemporaneous written board-level evidence supporting Petitioner's claim that the concealment issue cannot be resolved against him without factual development**.

### Essential Excerpt

**Email header:**

*From: Seth Andrew <sandrew@democracybuilders.org> • To: Ryan Offutt, DPPS Board Chair • Cc: Christopher T. Kraus, Carlos Lejnieks, Dr. Robert North, Pallavi Verma • Date: Monday, March 11, 2019, 5:34 a.m. EST • Subject: "URGENT Proposal for next steps with DPPS"*

**Operative language (verbatim):**

*"…financial controls (on issues like escrow accounts, that I will demonstrate to you immediately)…"*

### Source and Materiality

Email referenced in U.S. Probation Department's Presentence Investigation Report (Doc. 41) and the parties' sentencing memoranda (Doc. 42, defense; Doc. 43, government). The underlying email file is maintained in Petitioner's personal email archive and available for Rule 6 production. Authenticated by Petitioner under penalty of perjury in Ex. P ¶ 28(d).

**Material to:** Motion Ground Four (Factual Innocence — no concealment); Memorandum §§ VII.A, VII.C.

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit K • Filed pro se pursuant to Rules Governing § 2255 Proceedings

# EXHIBIT L

## Krieger Kim & Lewin LLP Retainer Agreement

May 1, 2021 • Engagement Letter Between Petitioner and KKL

This Exhibit L is the engagement / retainer agreement between Petitioner and Krieger Kim & Lewin LLP ("KKL") executed May 1, 2021, providing for a $100,000 initial retainer at engagement.

Lead counsel Edward Y. Kim subsequently advised Petitioner that a full-trial budget would be in the range of $1.5 to $2.0 million, and that after review of Petitioner's personal finances he did not believe sufficient funds remained to take the case through trial and appeal. The retainer structure therefore created a documented economic incentive against trial: once the retainer was exhausted, each additional hour was likely to be unfunded.

### Materiality

**Material to:** § 2255 Motion Ground One (Conflict — economic conflict prong, alternative-strategy: full trial preparation); Memorandum § IV.B (Conflict-of-Interest analysis under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and *Armienti v. United States*, 234 F.3d 820 (2d Cir. 2000)).

### Source

Retainer Agreement between Seth Andrew and Krieger Kim & Lewin LLP, dated May 1, 2021. Authenticated by Petitioner's sworn declaration (Ex. P).

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit L • Filed pro se pursuant to Rules Governing § 2255 Proceedings

**<u>Confidential</u>**

May 1, 2021

<u>By E-Mail</u>

Seth Andrew
sethaarongrossandrew@gmail.com

      ***Re:    United States v. Seth Andrew*, 21 Mag. 4262**

Dear Mr. Andrew:

We are pleased that you have decided to retain Krieger Kim & Lewin LLP (the "Firm") to provide legal services to you in connection with the above-captioned matter (the "Engagement"). This letter will constitute your agreement with us. You authorize us to represent you in the Engagement and to take such action as we, in consultation with you, deem appropriate.

We will undertake this representation upon payment of an initial retainer in the amount of $50,000. Should an indictment or information be filed against you, you agree to pay an additional retainer in the amount of $50,000, for a total retainer of $100,000, prior to the filing of a notice of appearance by the Firm. Our bills will be rendered on a monthly basis and will include fees for professional services and related expenses. Our fees are determined by hourly charges which are based upon consideration for our expertise and effort expended. Our hourly rate for partners is $895 per hour. Our hourly rates for associates and counsel range from $600 to $675 per hour, and our hourly rate for analysts is $350 per hour. (These rates are subject to change from time to time in the ordinary course.) As a courtesy, we have agreed to discount our normal professional fees by fifteen percent (15%), resulting in an hourly rate of $760.75 for partners, $510 to $573.75 for associates and counsel, and $297.50 for analysts. The monthly bill may also include specified categories of out-of-pocket costs, if any, which will be billed to you without any mark-up. These costs may include disbursements for services such as travel, filing fees, postage, messengers, photocopying, and certain computer-assisted research expenses.

If the Engagement requires services provided by third-party vendors (*e.g.*, data processing/hosting, investigative specialists, translation services, or accountants), then you agree to pay such vendors directly, understanding that, if you are late with payment or decline to pay them, the Firm's ability to represent you may be significantly and adversely affected. Should any vendor file suit against the Firm for monies you owe, you agree to fully indemnify the Firm, including by payment of fees and costs to an attorney of the Firm's choosing to defend the Firm against any such claim.

Payment of all bills is due upon receipt.  Wire instructions are enclosed.  You are not entitled to apply the initial retainer to the balance of the Firm's bills.  In the case of nonpayment of Firm bills by you, however, the Firm retains the right to apply the initial retainer to any outstanding bills.  Upon conclusion of the Engagement, the Firm will refund to you any unused portion of the initial retainer.  It is further understood that if, for any reason, our bills are not paid within thirty days, we are free to withdraw as counsel and you will not oppose any decision by us to be relieved as counsel based upon non-payment of our bills.

We draw your attention to the Statement of Client's Rights, promulgated by the Appellate Divisions of the New York Supreme Court, a copy of which we enclose for your convenience.  In the unlikely event that a dispute arises between us that we cannot resolve, pursuant to applicable rules of court, it is your right to initiate an arbitration proceeding to resolve any fee dispute in a civil matter where the amount at issue is between $1,000 and $50,000.  Otherwise, and regardless of the amount at issue, you and the Firm agree that any dispute will be resolved through binding arbitration to take place in New York City in accordance with the Commercial Arbitration Rules of the American Arbitration Association pursuant to New York law.  By agreeing to arbitration, you (and the Firm) are relinquishing any right to pursue claims, or have any disputes resolved, in a court of law; and, accordingly, you (and the Firm) are relinquishing any rights to the compulsory processes of law applicable to pre-trial discovery, to have the matter decided by a jury, and/or to the appeal of any adverse arbitration decision.

If the foregoing is acceptable to you, please execute the duplicate of this letter and return it to us.

Very truly yours,
KRIEGER KIM & LEWIN LLP

By: _____
Edward Y. Kim
Paul M. Krieger
Nicholas J. Lewin

Encls.

The foregoing is hereby accepted:

_____          May 3, 2021
Seth Andrew                     _____
                                        Date

The Appellate Divisions of the Supreme Court, pursuant to the authority vested in them, do hereby, effective January 1, 1998, add Part 1210 to Title 22 of the Official Compilation of Codes, Rules and Regulations of the State of New York as follows:

PART 1210. STATEMENT OF CLIENT'S RIGHTS

Section 1210.1 Posting

Every attorney with an office located in the State of New York shall insure that there is posted in that office, in a manner visible to clients of the attorney, a statement of client's rights in the form set forth below. Attorney's in offices that provide legal services without fee may delete from the statement those provisions dealing with fees. The statement shall contain the following:

1. You are entitled to be treated with courtesy and consideration at all times by your lawyer and other lawyers and personnel in your lawyer's office.
2. You are entitled to an attorney capable of handling your legal matter competently and diligently, in accordance with the highest standards of the profession. If you are not satisfied with how your matter is being handled, you have the right to withdraw from the attorney-client relationship at any time (court approval may be required in some matters and your attorney may have a claim against you for the value of services rendered to you up to the point of discharge).
3. You are entitled to your lawyer's independent professional judgment and undivided loyalty uncompromised by conflicts of interest.
4. You are entitled to be charged a reasonable fee and to have your lawyer explain at the outset how the fee will be computed and the manner and frequency of billing. You are entitled to request and receive a written itemized bill from your attorney at reasonable intervals. You may refuse to enter into any fee arrangement that you find unsatisfactory.
5. You are entitled to have your questions and concerns addressed in a prompt manner and to have your telephone calls returned promptly.
6. You are entitled to be kept informed as to the status of your matter and to request and receive copies of papers. You are entitled to sufficient information to allow you to participate meaningfully in the development of your matter.
7. You are entitled to have your legitimate objectives respected by your attorney, including whether or not to settle your matter (court approval of a settlement is required in some matters).
8. You have the right to privacy in your dealings with your lawyer and to have your secrets and confidences preserved to the extent permitted by law.
9. You are entitled to have your attorney conduct himself or herself ethically in accordance with the Code of Professional Responsibility.
10. You may not be refused representation on the basis of race, creed, color, religion, sex, sexual orientation, age, national origin or disability.

**For a Domestic Wire Transfer to KKL IOLA account:**

Pay to Bank:        First Republic Bank

Address:            111 Pine Street
                    San Francisco, CA 94111

ABA:                321081669

Beneficiary:        Krieger Kim & Lewin LLP
                    IOLA Account

Account to Credit:  80006329892

Optional Text:      Attention:    Evelyn Jankousky
                                  Rockefeller Center

**For a Domestic Wire Transfer to KKL operating account:**

Pay to Bank:        First Republic Bank

Address:            111 Pine Street
                    San Francisco, CA 94111

ABA:                321081669

Beneficiary:        Krieger Kim & Lewin LLP

Account to Credit:  80006262929

Optional Text:      Attention:    Evelyn Jankousky
                                  Rockefeller Center

# EXHIBIT M

## Three SDNY Press Releases re Petitioner

Arrest (April 27, 2021) • Plea (January 14, 2022) • Sentencing (July 28, 2022)

This Exhibit M reproduces the three United States Attorney's Office press releases issued by the Southern District of New York concerning Petitioner: (i) at arrest on April 27, 2021; (ii) upon the plea on January 14, 2022; and (iii) upon sentencing on July 28, 2022.

All three releases were issued by the SDNY Complex Frauds and Cybercrime Unit, the unit Mr. Edward Y. Kim led in 2016–2017 before founding KKL and again headed upon his appointment as Deputy U.S. Attorney (June 3, 2024) and Acting U.S. Attorney (December 13, 2024 – approximately March 31, 2025).

### Use of This Exhibit

Offered as procedural and institutional context relevant to the § 455 Reassignment Motion. Petitioner reserves a detailed point-by-point factual impeachment of the press releases for a later amended pleading, evidentiary-hearing exhibit, or supplemental brief permitted under *Mayle v. Felix*, 545 U.S. 644 (2005). Three press releases retrieved verbatim from justice.gov/usao-sdny on May 12, 2026.

### Materiality

**Material to:** § 455 Reassignment Motion; Motion Ground One (Conflict); Memorandum § IX.

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit M • Filed pro se pursuant to Rules Governing § 2255 Proceedings

EXHIBIT M

THREE U.S. ATTORNEY'S OFFICE PRESS RELEASES

**SOUTHERN DISTRICT OF NEW YORK**

RE: SETH ANDREW

(Verbatim, retrieved from justice.gov/usao-sdny press release pages on May 12, 2026)

=================================================================

PRESS RELEASE #1 — ARREST

April 27, 2021

Press Release Number: 21-101

U.S. Attorney: Audrey Strauss

Headline: "Former White House Adviser Arrested For Stealing $218,000 From Charter Schools He Founded"

URL: https://www.justice.gov/usao-sdny/pr/former-white-house-adviser-arrested-stealing-218000-charter-schools-he-founded

=================================================================

Audrey Strauss, the United States Attorney for the Southern District of New York, and William F. Sweeney Jr., Assistant Director-in-Charge of the New York Field Office of the Federal Bureau of Investigation ("FBI"), announced today the unsealing of a complaint charging SETH ANDREW with wire fraud, money laundering, and making false statements to a financial institution, in connection with a scheme in which ANDREW stole $218,005 from a charter school network that he founded. ANDREW was arrested this morning in New York, New York, and will be presented today before U.S. Magistrate Judge Gabriel W. Gorenstein.

Manhattan U.S. Attorney Audrey Strauss said: "As alleged, Seth Andrew abused his position as a founder of a charter school network to steal from the very same schools he helped create. Andrew is not only alleged to have stolen the schools' money but also to have used the stolen funds to obtain a savings on a mortgage for a multimillion-dollar Manhattan apartment. Thanks to the FBI's diligent work, Andrew now faces federal charges for his alleged scheme."

FBI Assistant Director William F. Sweeney Jr. said: "Locking into the lowest interest rate when applying for a loan is certainly the objective of every home buyer, but when you don't have the necessary funds to put down, and you steal the money from your former employer to make up the difference, saving money in interest is likely to be the least of your concerns. We allege today that Andrew did just that, and since the employer he stole from was a charter school organization, the money he took belonged to an institution serving school-aged children. Today Andrew himself is learning one of life's most basic lessons – what doesn't belong to you is not yours for the taking."

As alleged in the Complaint unsealed today:

In 2005, SETH ANDREW helped create "School Network-1," a series of public charter schools then based in New York City. In the Spring of 2013, ANDREW left School Network-1 and accepted a job in the United States Department of Education and, thereafter, as a senior adviser in the Office of Educational Technology at the White House. While employed at the Department of Education, and at the White House, ANDREW was paid by School Network-1. In November 2016, ANDREW left his role in the White House and, shortly thereafter, in January 2017, ANDREW officially severed his relationship with School Network-1.

School Network-1 comprises several charter schools throughout United States including several in New York City. Pursuant to an agreement with the New York State Board of Regents, School Network-1's New York-based charter schools must maintain an "escrow account" that may be accessed only if the school dissolves. Three such escrow accounts, for three New York City-based School Network-1 schools, were opened by ANDREW and other School Network-1 employees at "Bank-1" in 2009, 2011, and 2013. As to each of those three accounts – Escrow Account-1, Escrow Account-2, and Escrow Account-3 – ANDREW was a signatory and had access to the funds in them. However, pursuant to the charter agreement, the funds in the Escrow Accounts were reserved in case the school dissolved, and the funds could not be moved by ANDREW, or anyone, without proper authorization.

After he severed his relationship with School Network-1, on March 28, 2019, ANDREW entered a Bank-1 branch in New York City and closed both Escrow Account-1 and Escrow Account-2. Bank-1 provided ANDREW a bank check in the amount of $71,881.23 made payable to "[School Network-1] Charter School" ("Check-1") and a second bank check in the amount of $70,642.98 to "[School Network-1] Harlem Charter" ("Check-2"). Check-1 and Check-2 represented the funds that were in Escrow Account-1 and Escrow Account-2, respectively.

The same day that ANDREW closed Escrow Account-1 and Escrow Account-2, ANDREW entered a Manhattan branch of a different FDIC-insured bank ("Bank-2") and opened a business bank account in the name of "[School Network-1] Charter School" ("Fraud Account-1"). To open that account, ANDREW represented to a Bank-2 employee that he was a "Key Executive with Control of" School Network-1 Charter School, which was a lie. ANDREW then deposited Check-1 into the account but, that day, ANDREW did not deposit Check-2.

Five days later, on April 2, 2019, ANDREW used an ATM machine in Baltimore, Maryland, to deposit Check-2 into Fraud Account-1. It appears ANDREW waited to deposit Check-2 because it was made payable to "School Network-1 Harlem Charter" and not "School Network-1 Charter School." Had he tried to deposit Check-2 when he opened Fraud Account-1 it would not have been honored by Bank-2.

At the time ANDREW deposited Check-1 and Check-2 into a Bank-2 bank account, ANDREW was contemplating obtaining a mortgage from Bank-2 to purchase a residential property. At that time, Bank-2 offered certain customers, as a promotion, more favorable mortgage interest rates if those customers maintained a certain amount of funds in Bank-2 accounts. Specifically, for every $250,000 on deposit, up to a total of $1 million, Bank-2 would lower that qualifying customer's mortgage interest rate by 0.125%. Thus, in total, if a qualifying customer maintained $1 million or more of his/her funds in Bank-2 accounts that customer would receive a 0.5% interest rate deduction on a Bank-2 mortgage. But to take advantage of the interest rate deduction promotion, Bank-2 required that the funds a customer deposited be funds owned by the customer or, in some instances, a business the customer owned, controlled or was lawfully associated with. Bank-2 did not permit a customer to utilize money owned by someone else to gain the benefit of the interest rate deduction promotion.

By April 2019, because of the $142,524 ANDREW deposited in Bank-2, using the money he stole from two charter schools, ANDREW deposited a total of approximately $1,007,716 with Bank-2, and therefore became eligible to receive a 0.5% interest rate deduction – the largest deduction a customer could receive from Bank-2's promotion. Without the $142,524 deposited stolen funds, ANDREW would have been eligible for only a 0.375% interest rate deduction. On August 21, 2019, ANDREW purchased a residential property located in New York, New York, for approximately $2,368,000. To effectuate that purchase, ANDREW, and his spouse, obtained a mortgage from Bank-2 in the amount of $1,776,000 with an interest rate of 2.5% – taking full advantage of the promotion Bank-2 offered.

On October 17, 2019, ANDREW closed out Escrow Account-3 and received a check ("Check-3") made payable to "[School Network-1] Endurance" in the amount of $75,481.10.

On October 21, 2019, ANDREW deposited Check-3 into an account that he opened at a third bank ("Fraud Account-2"). Approximately one month later, ANDREW obtained a check from Bank-2 for $144,473.29, which constituted the funds stolen from Escrow Account-1 and Escrow Account-2, and ANDREW ultimately deposited those funds into Fraud Account-2. Five days later, ANDREW rolled the funds in Fraud Account-2 into a certificate of deposit. That certificate of deposit matured on May 20, 2020, which earned ANDREW $2,083.52 in interest. ANDREW then transferred the funds from the certificate of deposit – including the funds stolen from the Escrow Accounts – into a bank account held in the name of a particular civic organization that ANDREW currently controls, thereby concealing the money's association with School Network-1, and depositing the stolen money into an account under ANDREW's complete control.

ANDREW, 42, is charged with one count of wire fraud, which carries a maximum sentence of 20 years in prison, one count of money laundering, which carries a maximum sentence of 20 years in prison, and one count of making a false statement to a bank, which carries a maximum sentence of 30 years in prison.

This case is being handled by the Office's Complex Frauds and Cybercrime Unit. Assistant United States Attorney Ryan B. Finkel is in charge of the prosecution.

========================================================================

PRESS RELEASE #2 — GUILTY PLEA

January 14, 2022

Press Release Number: 22-011

U.S. Attorney: Damian Williams

Headline: "Former White House Advisor Pleads Guilty To Devising A Scheme To Steal $218,000 From Charter Schools He Founded"

URL: https://www.justice.gov/usao-sdny/pr/former-white-house-advisor-pleads-guilty-devising-scheme-steal-218000-charter-schools

========================================================================

Damian Williams, the United States Attorney for the Southern District of New York, announced that SETH ANDREW pled guilty today to wire fraud, before United States District Judge John P. Cronan, in Manhattan federal court.

U.S. Attorney Damian Williams said: "Seth Andrew, a former White House advisor, admitted today to devising a scheme to steal from the very same schools he helped create. Andrew now faces time in federal prison for abusing his position and robbing those he promised to help."

According to previous filings in this case:

In 2005, SETH ANDREW helped create "School Network-1," a series of public charter schools then based in New York City. In the Spring of 2013, ANDREW left School Network-1 and accepted a job in the United States Department of Education and, thereafter, as a senior advisor in the Office of Educational Technology at the White House. In November 2016, ANDREW left his role in the White House and, shortly thereafter, in January 2017, ANDREW officially severed his relationship with School Network-1.

School Network-1's New York based charter schools must maintain an "escrow account" that may be accessed only if the school dissolves. Three such escrow accounts, for three New York

City based-School Network-1 schools, were opened by ANDREW and other School Network-1 employees, at "Bank-1" in 2009, 2011 and 2013. As to each of those three accounts -- Escrow Account-1, Escrow Account-2 and Escrow Account-3 -- ANDREW was a signatory and had access to the funds in them. However, pursuant to the charter agreement, the funds in the Escrow Accounts were reserved in case the school dissolved, and the funds could not be moved by ANDREW, or anyone, without proper authorization.

After he severed his relationship with School Network-1, on March 28, 2019, ANDREW entered a Bank-1 branch in New York City and closed both Escrow Account-1 and Escrow Account-2. Bank-1 provided ANDREW a bank check in the amount of $71,881.23 made payable to "[School Network-1] Charter School" ("Check-1") and a second bank check in the amount of $70,642.98 to "[School Network-1] Harlem Charter" ("Check-2").

The same day that ANDREW closed Escrow Account-1 and Escrow Account-2, ANDREW entered a Manhattan branch of a different FDIC insured bank ("Bank-2") and opened a business bank account in the name of "[School Network-1] Charter School" ("Fraud Account-1"). To open that account, ANDREW misrepresented to a Bank-2 employee that he was a "Key Executive with Control of" School Network-1 Charter School and supported that misrepresentation with emails sent to the Bank-2 employee. ANDREW then deposited Check-1 into the account. Five days later, on April 2, 2019, ANDREW used an ATM machine in Baltimore, Maryland to deposit Check-2 into Fraud Account-1.

On October 17, 2019, ANDREW closed out Escrow Account-3 and received a check ("Check-3") made payable to "[School Network-1] Endurance" in the amount of $75,481.10. On October 21, 2019, ANDREW deposited Check-3 into an account that he opened at a third bank ("Fraud Account-2").

Approximately one month later, ANDREW obtained a check from Bank-2 for $144,473.29, which constituted the funds stolen from Escrow Account-1 and Escrow Account-2, and ANDREW ultimately deposited those funds into Fraud Account-2. Five days later, ANDREW rolled the funds in Fraud Account-2 into a certificate of deposit. That certificate of deposit matured on May 20, 2020, which earned ANDREW $2,083.52 in interest. ANDREW then transferred the funds from the certificate of deposit -- including the funds stolen from the Escrow Accounts -- into a bank account held in the name of a particular civic organization that

ANDREW then-controlled thereby concealing the money's association with School Network-1, and depositing the stolen money into an account under Andrew's complete control.

ANDREW, 42, pled guilty to one count of wire fraud, which carries a maximum sentence of 20 years in prison. ANDREW has agreed to pay restitution to the Charter School Network from which he stole. ANDREW is scheduled to be sentenced before Judge Cronan on April 14, 2022.

This case is being handled by the Office's Complex Frauds and Cybercrime Unit. Assistant United States Attorney Ryan B. Finkel is in charge of the prosecution.

===================================================================

PRESS RELEASE #3 — SENTENCING

July 28, 2022

Press Release Number: 22-243

U.S. Attorney: Damian Williams

Headline: "Former White House Advisor Sentenced To One Year And One Day In Prison For Devising A Scheme To Steal From Charter Schools He Founded"

URL: https://www.justice.gov/usao-sdny/pr/former-white-house-advisor-sentenced-one-year-and-one-day-prison-devising-scheme-steal

===================================================================

Damian Williams, the United States Attorney for the Southern District of New York, announced that SETH ANDREW was sentenced to 366 days in prison in connection with his execution of a scheme to defraud Democracy Prep Public Schools ("DPPS"), a charter school network that he founded, of more than $218,000. United States District Judge John P. Cronan imposed today's sentence.

U.S. Attorney Damian Williams said: "Seth Andrew was sentenced today for stealing from those who once trusted him. Andrew committed this crime to attempt to punish non-profit charter schools because they declined his offer to return as their leader. Thankfully, the victim of Andrew's crime was resilient, and its important work continues. Today's sentence sends a message that those who engage in fraud schemes and steal from others will face appropriate consequences for their conduct."

According to previous filings in this case:

In 2005, SETH ANDREW helped to found Democracy Prep Public Schools, a series of public charter schools then based in New York City. In the Spring of 2013, ANDREW left DPPS and accepted a job in the United States Department of Education and, thereafter, as a senior advisor in the Office of Educational Technology at the White House. In November 2016, ANDREW left his role at the White House. Shortly thereafter, in January 2017, ANDREW officially severed his relationship with DPPS.

Under New York state regulations, DPPS's New York-based charter schools must maintain an "escrow account" that may be accessed only if the school dissolves. Three such escrow accounts, for three New York City-based-DPPS schools, were opened by ANDREW and other DPPS employees, at a bank ("Bank-1") in 2009, 2011 and 2013, respectively ("Escrow Account-1," "Escrow Account-2," and "Escrow Account-3", collectively, the "Escrow Accounts"). ANDREW was a signatory and had access to the funds in the Escrow Accounts. However, pursuant to the charter agreement, the funds in the Escrow Accounts were reserved in case the schools dissolved, and the funds could not be moved by ANDREW, or anyone, without proper authorization.

In early 2019, apparently frustrated with decisions made by DPPS, and his inability to exercise control over the organization, ANDREW sought to rejoin DPPS. On March 10, 2019, ANDREW sent an email to several members of DPPS, including its Chairman, offering to return as "President," in exchange for "$25k/month as [a] salaried employee and basic frugal expenses," plus a $250,000 bonus if he met deliverables ANDREW outlined. ANDREW further stated that "every single day that goes by, this situation becomes exponentially more difficult and the ability to pull out of a nosedive becomes harder. So after 24 hours, my monthly salary expectation will go up every day that we're not under a signed contract."

DPPS declined ANDREW's offer. Eighteen days later, on March 28, 2019, ANDREW entered a Bank-1 branch in New York City and closed both Escrow Account-1 and Escrow Account-2. Bank-1 provided ANDREW a bank check in the amount of $71,881.23 made payable to "Democracy Prep Charter School" ("Check-1") and a second bank check in the amount of $70,642.98 made payable to "Democracy Prep Harlem Charter" ("Check-2").

The same day that ANDREW closed Escrow Account-1 and Escrow Account-2, ANDREW entered a Manhattan branch of a different FDIC-insured bank ("Bank-2") and opened a business bank account in the name of "Democracy Prep Charter School" ("Fraud Account-1"). To open that account, ANDREW misrepresented to a Bank-2 employee that he was a "Key Executive with Control of" DPPS and supported that misrepresentation by sending emails sent to the Bank-2 employee from a DPPS email account. ANDREW then deposited Check-1 into Fraud Account-1. Five days later, on April 2, 2019, ANDREW used an ATM machine in Baltimore, Maryland to deposit Check-2 into Fraud Account-1.

On October 17, 2019, ANDREW closed out Escrow Account-3 and received a check ("Check-3") made payable to "Democracy Prep Endurance" in the amount of $75,481.10. On October 21, 2019, ANDREW deposited Check-3 into an account that he opened at a third bank ("Fraud Account-2").

Approximately one month later, ANDREW obtained a check from Bank-2 for $144,473.29, which constituted the funds stolen from Escrow Account-1 and Escrow Account-2. ANDREW ultimately deposited those funds into Fraud Account-2, combing all of the stolen funds, then worth approximately $219,954. Five days later, ANDREW rolled the stolen funds in Fraud Account-2 into a certificate of deposit. That certificate of deposit matured on May 20, 2020, which earned ANDREW $2,083.52 in interest. ANDREW then transferred the funds from the certificate of deposit -- including the funds stolen from the Escrow Accounts -- into a bank account held in the name of Democracy Builders, another nonprofit that ANDREW then-controlled, thereby concealing the money's association with DPPS, and depositing the stolen money into an account under ANDREW's complete control. The next day, ANDREW sent a wire for $225,000, apparently comprised primarily of funds from the Escrow Accounts, for a down payment on a significant purchase of property for Democracy Builders.

In total, DPPS lost $218,005 as a result of Andrew's actions.

## PETITIONER'S RESERVATION OF RIGHTS — SPECIFIC FACTUAL DISPUTES

Petitioner reserves the right to amend and supplement this filing with a detailed line-by-line refutation of factual matters in dispute in each of the three SDNY press releases above. The following ten points identify the principal factual disputes Petitioner raises, in neutral form:

1. **"Paid by School Network-1" while at the Department of Education / White House.** The April 27, 2021 release's characterization of Petitioner as having been "paid by School Network-1" "[w]hile employed at the Department of Education, and at the White House" is, on Petitioner's contention, overstated relative to the actual payroll record of Petitioner's pre-government, government, and post-government tenure.

2. **"Officially severed" in January 2017.** The April 27, 2021 release's characterization that Petitioner "officially severed his relationship" with the network in January 2017 is in tension with the contemporaneous record: Petitioner's escrow-agent, sole-signatory, and fiduciary roles continued, as later confirmed by the Brady-disclosed FBI Form 302 correction letter (Ex. H, July 20, 2022).

3. **"$1,007,716 deposited / 0.5% interest deduction" (April 27, 2021).** Petitioner's banking records, disclosed as Brady material, do not show a rate reduction obtained as a result of the funds transfer. Petitioner had sufficient personal assets for the maximum rate reduction prior to the transfers (Ex. H), and Petitioner had signed a rate-lock agreement with Wells Fargo Mortgage prior to the transfers (Ex. S).

4. **"Key Executive with Control of" / "which was a lie" (April 27, 2021).** The FBI's own corrected Form 302 (Ex. H) records that Petitioner specifically informed the Wells Fargo banker that he was no longer an employee of any Democracy Prep entity but remained the authorized escrow agent and sole signatory on the accounts. The corrected record is in tension with the press release's "which was a lie" characterization.

5. **"Concealed" framing (April 27, 2021 and January 14, 2022).** The contemporaneous March 7, 2019 board-meeting disclosure and the March 11, 2019 board-level email (Ex. K) record that Petitioner addressed the financial controls and escrow arrangements at board level, in writing, weeks before any of the transfers at issue. That contemporaneous record is offered as context against the press releases' "concealed" characterization.

6. **March 10, 2019 transition-services communication characterized as "motive."** The July 28, 2022 release frames Petitioner's March 10, 2019 communication offering to return to DPPS as evidence of motive. The communication itself (Ex. K) expressly identifies "financial controls (on issues like escrow accounts, that I will demonstrate to you immediately)" as the proposed corrective action; that record is in tension with a quid-pro-quo motive theory.

7. **"DPPS lost $218,005 as a result of Andrew's actions" / "$200,000 stolen."** Each of the three press releases attributes a "loss" figure (approximately $218,005, or in earlier framings approximately $200,000) to Democracy Prep Public Schools (DPPS). The attribution is in dispute on the existing record:
   **(a)** The underlying assets sat on the charter schools' own books, not on DPPS's balance sheet (Ex. T, AFR Notes 1, 2, 14, 17; Combined Audit FY19; ProPublica Form 990 Part X).
   **(b)** To the extent the funds are traceable to a charter entity, they are traceable to Democracy Prep New York Charter Schools (DPNY) — the surviving merged entity formed when three previously-existing charter schools (DPC, DPH, and HPCS) were dissolved by Board of Regents-approved merger effective July 1, 2017 (Ex. T).
   **(c)** The funds were preserved in escrow accounts established under each charter's own dissolution-escrow provisions (Ex. T, AFR FY18 Note 2, p. 11), earning interest at the time of arrest.
   **(d)** The funds were on track to be applied for the benefit of the alumni and educational mission of the dissolved schools and the successor DPNY entity, consistent with not-for-profit asset-distribution rules applicable to dissolved educational corporations.
   **(e)** Petitioner submits that points (a)–(d) place the press releases' economic-loss attribution in factual dispute.

8. **Restitution and forfeiture figures carry forward the same DPPS-attribution question.** The July 28, 2022 release's reference to "$218,005 in restitution to DPPS, and $22,537 in forfeiture" carries forward the same attribution question identified in point 7. Petitioner reserves the right to revisit restitution under *Nelson v. Colorado*, 581 U.S. 128 (2017), upon vacatur of the underlying conviction.

9. **Continued "stole" / "stolen" framing alongside the Brady-disclosed Dr. North retraction.** The Government's off-docket Brady disclosure of February 28, 2022 (Ex. R, March 11, 2022 letter) reflects Dr. North's retraction of the statement repeating the "stole" framing. The Government's subsequent April 8, 2022 letter (also Ex. R) attributes that retraction to the Board's desire to "speak with a unified voice." The retraction record and the press releases' continued use of the same framing are offered as context for the prejudice and Brady-IAC analyses in the contemporaneously-filed § 2255 Motion.

10. **Inconsistent entity references (DPPS / DPNY / "Democracy Prep") across the three releases.** The releases interchange "Democracy Prep," "Democracy Prep Public Schools (DPPS)," and "Democracy Prep Charter Schools" without distinguishing between the network's charter management organization and its underlying charter-school entities. The distinction matters for the legal owner of any specific account, the dissolution status of the relevant entity, and the books on which the funds sat (Ex. T).

Petitioner reserves the right to file a more detailed point-by-point response to the factual matters in dispute in these press releases as part of any amended pleading, evidentiary-hearing exhibit, or supplemental brief permitted under *Mayle v. Felix*, 545 U.S. 644 (2005).


Dated: May 14, 2026


/S/ Seth Andrew, pro se

***United States v. Andrew***, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT N

## KKL Brady Letter to AUSA Finkel

March 16, 2022 • From Krieger Kim & Lewin LLP to AUSA Ryan B. Finkel

This Exhibit N is the March 16, 2022 letter from Petitioner's defense team at Krieger Kim & Lewin LLP ("KKL") to AUSA Ryan B. Finkel demanding production of *Brady* material and identifying specific categories of exculpatory evidence.

## Use of This Exhibit

The letter is contemporaneous documentary evidence that counsel themselves identified the disputed factual matters subsequently abandoned at sentencing (Ex. G p. 9: "None from the defense, your Honor"). Together with the PSR-objection drafts (Ex. D), it supports the Strickland / Hill / Lee prejudice analysis.

## Materiality

**Material to:** Motion Grounds Three (*Brady* / IAC) and Five (Failure to Investigate); Memorandum §§ V, VI, VIII.

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit N • Filed pro se pursuant to Rules Governing § 2255 Proceedings

# KRIEGER KIM & LEWIN LLP

500 Fifth Avenue
New York, NY 10110

Telephone: (212) 390-9550
www.KKLllp.com

March 16, 2022

<u>By E-Mail</u>

Ryan B. Finkel
Assistant United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007

**Re:**     *United States v. Seth Andrew,* **22 Cr. 32 (JPC)**

Dear Mr. Finkel:

Thank you for your letter dated March 11, 2022. We write to request that you provide the following information:

- The identities of the members of Democracy Prep's Board of Directors who believe Mr. Andrew should receive "a slap on the hand."

- Any statements regarding Mr. Andrew made by such board members, including any communications received by the Government and any notes memorializing any meetings or other conversations.

- Any statements regarding Mr. Andrew made by Dr. Robert North, including any communications received by the Government and any notes memorializing any meetings or other conversations.

- Any information related to Dr. North's retraction of his February 16, 2022 statement, including the method of communication, individual(s) or entit(ies) that disclosed such information, the reason for Dr. North's retraction, any communications received or sent by the Government, and any notes memorializing any meetings or other conversations.

- Evidence of efforts by Democracy Prep or anyone else to influence or restrict statements made by anyone affiliated with Democracy Prep, including but not limited to members of Democracy Prep's Board of Directors, regarding Mr. Andrew.

Please let us know if you have any questions or would like to discuss further.

Very truly yours,
KRIEGER KIM & LEWIN LLP

By: _____

Edward Y. Kim
Varun A. Gumaste

*United States v. Andrew*, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT O

## Petitioner's March 20, 2025 Pro Se Letter to This Court

Filed March 24, 2025 • Doc. 57 (with Attachments 57-1 and 57-2)

This Exhibit O is Petitioner's six-page pro se letter to this Court, dated March 20, 2025 and filed March 24, 2025 as Doc. 57 (with attachments 57-1 and 57-2).

### Use of This Exhibit

Offered as contemporaneous documentary evidence of (i) Petitioner's diligence under *Holland v. Florida*, 560 U.S. 631 (2010); (ii) the non-post-hoc framing of every legal theory now formally pleaded; and (iii) preservation on this Court's docket — thirteen to fourteen months before this § 2255 filing — of the same claims now formally asserted, including: (a) request for permission to withdraw the guilty plea based on the now-disavowed right-to-control theory; (b) request for venue change to avoid even the perception of conflict; and (c) explicit reservation of post-conviction relief under § 2255.

### Materiality

**Material to:** Motion § III (Timeliness/Diligence); Memorandum § II.B(3) (*Holland* diligence); Ex. P ¶¶ 14, 27 (sworn diligence record). Authenticated by Petitioner under penalty of perjury (Ex. P ¶ 28(e)).

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit O • Filed pro se pursuant to Rules Governing § 2255 Proceedings

Seth Aaron Gross Andrew, Pro Se
Docket Number 22 CR 32 (JPC)

3/20/2025

Judge Cronan,

**I have represented myself pro-se since just after my sentencing. I write today in response to the government's reply which demonstrates again AUSA Finkle's personal animus, bias, and continued conflicts of interest within SDNY that cannot be ignored.** For two-weeks I have attempted to draft you an adequate line-by-line reply to AUSA Finkle's legalease. Unfortunately, his weaponized, overcriminalized, factually-incorrect, and outright malicious response falsely asserts as facts so much of the same demonstrable misinformation he has told you in District Court and the Second Circuit on appeal.  Mr. Finkle's may have prevented my request for termination first made on May 28th of 2024 from reaching you until now, 10 months after required by Monograph 109 at the First Step Act. His unmoored opposition to this rational request by US Probation for termination of my supervision is the final indication that I cannot receive fair treatment in the Southern District, even for post-conviction relief such as this. I too would cite *US v. Lussier*, if only to say that if my case does not meet the standard for relief of "new and unforeseen circumstances" such as "exceptionally good behavior," to Mr. Finkle, what would?

**<u>As all three DOJ press-releases in my case and the most recent reply from the SDNY demonstrate that I was a primarily a high-value critic of Mr. Williams and President Biden. I was politically prosecuted for my work in a previous Presidential administrations and I continue to be treated differently as a worthy-target and persecuted by the Southern District of New York which includes my own defense attornies. Accordingly, I respectfully request that in order to avoid *even the perception of conflict,* my case be transferred to another Federal District Court for immediate review.</u>**

**Mr. Finkle's politically-motivated misinformation and lies** are explicitly contradicted in copious public documents as well as the *Brady* material he intentionally withheld for 12 to 16 months with over 1,000 pages released just days before sentencing; providing neither my counsel nor I enough time to read it. Mr. Finkle and SDNY used a politically normalized, but no-less unconscionable, playbook by waiting until the last minute to release potentially exculpatory *Brady* documents in order to coerce an involuntary plea though threats of legal action against my family and a complaint calling for up to 60 years in federal prison for a zero dollar loss crime. It was an approach seemingly crafted directly out of prosecutorial misconduct prohibitions in the Office of Professional Responsibility at DOJ.

**As demonstrated in the public record, and supported by countless letters of support, I care deeply for the public charter schools that I founded and the thousands of low-income students and alumni we educated.**  I took seriously my obligation as the only fiscal agent with control of the dissolution funds for three of those dissolved schools; and I

1

Seth Aaron Gross Andrew, Pro Se
Docket Number 22 CR 32 (JPC)

moved the escrow funds to another bank to preserve them from loss, waste, fraud, and abuse. Even Mr. Finkle agrees they were never used to line my own pocket.  If I knew what I knew then, not what I know now, I believe I would transfer the funds again today–I felt it was my legal and ethical obligation to do so. I never believed it was a violation of any law or statute, nor did I believe that DPPS had any right to exercise control over the funds, then or now. However, emails and documents with my legal team show that it was only after nine months that I became willing to plead "guilty" to one count of wire fraud because I was presented with the now debunked right-to-control theory–and counseled that it was valid law in the Second Circuit at the time.

**My plea was made without the knowledge of the Government's evidence or the state of wire fraud related cases that were appellate status eventually overturned in *Ciminelli, Percoco,* and likely *Kousisis.*** While *Ciminelli* may not disturb convictions based on the acquisition of property, the Second Circuit erred in my case due to my appeals waiver. Because of the continued willful misinformation and lies by SDNY and AUSA Finkle, as demonstrated in the Oral Argument transcript and briefs, the appeals court erroneously believed that I had personally stolen funds, equating it to stealing a wallet. My actions never deprived any *victim* of property, and I was never personally in control of any funds. The independent non-profit governing board of Democracy Builders always maintained control of non-profit accounts and decisions, with me as just one member. What I allocuted to doing was *possibly* denying some individual DPPS board members of proactively using their individual abilities to make informed economic decisions for DPPS, an act which is no longer a crime. I never did, nor would have, pled guilty to stealing funds regarding the specific accounts in question.

**Moreover, I never agreed that the non-profit management entity, DPPS, had the ability to make economic decisions over the dissolution escrow accounts of the three school accounts that had been legally dissolved.** Specifically, Democracy Prep Charter, Democracy Prep Harlem, and Democracy Prep Endurance (DPC, DPH, and DPE) each had their own employer identification numbers, boards of trustees, and legal obligations independent from DPPS. These legal entities each individually appointed me as their fiduciary, sole remaining bank-signatory, and escrow agent specifically requiring me to manage the dissolution funds in the case of their corporate demise. I was the trustee of their estates, and a state corporate probate inquiry would have been a more reasonable forum to resolve this dispute than your Federal District Criminal court as these appointments were never revoked before the entities' dissolution. These facts are all made clear in numerous public documents later discovered and *Brady* material intentionally withheld and only delivered to my counsel post-plea.

**Mr. Finkle intentionally withheld *Brady* material from me, <u>from you,</u> and most explicitly from my defense attorneys. Each of whom also have overlapping conflicts or perception of conflicts along with Mr. Finkle and his supervisors and colleagues:**

2

Seth Aaron Gross Andrew, Pro Se
Docket Number 22 CR 32 (JPC)

- **Now former US Attorney for the Southern District, <u>Ed Kim;</u>**
- **Current SDNY Assistant US Attorney, <u>Varun Gumaste;</u> and**
- **Sitting District Court, <u>Judge Tim Doherty</u>**

Mr. Finkle withheld this material to cause me a legal disadvantage. This was not an accidental or unintentional delay. Mr. Finkle knew that my legal team at the time would have to advise me differently regarding a plea if they had the materials in the Government's possession.

**Instead, I first heard the names *"Ciminelli," "Percoco," "Porat," and "Kousisis"* from a fellow inmate and Yale Law School alumni while serving my sentence at FCI Otisville.** Until then, I did not know that the faulty legal theories on which my complaint was based might later be overturned. It was in my prison bunk that I read the *amici briefs* and learned the painful irony that the single defense attorney I had who did not seek a political appointment was  Michael Yaeger. He only represented me at the presentment where I was explicitly denied my Due Process Protection Act rights as you can read in the transcript. Unfortunately, I didn't retain him further because I was explicitly counseled that I needed to hire lead-attorneys with current-insider ties to the SDNY, which Mr. Yaeger did not have as he was not an "SDNY alumni." We now know that Mr. Yaeger and others went on to successfully argue in front of the US Supreme Court that the Southern District's faulty right-to-control and honest services theories, which formed the basis of the complaint on which I was arrested, and which were struck down 9-0.

**Judge Cronan, due to no fault of your own, your acceptance of my plea and sentence were based on the false notion intentionally presented by SDNY that the management entity, DPPS, was somehow the same corporate person as DPC, DPH, and DPE. This was a lie. DPPS was never a *victim* with legal standing over the escrow funds in question.**  Under the Victims' Notification Act, and a multitude of other statutes, DPPS should never have had standing of any kind as it is an independent non-profit entity *explicitly barred by multiple state laws and federal grant policy from controlling any of the escrow funds in question*. This essential falsehood was the foundation of Mr. Finkle's narrative. It is that lie that caused you to surmise in your sentencing that DPPS might have had a pecuniary damage or even a theoretical risk of regulatory sanction, *which the regulator confirmed to me in advance and after the transfers, was never the case*. Mr. Finkle never denied in court that I was the duly appointed escrow agent for the three dissolved entities, DPC, DPH, and DPE. Instead he tried to confuse you and the issue, making it appear as though the management company, DPPS, had money stolen from them–*they did not.*

**Mr. Finkle knows now, as he did then, in the *Brady* material, that my motivation for the financial transfers in writing, documenting my contemporaneous *mens rea*, was to save the funds from further loss, waste, and abuse by the leadership of DPPS, which I had been fighting to fix at that time.** I was an explicit, documented whistleblower to the DPNY board in New York, as well as governing board members in other states where DPPS

3

Seth Aaron Gross Andrew, Pro Se
Docket Number 22 CR 32 (JPC)

held contracts with "Democracy" branded schools, regarding their financial malfeasance, failed prioritization of policies requiring CRT and DEI, civil legal troubles, stagnated enrollment, rapidly declining academic outcomes, and explicit violations of its status as a non-profit, 501c3 organization.

**He also knows now, as he did then, that the purported financial motive ascribed to me was always false:**

- We had more than sufficient funds to qualify for any mortgage rate without counting non-profit assets; these funds were *never* counted towards a personal mortgage of my family's home.
- When asked, I explicitly told the bankers in writing, that the funds were not mine personally;
- I did not receive any adjustable mortgage rate reduction–I had a floating rate-lock of 2.5% before and after all of the transactions through closing, and recently selling, my family's apartment;
- The ~$300/month mortgage benefit was always a canard, used simply because my family purchased a home that same year. The SDNY manipulated that timeline to fit a false and nefarious narrative. Even if true, it couldn't have justified his 60 year prison sentence threat on federal criminal fraud charges, especially given President Trump's January 2021 Overcriminalization Executive Order that specifically instructed Mr. Finkle to *avoid such prosecutions on issues such as charter-school dissolution escrow account board politics.*
- A phone call, a target-letter, a civil lawsuit, state charges, or regulatory actions all could have resolved this matter without DOJ and FBI involvement, saving taxpayers millions, as no funds were ever hidden in any way.  As a reminder, the auditors and accounting firms for all the relevant organizations were the same; Mr. Finkle's letter to you attempts to cite "laundering" even though those charges were dropped, he knows that no attempts by me or those parties were ever made to "hide" or "launder" any of the funds. Without either intent to deceive or property loss the Supreme Court has repeatedly ruled *there can be no fraud.*
- Mr. Finkle lied when he told this court that DPPS rejected my offer to return in a temporary leadership role. He nor DPPS ever produced any evidence they did so, *because they did not.* After weeks with no reply to my harshly worded email, I transferred the money to safeguard it from loss as I indicated I would do, and I accepted another job offer and began the process of moving my family to Spain instead.
- While under no obligation to do so, I informed DPPS' accountants, auditors, CEO, Interim CEO, Interim CFO, Board members, DPNY, and numerous other parties *both before, during, and after the transfers were made.* I also told them why and where I was moving the funds, and under what authorization I had as the duly appointed escrow agent for DPC, DPE and DPH.  At no point leading up to those transfers was that authorization ever withdrawn. *DPPS never had authorization to control the funds.*

4

Seth Aaron Gross Andrew, Pro Se
Docket Number 22 CR 32 (JPC)

- Among other egregious legal and constitutional errors, Mr. Finkle chose to violate the 10th amendment on the normalized but flimsy logic that the 1953 Television and Wire fraud statute included Gmail servers because they may not have been located in New York State.
- We now know from related and dropped or overturned political cases including those against associates of Governor Cuomo, Mayor Adams, Lt. Governor Benjamin, that the SDNY's recent practices under Mr. Williams were made with explicitly political calculations and the headlines they would generate.

**It should be clear to you today, in ways you or I couldn't have seen before the *Brady* materials and other "new evidence" was released, that I was not actually prosecuted for the "crime" of right-to-control wire fraud, I was prosecuted for my politically heterodox views.** I want to be clear, I deeply regret my actions, as I said in your court under oath, and affirm today, I will spend my life repenting for the harm I caused to people and institutions I love. However, those actions have been found to not be a crime. For two decades, I have taken positions publicly criticising both political parties, public sector unions, FCPA violations, financial malfeasance, and for blowing the whistle on waste fraud and abuse with the use of taxpayer funds. These are beliefs I continue to hold, and once out of the corporeal control and supervision of the SDNY, I hope to call attention to again publicly.

**Mr. Finkle first found me to be a headline-worthy person, and in a Kafkaesque nightmare for my family, then he found the crime.** I hope that you see now that my politics were at fault, not my actions. I worked to register millions of voters by taking a domain away from the DOJ in 2015 and building Vote.gov in partnership with what is now DOGE (formerly USDS); I opposed candidate and President Biden's policies; I critiqued President Biden's the wasteful Department of Education; and my attacks on the careerist behaviors masking political ambitions of those such as Mr. Wiliams were common. Mr Finkle cites his theory for my continued Supervision as one of deterrence. Sadly for our country, the only thing my prosecution deterred was honest public service and public charter school creation that the Biden Administration's Department of Education has so vigorously opposed. Instead, SDNY used a legally and factually faulty complaint, not even worthy of an indictment, to take away my liberty for four years and my credibility for life. In short, President Biden and Mr. Williams successfully took me as a political opponent off the battlefield for their entire term in office.

**Mr. Finkle's letter doesn't acknowledge the *First Step Act or Monograph 109* (attached).** Both which make clear in plain language the congressional and US Probation intent towards supervision of first time, non-violent, political "offenders" like me. Today, the major political parties, of which I belong to neither, agree on very little. However they came together to pass the *First Step Act* and other areas of Criminal Justice Reform, the issue I work on full time today at the Livelihood Impact Fund & Impact Talent Network. We are working to increase the employability of ~80 million+ formerly incarcerated Americans like myself in the age of AI.

5

Seth Aaron Gross Andrew, Pro Se
Docket Number 22 CR 32 (JPC)

**I cheered publicly as President Trump issued the _2021 Overcriminalization_ and now the _2025 Weaponization_ Executive Orders and led the charge for Criminal Justice Reform in his first term.** I also cheered, though privately, as Minority Leader Jefferies recently stated: _"During his final weeks in office, President Biden should exercise the high level of compassion he has consistently demonstrated throughout his life, including toward his son, and pardon on a case-by-case basis the working-class Americans in the federal prison system whose lives have been ruined by unjustly aggressive prosecutions for nonviolent offenses. This moment calls for liberty and justice for all."_ My release from supervision should be a non-partisan decision to save the government future funds, after it has already wasted so much on my prosecution and incarceration. It is clear that Mr. Finkle's personal animus is driving his opposition, not the letter or spirit of the law.

**Judge Cronan, I implore you, to change my venue so that I may hope to receive justice without _even the perception of conflict,_ so that I may retain new counsel, and submit a motion to reconsider, and withdraw my guilty plea.** During my plea hearing, as you will recall from the transcript, you were not sure whether my allocution met the elements of wire-fraud. It is clear now, post _Ciminelli, Percoco, and Kousisis_ oral arguments, that it did not. Moreover, you will see that it is clear at the time and in the _Brady_ material, I was not making my plea or waiving my appellate rights voluntarily or knowingly, but under duress from a politically motivated prosecutor seeking headlines, not justice. As I told the Second Circuit, I am not going to give up my effort to have my conviction overturned, even if I have already served my entire prison sentence and it would mean risking a different, more severe, outcome than yours because we now know the all of the lies you were told by Mr. Finkle.

**Thus, I hope to preserve my rights, whether on supervision by SDNY or not, to file for further post-conviction relief based on a 2255, 2254, 2241, new-evidence, plain-error, and new Supreme Court decisions, as well as a collateral appeal if necessary.**

**If you have any questions about the facts I have stated here, I beg of you to allow me to present to you the _Brady_ documents or those in the public domain as well as Oral Argument so that I can answer any questions you may have under oath.**

**You were fair and thoughtful in your courtroom.** The problem I faced then, and now, is a malicious politically-motivated careerist prosecution. While my belief in "democracy" has been shaken, I do hope that you can help to restore it. I thank you in advance for your compassion and support.

Sincerely,

Seth Aaron Gross Andrew
212-928-8887

6

**United States v. Andrew**, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT P

## Petitioner's Sworn Declaration

Authentication, Diligence, and Strickland/Hill Prejudice (28 U.S.C. § 1746)

This Exhibit P is Petitioner's sworn declaration pursuant to 28 U.S.C. § 1746, executed pro se in support of his § 2255 Motion. The Declaration serves three distinct purposes:

**(1) Authentication.** The Declaration authenticates contemporaneous emails, draft documents, and other records referenced throughout the Motion and supporting exhibits, including **Ex. B** (Draft Allocution.003), **Ex. C** (Counsel Email Correspondence), **Ex. D** (PSR Objection Letters), **Ex. K** (March 11, 2019 email to DPPS Board), and **Ex. U** (April 2019 + October 2019 Wells Fargo emails).

**(2) Diligence.** The Declaration chronicles Petitioner's diligence efforts from the November 19, 2024 Second Circuit mandate forward — including his January 17, 2025 Petition for Rehearing En Banc (**Ex. I**) and his March 20, 2025 pro se letter to this Court (**Ex. O**) — in support of equitable tolling under *Holland v. Florida*, 560 U.S. 631 (2010), and *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004).

**(3) Strickland / Hill prejudice — sworn affirmatively.** The Declaration includes Petitioner's sworn statement of prejudice required by *Hill v. Lockhart*, 474 U.S. 52 (1985), *Lee v. United States*, 582 U.S. 357 (2017), and the Second Circuit's emphasis in *Puglisi v. United States*, 586 F.3d 209, 215 (2d Cir. 2009), that the petitioner himself swear personally to the key prejudice fact.

### PETITIONER'S SWORN PREJUDICE STATEMENT (extracted from Ex. P, ¶ 22 below)

> *"Had I received conflict-free advice, I would not have pleaded guilty on January 14, 2022. Instead, I would have taken one or more of the following actions: requested independent recusal advice; sought a continuance; moved to withdraw the plea or to defer entry of plea; demanded investigation of Dr. Robert North, Charter School Business Management (CSBM), the SUNY Charter Schools Institute, and Wells Fargo; moved to correct the Presentence Investigation Report; or proceeded to trial. I make this statement on personal knowledge and under penalty of perjury pursuant to 28 U.S.C. § 1746."*

**Material to:** § 2255 Motion Grounds One (Conflict — Strickland/Hill/Lee prejudice), Two (Invalid Plea), Three (Brady/IAC), and Five (Failure to Investigate); Memorandum §§ IV, V, VI, VIII; equitable tolling under *Holland v. Florida* (Memorandum § II.B(3)); authentication of Exs. B, C, D, K, and U.

### AUTHORITY

*Puglisi v. United States*, 586 F.3d 209, 215 (2d Cir. 2009) (petitioner must personally swear to the key prejudice fact; a statement buried in a memorandum is not enough); *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (Strickland prejudice in the plea context requires showing a reasonable probability that, but for counsel's deficient performance, the defendant would not have pleaded guilty); *Lee v. United States*, 582 U.S. 357 (2017) ("reasonable probability" does not require demonstration that trial would have produced acquittal).

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit P • Filed pro se pursuant to Rules Governing § 2255 Proceedings

SETH ANDREW,

   Petitioner-Movant,         Crim. No. 1:22-cr-00032 (JPC)

v.                    Civ. No. _____ (to be assigned)

UNITED STATES OF AMERICA,

   Respondent.

# DECLARATION OF SETH ANDREW IN SUPPORT OF EQUITABLE TOLLING, AUTHENTICATION, AND STRICKLAND/HILL PREJUDICE

I, Seth Andrew, hereby declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

## INTRODUCTION

**1.** I am the Petitioner-Movant in the above-captioned matter. I submit this Declaration in support of (a) the Strickland/Hill prejudice element of Grounds One and Two of my § 2255 Motion, (b) the equitable-tolling and diligence elements, and (c) authentication of contemporaneous records cited in the Motion and Memorandum. I am pro se. I make this Declaration based on personal knowledge of my own conduct, communications, and circumstances during the period covered. I reserve the right to supplement this Declaration with additional records, communications, and witnesses at evidentiary hearing or by leave to amend under *Mayle v. Felix*, 545 U.S. 644 (2005).

**2.** I have been continuously, diligently litigating my case — pro se since approximately August 25, 2022, when the Second Circuit relieved my prior counsel — without any meaningful period of inactivity. Extraordinary circumstances of three independent kinds have continuously impeded my ability to file a § 2255 motion until now: (i) the conflict of interest at the heart of Ground One of the Motion, which made it impossible to retain conflict-free counsel during the period when my former lead trial counsel led the office that would defend the conviction; (ii) financial constraints that left me without the means to retain post-conviction counsel until after the sale of my family residence on January 16, 2025; and (iii) the Government's continued adversarial posture, including AUSA Finkel's March 7, 2025 opposition to early termination of supervised release notwithstanding the Probation Department's affirmative February 21, 2025 recommendation.

## DILIGENCE TIMELINE (POST-MANDATE)

**3. November 19, 2024 — Second Circuit Mandate** issued in No. 22-1749. I learned of the mandate from PACER and through public-record monitoring. At that point, my former lead trial counsel Edward Y. Kim was the announced incoming Acting U.S. Attorney for SDNY (he formally assumed that role on December 13, 2024), and my former co-counsel Varun A. Gumaste was, on information and belief, serving as an AUSA within SDNY.

**4. November 19 – December 31, 2024.** I prepared for a possible petition for a writ of certiorari while attempting to retain counsel. I contacted multiple attorneys regarding representation for post-mandate proceedings. Each declined, citing the institutional posture of SDNY under Mr. Kim's leadership and (in

several cases) explicit professional reluctance to file against the Acting U.S. Attorney whose former representation was the subject of the IAC claim. I retained copies of email exchanges and decline notes; I reserve the right to produce these at evidentiary hearing, under seal if necessary to protect attorney-client and professional-courtesy interests.

**5. December 13, 2024.** Edward Y. Kim formally assumed the role of Acting U.S. Attorney for SDNY. From that date through approximately March 31, 2025, my former lead trial counsel led the office that would defend any § 2255 motion against him personally for IAC.

**6. January 2025.** I continued to attempt to retain counsel. Multiple attorneys, both pro bono and on a retained basis, declined. I additionally researched, on a pro se basis, the Supreme Court certiorari process, the § 2255 framework, the *Ciminelli*, *Percoco*, and *Kelly* trajectory of federal-fraud Supreme Court jurisprudence, and the *Kousisis* case then pending oral argument. I monitored the Supreme Court docket for relevant decisions.

**7. January 16, 2025.** Sale of my family residence at 370 Central Park West closed. The closing produced proceeds that I intended in part to fund post-conviction litigation. I am prepared to produce the closing settlement statement at hearing.

**8. January 17, 2025.** I filed pro se with the Second Circuit a sworn affidavit in support of a motion for rehearing en banc and/or T-1080 review, preserving the conflict-of-interest claim on the appellate record. The affidavit expressly stated my then-intent to pursue post-conviction relief under § 2255. See **Ex. I**.

**9. January 17, 2025.** My family relocated to Coralville, Iowa, for my wife's broadcast-journalism position. I requested transfer of supervised-release jurisdiction to the U.S. Probation Office for the Southern District of Iowa. Transfer was processed in due course.

**10. February 2025.** I attempted again to retain counsel. My outreach during this period included firms and attorneys with white-collar collateral-attack experience, firms and attorneys with Sixth Amendment conflict experience, pro bono organizations, and law-school clinics. I have separately preserved the specific names, dates, and decline communications and am prepared to produce them under seal upon request of the Court.

**11. February 21, 2025.** U.S. Probation (S.D.N.Y.) filed Probation Form 35 / Court Action Request recommending early termination of supervised release. Probation described my adjustment as "satisfactory" and noted that financial obligations had been fully paid. See **Ex. V**.

**12. February 21, 2025.** This Court, by Order (Doc. 55), invited the Government's position on early termination. See **Ex. V**.

**13. March 7, 2025.** AUSA Ryan B. Finkel filed an opposition letter on behalf of the Government under the institutional authority of then-Acting U.S. Attorney Matthew Podolsky's letterhead. See **Ex. V**.

**14. March 20, 2025.** I drafted a six-page pro se letter responding to the Government's opposition and requesting venue change and leave to withdraw my guilty plea. I executed the letter on March 20, 2025 and it was filed on the docket as Doc. 57-2 on March 24, 2025. That letter (**Ex. O**) expressly preserved my § 2255 rights and identified the same factual and legal disputes that I now formally plead in this Motion.

**15. April 2, 2025.** This Court denied early termination of supervised release. See **Ex. V** (Cronan Order, Doc. 58).

**16. March 2025.** Edward Y. Kim formally departed the Acting U.S. Attorney role and returned to private practice.

**17. March – May 2025.** I continued attempts to retain counsel for § 2255 preparation. Multiple attorneys declined, citing both the institutional posture of SDNY (where my former co-counsel Mr. Gumaste continued to serve as an AUSA) and the financial scope of preparing a contested § 2255 motion.

I also continued my own pro se preparation, including reading the post-plea Brady disclosures, the FBI Form 302 correction letter (**Ex. H**), the KKL Brady letter (**Ex. N**), the plea agreement (**Ex. W**), the plea transcript (**Ex. E**), and the sentencing transcript (**Ex. G**).

**18. May 22, 2025.** The U.S. Supreme Court decided *Kousisis v. United States*, 605 U.S. ___, 145 S. Ct. 1382 (2025). I obtained the slip opinion and read it within days of its issuance. *Kousisis*'s clarification of the "demanding" materiality requirement and the inducement element crystallized the legal framework for the Ground Four factual-innocence claim.

**19. June – December 2025.** I continued to attempt to retain counsel. I also continued the pro se preparation of the § 2255 Motion. During this period, I cataloged the conflict facts, the contemporaneous-resistance documentary record, the Brady-disclosed materials, and the legal theories. I drafted preliminary outlines of the Motion, Memorandum, Reassignment Motion, and Timeline.

**20. January – May 2026.** I drafted, revised, and finalized the Motion, Memorandum, Reassignment Motion, Timeline, and exhibits. The legal theories, factual averments, and supporting record cited in the Motion are the product of continuous pro se preparation between November 19, 2024 and the filing date.

## STRICKLAND / HILL PREJUDICE — SWORN STATEMENT

**21.** I affirm under penalty of perjury that the facts set forth in paragraphs 22–24 below are true to the best of my knowledge, information, and belief, and constitute the personal sworn statement required by *Puglisi v. United States*, 586 F.3d 209, 215 (2d Cir. 2009).

**22. Had I received conflict-free advice, I would not have pleaded guilty on January 14, 2022.** Instead, I would have taken one or more of the following actions, each of which was foreclosed by the conflict-burdened advice I received: (a) requested independent recusal advice from non-conflicted counsel concerning Judge Cronan's pre-disclosed personal friendship with my lead defense counsel; (b) sought a continuance to allow Brady disclosures already produced to opposing counsel to be shared with me, which they were not; (c) moved to withdraw the plea or to defer entry of plea pending Brady review; (d) demanded counsel investigate Dr. Robert North (the Government's central documentary witness, whose retracted statements were Brady material), Charter School Business Management (CSBM, the third-party bookkeeper whose contemporaneous communications established institutional separateness), the SUNY Charter Schools Institute (whose Annual Financial Reports and public regulatory filings established that escrow funds sat on the SCHOOLS' books and not DPPS's), and Wells Fargo (whose contemporaneous loan-officer emails confirmed the non-profit-assets exception communicated to me); (e) moved to correct the Presentence Investigation Report's factual errors regarding ownership, control, and loss; or (f) proceeded to trial.

**23.** The above statement is not retrospective rationalization. The contemporaneous documentary record — including my December 28, 2021 redlined Draft Allocution.003 (**Ex. B**), my May 2021 – January 2022 email exchanges with counsel (**Ex. C**), my March – July 2022 PSR Objection Letter drafts (**Ex. D**), my March 11, 2019 email to the DPPS Board (**Ex. K**), my April and October 2019 Wells Fargo email exchanges (**Ex. U**), and my real-time text-message and email communications with the CSBM bookkeeper (**Ex. Q**) — corroborate the substance of every statement in paragraph 22.

**24.** I affirm under penalty of perjury, consistent with *Lee v. United States*, 582 U.S. 357 (2017), that I am not required to demonstrate that trial would have produced an acquittal; I am required only to show a reasonable probability that, but for the conflicted advice, I would not have pleaded guilty. I affirm that reasonable probability is satisfied for each of the alternatives in paragraph 22.

## EXTRAORDINARY-CIRCUMSTANCE CONFIRMATION

**25.** I confirm under penalty of perjury that during the period from November 19, 2024 (mandate) through the filing date, I was either (a) actively attempting to retain conflict-free post-conviction counsel; (b)

prevented by financial constraints from doing so; (c) impeded by the institutional conflict caused by Mr. Kim's leadership of SDNY and Mr. Gumaste's continuing service as an AUSA at SDNY; or (d) actively engaged in pro se preparation of this Motion. There was no meaningful period during which I was idle, inattentive, or strategically delaying.

**26.** I did not file a petition for a writ of certiorari from the September 26, 2024 Second Circuit decision. I could not retain counsel who would file against the leadership of the office that would defend the petition, and I lacked the means to undertake the cert process pro se while in continuing supervised-release custody under conditions actively maintained by the same office.

**27.** I confirm under penalty of perjury that the contemporaneous record corroborates this diligence timeline: the Second Circuit docket entries; my January 17, 2025 sworn affidavit (**Ex. I**); the Probation Department's February 21, 2025 Form 35 recommendation (**Ex. V**); this Court's February 21, 2025 invitation for Government position (Doc. 55, in **Ex. V**); the Government's March 7, 2025 opposition letter (**Ex. V**); my March 20, 2025 letter (**Ex. O**, Doc. 57-2); the April 2, 2025 Order denying early termination (**Ex. V**, Doc. 58); and the closing settlement statement from the January 16, 2025 sale.

## AUTHENTICATION PARAGRAPHS

**28.** I authenticate the documents listed below as true and correct copies of records in my possession, retrieved from my own email archives, document archives, or counsel-produced files, as indicated:

**a. Ex. B** — Draft Allocution.003 dated December 28, 2021. Retrieved from my personal document archive. True and correct copy of the draft I redlined in response to counsel's drafts.

**b. Ex. C** — Contemporaneous email correspondence with Krieger Kim & Lewin LLP counsel, including the May 28, 2021 email from me to Edward Y. Kim and Timothy P. Doherty, and the January 5, 2022 email from Edward Y. Kim to me. Retrieved from my personal email archive. True and correct copies of the emails I sent and received on the dates and times shown.

**c. Ex. D** — PSR Objection Letter drafts v004, v007, and v013, dated by the file metadata I have preserved. Retrieved from my personal document archive. True and correct copies of the drafts.

**d. Ex. K** — March 11, 2019 "URGENT Proposal" email from me to Mr. Offutt and the DPPS Board regarding financial controls and escrow accounts. Retrieved from my personal email archive. True and correct copy.

**e. Ex. O** — My March 20, 2025 pro se letter to this Court, filed as Doc. 57 (and attachments 57-1, 57-2) on March 24, 2025. True and correct copy.

**f. Ex. Q** — Real-time email and text-message communications with the bookkeeper at Charter School Business Management (CSBM) regarding the financial transactions at issue. Retrieved from my personal email and iPhone archives. True and correct copies of the communications I exchanged with the CSBM bookkeeper during the period shown; the record does not capture phone calls or in-person meetings.

**g. Ex. U** — April 10, 2019 and October 25, 2019 Wells Fargo email exchanges between Wells Fargo loan officers and me regarding the non-profit-assets exception, the rate-lock chronology, and Petitioner's contemporaneous disclaimer of personal ownership of the funds. Retrieved from my personal email archive. True and correct copies.

**h. Counsel email chains preserved within Ex. C** — including the July 13–14, 2022 email chain among me, Edward Y. Kim, Timothy P. Doherty, and Varun A. Gumaste regarding the "qualifying authorization" language in the sentencing memorandum. I authenticate the substance of these communications on my personal knowledge and recollection of having sent and received them on the dates and at the times shown. To the extent any underlying email file is not in my possession at the time of filing, I have included the text of the relevant communications based on my contemporaneous recollection and preserved copies,

and I respectfully request leave to authenticate the underlying email files at evidentiary hearing or upon Rule 6 production from Krieger Kim & Lewin LLP.

## RESERVATION OF SUPPLEMENTAL PROOF

**29.** I reserve the right, upon evidentiary hearing or appointment of counsel, to produce: (a) the specific decline communications from attorneys I attempted to retain during this period; (b) my financial records evidencing the inability to fund counsel before the apartment sale; (c) any further documentary evidence of the diligence and impediment described above; and (d) any further documentary or testimonial evidence corroborating the sworn prejudice statement at paragraph 22.

**30.** I respectfully request that this Declaration be considered in support of (a) the equitable-tolling analysis under *Holland v. Florida*, 560 U.S. 631 (2010), and *Doe v. Menefee*, 391 F.3d 147 (2d Cir. 2004), as set out in Section III of the contemporaneously-filed Motion and Section II of the contemporaneously-filed Memorandum; (b) the Strickland/Hill prejudice analysis required by *Puglisi v. United States*, 586 F.3d 209 (2d Cir. 2009); and (c) authentication of Exhibits B, C, D, K, O, Q, and U.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted,

_____

S. Aaron Andrew, pro se

Coralville, Iowa 52241

Dated: May 14, 2026

Coralville, Iowa

# EXHIBIT Q

## Reserved / Rule 6 Target: Accountant and Bookkeeper Correspondence

DPPS, DPNY, and DBF • Real-Time Communications with Bookkeeping and Accounting Firms (2017–2021)

**Reserved.** Petitioner's text-message and email correspondence with the accountants and bookkeepers for Democracy Prep Public Schools (DPPS), Democracy Prep New York (DPNY), and Democracy Builders Fund (DBF) — including the Charter School Business Management (CSBM) team — remained consistent and transparent from 2017 through 2021 regarding the financial structure, escrow arrangements, and reserve-account accounting at issue.

Some of these materials are no longer easily in Petitioner's possession but can be made available upon limited Rule 6 discovery or in camera review.

## Use of This Exhibit

Identified as a Rule 6 discovery target to authenticate the real-time, contemporaneous nature of Petitioner's communications with the third-party accountants and bookkeepers regarding the transactions at issue. The records bear on the materiality and inducement analysis under *Kousisis v. United States*, 605 U.S. ___, 145 S. Ct. 1382 (2025), and on Ground Four (Factual Innocence).

## Materiality

**Material to:** § 2255 Motion Grounds Four (Factual Innocence) and Five (Failure to Investigate); Memorandum §§ II.B(1) (*Kousisis* materiality), VII (Factual Innocence). Supports first-stage Rule 6 discovery (Section XI of the Motion).

## Authentication and Reservation

Petitioner authenticates the existence and substance of these communications under penalty of perjury (Ex. P ¶ 28(f)). Petitioner reserves the right to supplement this Exhibit with specific produced records following Rule 6 discovery, and to call accountants and bookkeepers as fact witnesses at evidentiary hearing under § 2255(b).

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit Q • Filed pro se pursuant to Rules Governing § 2255 Proceedings

*United States **v. Andrew***, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT R

## Dr. Robert North — Brady-Disclosed Statements and Retraction

Two USAO Brady Letters (March 11, 2022 and April 8, 2022) • Off-Docket Production

This Exhibit R comprises two letters from AUSA Ryan B. Finkel to defense counsel Edward Y. Kim at Krieger Kim & Lewin LLP, produced as *Brady* material off-docket: (i) the **March 11, 2022 letter** disclosing Dr. Robert North's February 16, 2022 statement and February 28, 2022 retraction; and (ii) the **April 8, 2022 letter** in which the Government further explained that Dr. North "may have retracted his statement because the Board felt it important to speak with a unified voice."

### Use of This Exhibit

Offered as record evidence supporting the materiality of post-plea *Brady* disclosures and the Strickland / Hill / Lee prejudice analysis. The statements are not offered to prove that Dr. North exonerated Petitioner; they are offered to show the Government's own characterization of Dr. North's statements as *Brady* material, and the Government's acknowledgment that **the Board exerted unified-voice pressure** on what individual directors could say to the Court — a fact directly bearing on the "authorization," "mitigation," and "coercion" analyses underlying Grounds One, Three, and Five.

### Key Excerpts

#### From the March 11, 2022 USAO Brady letter:

*"The Government was informed that certain members of Democracy Prep's Board of Directors believe the defendant should receive 'a slap on the hand.' The Government understands one such Board member is Dr. Robert North who, on February 16, 2022, requested that the following statement, which was to be made in his individual capacity, be shared with the Court ... On February 28, 2022, the Government was notified that Dr. North retracted that statement."*

#### From the April 8, 2022 USAO Brady response letter (responding to KKL's April 1, 2022 letter):

*"The Government understands that Dr. North may have retracted his statement because the Board felt it important to speak with a unified voice."*

The Government further stated that it was "not obligated to disclose '[a]ny statements regarding Mr. Andrew' made by board members including Dr. North," and that the identities of the "slap on the hand" board members had been provided in the March 11, 2022 letter "to the extent that information is known to the Government."

### Significance for the § 2255 Motion

The April 8, 2022 letter is independently material: the Government's own characterization that the Board exerted "unified voice" pressure on individual director statements directly supports the conflict-of-counsel and coerced-witness analyses underlying Petitioner's claim that the "authorization" and "mitigation" record at sentencing was distorted. Counsel's failure to investigate, depose, or otherwise develop testimony from Dr. North or the other named "slap on the hand" board members — despite the Government's express identification of these witnesses as exculpatory or impeachment sources — supports Grounds One, Three, and Five.

### Materiality

**Material to:** Motion Grounds One (Conflict / IAC), Three (*Brady* / IAC), and Five (Failure to Investigate); Memorandum §§ IV, V, VI, VIII. Reserved for first-stage Rule 6 discovery: (i) the underlying Dr. North statements (February 16 and February 28, 2022); (ii) the Government's communications with the Democracy Prep Board concerning the "unified voice" instruction; and (iii) the identities of all "slap on the hand" board members.

### Source / Citation

Letter from AUSA Ryan B. Finkel to Krieger Kim & Lewin LLP, dated March 11, 2022 (off-docket *Brady* disclosure; on file with parties). Letter from AUSA Ryan B. Finkel to Krieger Kim & Lewin LLP, dated April 8, 2022 (responding to KKL's April 1, 2022 follow-up letter; off-docket disclosure). Originals of Dr. North's underlying February 16, 2022 and February 28, 2022 communications, as well as the Government's communications with the Democracy Prep Board, are within the USAO's possession and are the subject of Petitioner's Rule 6 discovery request.

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit R • Filed pro se pursuant to Rules Governing § 2255 Proceedings



*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 11, 2022

**By Email**
Edward Young Kyu Kim, Esq.
Krieger Kim & Lewin LLP
500 Fifth Avenue, 34th Floor
New York, NY 10110
212-390-9550
edward.kim@kklllp.com

      **Re: *United States v. Seth Andrew*, 22 Cr. 32 (JPC)**

Dear Mr. Kim:

      The Government recognizes its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  Pursuant to that obligation and the Government's other disclosure obligations, and in an abundance of caution, the Government writes to provide the information below.

      The Government was informed that certain members of Democracy Prep's Board of Directors believe the defendant should receive "a slap on the hand."  The Government understands one such Board member is Dr. Robert North who, on February 16, 2022, requested that the following statement, which was to be made in his individual capacity, be shared with the Court:

> Seth stole $200,000 from the students at Democracy Prep  which is unforgiveable but he also put a lot of blood, sweat and tears into the creation of a network of  Charter Schools that is providing a high quality education to more than 5,000 low income students.

      On February 28, 2022, the Government was notified that Dr. North retracted that statement.

      Very truly yours,

      DAMIAN WILLIAMS
      United States Attorney

By:   /s/ _____

      Ryan B. Finkel
      Assistant United States Attorney
      (212) 637-6612

2021.09.20



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 8, 2022

**By Email**
Edward Young Kyu Kim, Esq.
Krieger Kim & Lewin LLP
500 Fifth Avenue, 34th Floor
New York, NY 10110
212-390-9550
edward.kim@kklllp.com

　　　　Re: *United States v. Seth Andrew*, 22 Cr. 32 (JPC)

Dear Mr. Kim:

　　　　The Government writes in response to your April 1, 2022 letter.

　　　　*First*, with respect to "[t]he identities of the members of Democracy Prep's Board of Directors (current or past) who believe Mr. Andrew should receive 'a slap on the hand,'" to the extent that information is known to the Government, it was provided in our March 11, 2022 letter.

　　　　*Second*, in its March 11, 2022 letter, the Government disclosed, information in its possession, regarding sentencing, which may be helpful to the defense. The Government is not obligated to disclose "[a]ny statements regarding Mr. Andrew" made by board members including Dr. North.

　　　　*Third*, the Government understands that Dr. North may have retracted his statement because the Board felt it important to speak with a unified voice.

　　　　　　　　　　Very truly yours,

　　　　　　　　　　DAMIAN WILLIAMS
　　　　　　　　　　United States Attorney

　　　　　　By:　/s/ _____
　　　　　　　　　Ryan B. Finkel
　　　　　　　　　Assistant United States Attorney
　　　　　　　　　(212) 637-6612

2021.09.20

# EXHIBIT S

## Wells Fargo Financial Records — Factual Dispute Re: Materiality and Inducement

Wells Fargo Interest Rate Lock Records (USAO_00000001–USAO_00000033) • Brady Production

This Exhibit S comprises the Wells Fargo interest rate letters and mortgage rate-lock documentation produced as *Brady* material (USAO_00000001–USAO_00000033). The attached 33 pages reproduce the Wells Fargo Interest Rate Lock Agreements, asset-verification correspondence, and related loan-officer communications produced by the United States Attorney's Office in the underlying criminal case.

### Use of This Exhibit

These records support a factual dispute concerning the floating-down rate-lock chronology, the asset-verification process, and whether the alleged nonprofit-fund relationship discount caused or materially affected the mortgage terms. Pin-citation of rate, date, transfer, and Bates page is reserved for evidentiary hearing or Rule 6 discovery; Petitioner does not represent that, on the present record and without authentication, the records establish each specific challenged transfer date in relation to each rate-lock date.

### Authentication Required (Rule 6 Discovery)

Petitioner requests, as part of first-stage Rule 6 discovery: (i) authentication by Wells Fargo of the attached rate-lock documents; (ii) production of the relationship-discount criteria; (iii) the asset-verification materials referenced in the attached letters; and (iv) the loan-officer communications concerning whether nonprofit or escrow assets were included or excluded from the relationship-discount analysis.

### Materiality

**Material to:** Memorandum § II.B(1) (*Kousisis* materiality and inducement); Motion Grounds Four (Factual Innocence) and Five (Failure to Investigate); cross-reference Ex. H (FBI Form 302 correction) and Ex. U (Petitioner's contemporaneous email disclaimers).

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit S • Filed pro se pursuant to Rules Governing § 2255 Proceedings



# Interest Rate Lock Agreement

August 12, 2019

Seth Andrew and Lana Zak
622 MARYLAND AVE
WASHINGTON, DC 20002

Subject: **Your Interest Rate Lock Agreement**
Loan Number: XXXXXX5888
Property Address: 370 Central Park West, Apt 601, NEW YORK, NY 10025

Dear Seth and Lana:

We're writing to provide you with updated interest rate details for your proposed loan from Wells Fargo. We're required to send you a new agreement when your loan terms or closing date changes.

## Your interest rate lock details

The interest rate and terms stated below may change in some situations. See page two of this document for additional information.

| | | | |
|---|---|---|---|
| **Interest rate** | 2.500% | **Expiration date of rate lock** | December 9, 2019 |
| Annual percentage rate (APR)[1] | 3.193% | Rate lock period | 120 days |
| Principal amount of loan | $1,776,000.00 | Estimated principal and interest | $7,017.35 |
| Loan term | 360 months | Type of loan | ARM |
| Term of interest rate lock | 120 months | Index | 1 Year WSJ LIBOR |
| Origination charges | $6,606.00 | Margin | 2.250% |
| Discount points | 0.00 | Initial rate cap | 4.500% |
| Discount point fee included in total origination charges (loan amount x discount points) | $0.00 | Lifetime cap | 7.500% |
| Extended rate lock fee | $_____ | | |

[1] This annual percentage rate (APR) is an estimate based on information we have at this time. It may change based on factors such as changes in third party fees or the terms of your loan. APR is the cost of credit expressed as a yearly rate. It includes the prepaid interest rate, discount points, fees, and other credit charges you are required to pay, and it's a more complete measure of a loan's cost than the interest rate alone. The loan's interest rate, not its APR, is used to calculate the monthly principal and interest payment.

CONFIDENTIAL



USAO_00000001

## Rate lock and expiration information

- This rate lock is scheduled to expire on **December 9, 2019**. A rate lock on a mortgage loan means that your interest rate won't change between the offer and closing, as long as you close within the specified time frame and there are no changes to your application.
- If your rate lock will expire before your loan closing date, you have three choices:
  - **You can extend your rate lock** for a fee, which is a percentage of your final loan amount. If Wells Fargo is primarily responsible for the delay, you will not be charged a fee.
  - **You may return to float** by unlocking your rate if your closing date becomes unknown or uncertain and won't occur on or before the rate lock expiration date. You can relock in 14 calendar days or less at your original rate and loan terms. If you relock after 14 calendar days, you'll receive a new current market interest rate and rate lock expiration date. Contact your home mortgage consultant or private mortgage banker for help with this option.
  - **You may cancel/withdraw** your loan application. If you cancel/withdraw your loan application and then decide you want to move forward, you can reactivate your application in 14 calendar days or less and retain your original rate, loan terms, and rate lock expiration date. If you want to move forward after 14 calendar days, you will need to start a new application and obtain a new rate lock.
- If the market improves prior to closing your loan, you can pay a fee and relock at a lower interest rate. This is called "repricing" your loan.
- Refer to your Understanding Interest Rate Lock Options document in your initial disclosure package for additional details on rate lock and rate lock expirations.

## Additional information about this agreement

- The interest rate and terms displayed in the above table may change in some situations. These may include, but are not limited to:
  - If your loan is an adjustable-rate mortgage (ARM). In this case, the rate listed is the initial interest rate.
  - The type of loan you are applying for changes.
  - Your down payment amount changes.
  - Your requested loan amount increases or decreases after you initially locked your loan, which raises or lowers your loan-to-value (LTV) ratio.
  - The appraised value of the property is different than the value used when you initially locked your loan.
  - Your credit profile or qualifying income changes between the time you initially locked your loan and the loan closing.
  - Some of your income information, such as bonus or overtime income, cannot be verified.
- Refer to your Understanding Rate Lock Options document in your initial disclosure package for additional information on changes that may impact your interest rate.
- This agreement is not a commitment to lend. We will need to verify your information and review your financial documentation before we make a decision on your application. A loan commitment also depends on property eligibility, including the appraisal and title report. Please refer to your Loan Estimate for information about other closing costs you may need to pay in connection with this proposed loan.

## We're here for you

Thank you for the opportunity to help you reach your home financing goals. If you have any questions, please contact me.

Sincerely,

Harry Kalvonjian
Private Mortgage Banker
NMLSR ID: 409745
212-214-7780
Harry.Kalvonjian@wellsfargo.com

CONFIDENTIAL

WF000534
USAO_00000002



_____  August 12, 2019
Liz Bryant                        **Date**
Retail National Sales Manager

© 2018 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

EQUAL HOUSING
LENDER

HCFG-00038
Interest Rate Lock Agreement

2019081317.1.0.4574-J20180529Y

1012485319202

CONFIDENTIAL

USAO_00000003



# Interest Rate Lock Agreement

August 10, 2019

Seth Andrew and Lana Zak
622 MARYLAND AVE
WASHINGTON, DC 20002

Subject: **Your Interest Rate Lock Agreement**
Loan Number: XXXXXX5888
Property Address: 370 Central Park West, Apt 601, NEW YORK, NY 10025

Dear Seth and Lana:

We're writing to provide you with updated interest rate details for your proposed loan from Wells Fargo. We're required to send you a new agreement when your loan terms or closing date changes.

## Your interest rate lock details

The interest rate and terms stated below may change in some situations. See page two of this document for additional information.

| Interest rate | 2.500% | Expiration date of rate lock | December 9, 2019 |
| --- | --- | --- | --- |
| Annual percentage rate (APR)[1] | 3.194% | Rate lock period | 120 days |
| Principal amount of loan | $1,776,000.00 | Estimated principal and interest | $7,017.35 |
| Loan term | 360 months | Type of loan | ARM |
| Term of interest rate lock | 120 months | Index | 1 Year WSJ LIBOR |
| Origination charges | $6,606.00 | Margin | 2.250% |
| Discount points | 0.00 | Initial rate cap | 4.500% |
| Discount point fee included in total origination charges (loan amount x discount points) | $0.00 | Lifetime cap | 7.500% |
| Extended rate lock fee | $_____ | | |

[1] This annual percentage rate (APR) is an estimate based on information we have at this time. It may change based on factors such as changes in third party fees or the terms of your loan. APR is the cost of credit expressed as a yearly rate. It includes the prepaid interest rate, discount points, fees, and other credit charges you are required to pay, and it's a more complete measure of a loan's cost than the interest rate alone. The loan's interest rate, not its APR, is used to calculate the monthly principal and interest payment.

CONFIDENTIAL



USAO_00000004

# Rate lock and expiration information

- This rate lock is scheduled to expire on **December 9, 2019**. A rate lock on a mortgage loan means that your interest rate won't change between the offer and closing, as long as you close within the specified time frame and there are no changes to your application.
- If your rate lock will expire before your loan closing date, you have three choices:
  - **You can extend your rate lock** for a fee, which is a percentage of your final loan amount. If Wells Fargo is primarily responsible for the delay, you will not be charged a fee.
  - **You may return to float** by unlocking your rate if your closing date becomes unknown or uncertain and won't occur on or before the rate lock expiration date. You can relock in 14 calendar days or less at your original rate and loan terms. If you relock after 14 calendar days, you'll receive a new current market interest rate and rate lock expiration date. Contact your home mortgage consultant or private mortgage banker for help with this option.
  - **You may cancel/withdraw** your loan application. If you cancel/withdraw your loan application and then decide you want to move forward, you can reactivate your application in 14 calendar days or less and retain your original rate, loan terms, and rate lock expiration date. If you want to move forward after 14 calendar days, you will need to start a new application and obtain a new rate lock.
- If the market improves prior to closing your loan, you can pay a fee and relock at a lower interest rate. This is called "repricing" your loan.
- Refer to your Understanding Interest Rate Lock Options document in your initial disclosure package for additional details on rate lock and rate lock expirations.

# Additional information about this agreement

- The interest rate and terms displayed in the above table may change in some situations. These may include, but are not limited to:
  - If your loan is an adjustable-rate mortgage (ARM). In this case, the rate listed is the initial interest rate.
  - The type of loan you are applying for changes.
  - Your down payment amount changes.
  - Your requested loan amount increases or decreases after you initially locked your loan, which raises or lowers your loan-to-value (LTV) ratio.
  - The appraised value of the property is different than the value used when you initially locked your loan.
  - Your credit profile or qualifying income changes between the time you initially locked your loan and the loan closing.
  - Some of your income information, such as bonus or overtime income, cannot be verified.
- Refer to your Understanding Rate Lock Options document in your initial disclosure package for additional information on changes that may impact your interest rate.
- This agreement is not a commitment to lend. We will need to verify your information and review your financial documentation before we make a decision on your application. A loan commitment also depends on property eligibility, including the appraisal and title report. Please refer to your Loan Estimate for information about other closing costs you may need to pay in connection with this proposed loan.

# We're here for you

Thank you for the opportunity to help you reach your home financing goals. If you have any questions, please contact me.

Sincerely,

Harry Kalvonjian
Private Mortgage Banker
NMLSR ID: 409745
212-214-7780
Harry.Kalvonjian@wellsfargo.com

CONFIDENTIAL

WF000537
USAO_00000005



_____     August 10, 2019
Liz Bryant                **Date**
Retail National Sales Manager

© 2018 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801



CONFIDENTIAL

USAO_00000006

*Your actual rate, payment, and costs could be higher.*
*Get an official Loan Estimate before choosing a loan.*



# Interest Rate Lock Agreement

June 13, 2019

Seth Andrew and Lana Zak
622 MARYLAND AVE
WASHINGTON, DC 20002

Subject: **Your Interest Rate Lock Agreement**
Loan Number: XXXXXX5888
Property Address: 370 Central Park West, Apt 601, NEW YORK, NY 10025

Dear Seth and Lana:

We're writing to provide you with updated interest rate details for your proposed loan from Wells Fargo. We're required to send you a new agreement when your loan terms or closing date changes.

## Your interest rate lock details

The interest rate and terms stated below may change in some situations. See page two of this document for additional information.

| | | | |
|---|---|---|---|
| **Interest rate** | 2.750% | **Expiration date of rate lock** | July 19, 2019 |
| Annual percentage rate (APR)[1] | 3.435% | Rate lock period | 120 days |
| Principal amount of loan | $1,776,000.00 | Estimated principal and interest | $7,250.37 |
| Loan term | 360 months | Type of loan | ARM |
| Term of interest rate lock | 120 months | Index | 1 Year WSJ LIBOR |
| Origination charges | $6,481.00 | Margin | 2.250% |
| Discount points | 0.00 | Initial rate cap | 4.750% |
| Discount point fee included in total origination charges (loan amount x discount points) | $0.00 | Lifetime cap | 7.750% |

[1] This annual percentage rate (APR) is an estimate based on information we have at this time. It may change based on factors such as changes in third party fees or the terms of your loan. APR is the cost of credit expressed as a yearly rate. It includes the prepaid interest rate, discount points, fees, and other credit charges you are required to pay, and it's a more complete measure of a loan's cost than the interest rate alone. The loan's interest rate, not its APR, is used to calculate the monthly principal and interest payment.

CONFIDENTIAL



USAO_00000007

## Rate lock and expiration information

- This rate lock is scheduled to expire on **July 19, 2019**. A rate lock on a mortgage loan means that your interest rate won't change between the offer and closing, as long as you close within the specified time frame and there are no changes to your application.
- If your rate lock will expire before your loan closing date, you have three choices:
  - **You can extend your rate lock** for a fee, which is a percentage of your final loan amount. If Wells Fargo is primarily responsible for the delay, you will not be charged a fee.
  - **You may return to float** by unlocking your rate if your closing date becomes unknown or uncertain and won't occur on or before the rate lock expiration date. You can relock in 14 calendar days or less at your original rate and loan terms. If you relock after 14 calendar days, you'll receive a new current market interest rate and rate lock expiration date. Contact your home mortgage consultant or private mortgage banker for help with this option.
  - **You may cancel/withdraw** your loan application. If you cancel/withdraw your loan application and then decide you want to move forward, you can reactivate your application in 14 calendar days or less and retain your original rate, loan terms, and rate lock expiration date. If you want to move forward after 14 calendar days, you will need to start a new application and obtain a new rate lock.
- If the market improves prior to closing your loan, you can pay a fee and relock at a lower interest rate. This is called "repricing" your loan.
- Refer to your Understanding Interest Rate Lock Options document in your initial disclosure package for additional details on rate lock and rate lock expirations.

## Additional information about this agreement

- The interest rate and terms displayed in the above table may change in some situations. These may include, but are not limited to:
  - If your loan is an adjustable-rate mortgage (ARM). In this case, the rate listed is the initial interest rate.
  - The type of loan you are applying for changes.
  - Your down payment amount changes.
  - Your requested loan amount increases or decreases after you initially locked your loan, which raises or lowers your loan-to-value (LTV) ratio.
  - The appraised value of the property is different than the value used when you initially locked your loan.
  - Your credit profile or qualifying income changes between the time you initially locked your loan and the loan closing.
  - Some of your income information, such as bonus or overtime income, cannot be verified.
- Refer to your Understanding Rate Lock Options document in your initial disclosure package for additional information on changes that may impact your interest rate.
- This agreement is not a commitment to lend. We will need to verify your information and review your financial documentation before we make a decision on your application. A loan commitment also depends on property eligibility, including the appraisal and title report. Please refer to your Loan Estimate for information about other closing costs you may need to pay in connection with this proposed loan.

## We're here for you

Thank you for the opportunity to help you reach your home financing goals. If you have any questions, please contact me.

Sincerely,

Harry Kalvonjian
Private Mortgage Banker
NMLSR ID: 409745
212-214-7780
Harry.Kalvonjian@wellsfargo.com

CONFIDENTIAL

WF000540
USAO_00000008



June 13, 2019

Liz Bryant
Retail National Sales Manager

**Date**

© 2018 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

CONFIDENTIAL

USAO_00000009

*Your actual rate, payment, and costs could be higher.*
*Get an official Loan Estimate before choosing a loan.*



# Interest Rate Lock Agreement

June 12, 2019

Seth Andrew and Lana Zak
622 MARYLAND AVE
WASHINGTON, DC 20002

Subject: **Your Interest Rate Lock Agreement**
Loan Number: XXXXXX5888
Property Address: 370 Central Park West, Apt 601, NEW YORK, NY 10025

Dear Seth and Lana:

We're writing to provide you with updated interest rate details for your proposed loan from Wells Fargo. We're required to send you a new agreement when your loan terms or closing date changes.

## Your interest rate lock details

The interest rate and terms stated below may change in some situations. See page two of this document for additional information.

| | | | |
|---|---|---|---|
| **Interest rate** | 2.750% | **Expiration date of rate lock** | July 19, 2019 |
| Annual percentage rate (APR)[1] | 3.483% | Rate lock period | 120 days |
| Principal amount of loan | $1,776,000.00 | Estimated principal and interest | $7,250.37 |
| Loan term | 360 months | Type of loan | ARM |
| Term of interest rate lock | 120 months | Index | 1 Year WSJ LIBOR |
| Origination charges | $6,481.00 | Margin | 2.250% |
| Discount points | 0.00 | Initial rate cap | 4.750% |
| Discount point fee included in total origination charges (loan amount x discount points) | $0.00 | Lifetime cap | 7.750% |

[1] This annual percentage rate (APR) is an estimate based on information we have at this time. It may change based on factors such as changes in third party fees or the terms of your loan. APR is the cost of credit expressed as a yearly rate. It includes the prepaid interest rate, discount points, fees, and other credit charges you are required to pay, and it's a more complete measure of a loan's cost than the interest rate alone. The loan's interest rate, not its APR, is used to calculate the monthly principal and interest payment.

CONFIDENTIAL



USAO_00000010

## Rate lock and expiration information

- This rate lock is scheduled to expire on **July 19, 2019**. A rate lock on a mortgage loan means that your interest rate won't change between the offer and closing, as long as you close within the specified time frame and there are no changes to your application.
- If your rate lock will expire before your loan closing date, you have three choices:
  - **You can extend your rate lock** for a fee, which is a percentage of your final loan amount. If Wells Fargo is primarily responsible for the delay, you will not be charged a fee.
  - **You may return to float** by unlocking your rate if your closing date becomes unknown or uncertain and won't occur on or before the rate lock expiration date. You can relock in 14 calendar days or less at your original rate and loan terms. If you relock after 14 calendar days, you'll receive a new current market interest rate and rate lock expiration date. Contact your home mortgage consultant or private mortgage banker for help with this option.
  - **You may cancel/withdraw** your loan application. If you cancel/withdraw your loan application and then decide you want to move forward, you can reactivate your application in 14 calendar days or less and retain your original rate, loan terms, and rate lock expiration date. If you want to move forward after 14 calendar days, you will need to start a new application and obtain a new rate lock.
- If the market improves prior to closing your loan, you can pay a fee and relock at a lower interest rate. This is called "repricing" your loan.
- Refer to your Understanding Interest Rate Lock Options document in your initial disclosure package for additional details on rate lock and rate lock expirations.

## Additional information about this agreement

- The interest rate and terms displayed in the above table may change in some situations. These may include, but are not limited to:
  - If your loan is an adjustable-rate mortgage (ARM). In this case, the rate listed is the initial interest rate.
  - The type of loan you are applying for changes.
  - Your down payment amount changes.
  - Your requested loan amount increases or decreases after you initially locked your loan, which raises or lowers your loan-to-value (LTV) ratio.
  - The appraised value of the property is different than the value used when you initially locked your loan.
  - Your credit profile or qualifying income changes between the time you initially locked your loan and the loan closing.
  - Some of your income information, such as bonus or overtime income, cannot be verified.
- Refer to your Understanding Rate Lock Options document in your initial disclosure package for additional information on changes that may impact your interest rate.
- This agreement is not a commitment to lend. We will need to verify your information and review your financial documentation before we make a decision on your application. A loan commitment also depends on property eligibility, including the appraisal and title report. Please refer to your Loan Estimate for information about other closing costs you may need to pay in connection with this proposed loan.

## We're here for you

Thank you for the opportunity to help you reach your home financing goals. If you have any questions, please contact me.

Sincerely,

Harry Kalvonjian
Private Mortgage Banker
NMLSR ID: 409745
212-214-7780
Harry.Kalvonjian@wellsfargo.com

CONFIDENTIAL

WF000543
USAO_00000011



_____

Liz Bryant  
Retail National Sales Manager

June 12, 2019  
**Date**

© 2018 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801



EQUAL HOUSING  
**LENDER**

CONFIDENTIAL

USAO_00000012

*Your actual rate, payment, and costs could be higher.*
*Get an official Loan Estimate before choosing a loan.*



# Interest Rate Lock Agreement

April 23, 2019

Seth Andrew and Lana Zak
622 MARYLAND AVE
WASHINGTON, DC 20002

| Subject: | **Your Interest Rate Lock Agreement** |
|---|---|
| | Loan Number: XXXXXX5888 |
| | Property Address: 370 Central Park West, Apt 601, NEW YORK, NY 10025 |

Dear Seth and Lana:

We're writing to provide you with updated interest rate details for your proposed loan from Wells Fargo. We're required to send you a new agreement when your loan terms or closing date changes.

## Your interest rate lock details

The interest rate and terms stated below may change in some situations. See page two of this document for additional information.

| **Interest rate** | 2.750% | **Expiration date of rate lock** | July 19, 2019 |
|---|---|---|---|
| Annual percentage rate (APR)[1] | 3.615% | Rate lock period | 120 days |
| Principal amount of loan | $1,776,000.00 | Estimated principal and interest | $7,250.37 |
| Loan term | 360 months | Type of loan | ARM |
| Term of interest rate lock | 120 months | Index | 1 Year WSJ LIBOR |
| Origination charges | $4,261.00 | Margin | 2.250% |
| Discount points | 0.00 | Initial rate cap | 4.750% |
| Discount point fee included in total origination charges (loan amount x discount points) | $0.00 | Lifetime cap | 7.750% |

[1] This annual percentage rate (APR) is an estimate based on information we have at this time. It may change based on factors such as changes in third party fees or the terms of your loan. APR is the cost of credit expressed as a yearly rate. It includes the prepaid interest rate, discount points, fees, and other credit charges you are required to pay, and it's a more complete measure of a loan's cost than the interest rate alone. The loan's interest rate, not its APR, is used to calculate the monthly principal and interest payment.

CONFIDENTIAL



USAO_00000013

## Rate lock and expiration information

- This rate lock is scheduled to expire on **July 19, 2019**. A rate lock on a mortgage loan means that your interest rate won't change between the offer and closing, as long as you close within the specified time frame and there are no changes to your application.
- If your rate lock will expire before your loan closing date, you have three choices:
  - **You can extend your rate lock** for a fee, which is a percentage of your final loan amount. If Wells Fargo is primarily responsible for the delay, you will not be charged a fee.
  - **You may return to float** by unlocking your rate if your closing date becomes unknown or uncertain and won't occur on or before the rate lock expiration date. You can relock in 14 calendar days or less at your original rate and loan terms. If you relock after 14 calendar days, you'll receive a new current market interest rate and rate lock expiration date. Contact your home mortgage consultant or private mortgage banker for help with this option.
  - **You may cancel/withdraw** your loan application. If you cancel/withdraw your loan application and then decide you want to move forward, you can reactivate your application in 14 calendar days or less and retain your original rate, loan terms, and rate lock expiration date. If you want to move forward after 14 calendar days, you will need to start a new application and obtain a new rate lock.
- If the market improves prior to closing your loan, you can pay a fee and relock at a lower interest rate. This is called "repricing" your loan.
- Refer to your Understanding Interest Rate Lock Options document in your initial disclosure package for additional details on rate lock and rate lock expirations.

## Additional information about this agreement

- The interest rate and terms displayed in the above table may change in some situations. These may include, but are not limited to:
  - If your loan is an adjustable-rate mortgage (ARM). In this case, the rate listed is the initial interest rate.
  - The type of loan you are applying for changes.
  - Your down payment amount changes.
  - Your requested loan amount increases or decreases after you initially locked your loan, which raises or lowers your loan-to-value (LTV) ratio.
  - The appraised value of the property is different than the value used when you initially locked your loan.
  - Your credit profile or qualifying income changes between the time you initially locked your loan and the loan closing.
  - Some of your income information, such as bonus or overtime income, cannot be verified.
- Refer to your Understanding Rate Lock Options document in your initial disclosure package for additional information on changes that may impact your interest rate.
- This agreement is not a commitment to lend. We will need to verify your information and review your financial documentation before we make a decision on your application. A loan commitment also depends on property eligibility, including the appraisal and title report. Please refer to your Loan Estimate for information about other closing costs you may need to pay in connection with this proposed loan.

## We're here for you

Thank you for the opportunity to help you reach your home financing goals. If you have any questions, please contact me.

Sincerely,

Harry Kalvonjian
Private Mortgage Banker
NMLSR ID: 409745
212-214-7780
Harry.Kalvonjian@wellsfargo.com

CONFIDENTIAL

WF000546
USAO_00000014



April 23, 2019

Liz Bryant
Retail National Sales Manager

**Date**



© 2018 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

CONFIDENTIAL

USAO_00000015

*Your actual rate, payment, and costs could be higher.*
*Get an official Loan Estimate before choosing a loan.*



# Interest Rate Lock Agreement

April 12, 2019

Seth Andrew and Lana Zak
622 MARYLAND AVE
WASHINGTON, DC 20002

Subject: **Your Interest Rate Lock Agreement**

Loan Number: XXXXXX5888

Property Address: 370 Central Park West, Apt 601, NEW YORK, NY 10025

Dear Seth and Lana:

We're writing to provide you with updated interest rate details for your proposed loan from Wells Fargo. We're required to send you a new agreement when your loan terms or closing date changes.

## Your interest rate lock details

The interest rate and terms stated below may change in some situations. See page two of this document for additional information.

| | | | |
|---|---|---|---|
| **Interest rate** | 2.875% | **Expiration date of rate lock** | July 19, 2019 |
| Annual percentage rate (APR)[1] | 3.694% | Rate lock period | 120 days |
| Principal amount of loan | $1,776,000.00 | Estimated principal and interest | $7,368.50 |
| Loan term | 360 months | Type of loan | ARM |
| Term of interest rate lock | 120 months | Index | 1 Year WSJ LIBOR |
| Origination charges | $4,261.00 | Margin | 2.250% |
| Discount points | 0.00 | Initial rate cap | 4.875% |
| Discount point fee included in total origination charges (loan amount x discount points) | $0.00 | Lifetime cap | 7.875% |

[1] This annual percentage rate (APR) is an estimate based on information we have at this time. It may change based on factors such as changes in third party fees or the terms of your loan. APR is the cost of credit expressed as a yearly rate. It includes the prepaid interest rate, discount points, fees, and other credit charges you are required to pay, and it's a more complete measure of a loan's cost than the interest rate alone. The loan's interest rate, not its APR, is used to calculate the monthly principal and interest payment.

CONFIDENTIAL



USAO_00000016

# Rate lock and expiration information

- This rate lock is scheduled to expire on **July 19, 2019**. A rate lock on a mortgage loan means that your interest rate won't change between the offer and closing, as long as you close within the specified time frame and there are no changes to your application.
- If your rate lock will expire before your loan closing date, you have three choices:
  - **You can extend your rate lock** for a fee, which is a percentage of your final loan amount. If Wells Fargo is primarily responsible for the delay, you will not be charged a fee.
  - **You may return to float** by unlocking your rate if your closing date becomes unknown or uncertain and won't occur on or before the rate lock expiration date. You can relock in 14 calendar days or less at your original rate and loan terms. If you relock after 14 calendar days, you'll receive a new current market interest rate and rate lock expiration date. Contact your home mortgage consultant or private mortgage banker for help with this option.
  - **You may cancel/withdraw** your loan application. If you cancel/withdraw your loan application and then decide you want to move forward, you can reactivate your application in 14 calendar days or less and retain your original rate, loan terms, and rate lock expiration date. If you want to move forward after 14 calendar days, you will need to start a new application and obtain a new rate lock.
- If the market improves prior to closing your loan, you can pay a fee and relock at a lower interest rate. This is called "repricing" your loan.
- Refer to your Understanding Interest Rate Lock Options document in your initial disclosure package for additional details on rate lock and rate lock expirations.

# Additional information about this agreement

- The interest rate and terms displayed in the above table may change in some situations. These may include, but are not limited to:
  - If your loan is an adjustable-rate mortgage (ARM). In this case, the rate listed is the initial interest rate.
  - The type of loan you are applying for changes.
  - Your down payment amount changes.
  - Your requested loan amount increases or decreases after you initially locked your loan, which raises or lowers your loan-to-value (LTV) ratio.
  - The appraised value of the property is different than the value used when you initially locked your loan.
  - Your credit profile or qualifying income changes between the time you initially locked your loan and the loan closing.
  - Some of your income information, such as bonus or overtime income, cannot be verified.
- Refer to your Understanding Rate Lock Options document in your initial disclosure package for additional information on changes that may impact your interest rate.
- This agreement is not a commitment to lend. We will need to verify your information and review your financial documentation before we make a decision on your application. A loan commitment also depends on property eligibility, including the appraisal and title report. Please refer to your Loan Estimate for information about other closing costs you may need to pay in connection with this proposed loan.

# We're here for you

Thank you for the opportunity to help you reach your home financing goals. If you have any questions, please contact me.

Sincerely,

Harry Kalvonjian
Private Mortgage Banker
NMLSR ID: 409745
212-214-7780
Harry.Kalvonjian@wellsfargo.com

CONFIDENTIAL

WF000549

USAO_00000017



April 12, 2019

Liz Bryant
Retail National Sales Manager

**Date**

© 2018 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801



EQUAL HOUSING
**LENDER**

CONFIDENTIAL

USAO_00000018



# Interest Rate Lock Agreement

April 10, 2019

Seth Andrew and Lana Zak
622 MARYLAND AVE
WASHINGTON, DC 20002

| Subject: | **Your Interest Rate Lock Agreement** |
|---|---|
| | Loan Number: XXXXXX5888 |
| | Property Address: 370 Central Park West, Apt 601, NEW YORK, NY 10025 |

Dear Seth and Lana:

We're writing to provide you with updated interest rate details for your proposed loan from Wells Fargo. We're required to send you a new agreement when your loan terms or closing date changes.

## Your interest rate lock details

The interest rate and terms stated below may change in some situations. See page two of this document for additional information.

| | | | |
|---|---|---|---|
| **Interest rate** | 2.875% | **Expiration date of rate lock** | July 19, 2019 |
| Annual percentage rate (APR)[1] | 3.694% | Rate lock period | 120 days |
| Principal amount of loan | $1,776,000.00 | Estimated principal and interest | $7,368.50 |
| Loan term | 360 months | Type of loan | ARM |
| Term of interest rate lock | 120 months | Index | 1 Year WSJ LIBOR |
| Origination charges | $4,261.00 | Margin | 2.250% |
| Discount points | 0.00 | Initial rate cap | 4.875% |
| Discount point fee included in total origination charges (loan amount x discount points) | $0.00 | Lifetime cap | 7.875% |

[1] This annual percentage rate (APR) is an estimate based on information we have at this time. It may change based on factors such as changes in third party fees or the terms of your loan. APR is the cost of credit expressed as a yearly rate. It includes the prepaid interest rate, discount points, fees, and other credit charges you are required to pay, and it's a more complete measure of a loan's cost than the interest rate alone. The loan's interest rate, not its APR, is used to calculate the monthly principal and interest payment.

CONFIDENTIAL



USAO_00000019

## Rate lock and expiration information

- This rate lock is scheduled to expire on **July 19, 2019**. A rate lock on a mortgage loan means that your interest rate won't change between the offer and closing, as long as you close within the specified time frame and there are no changes to your application.
- If your rate lock will expire before your loan closing date, you have three choices:
  - **You can extend your rate lock** for a fee, which is a percentage of your final loan amount. If Wells Fargo is primarily responsible for the delay, you will not be charged a fee.
  - **You may return to float** by unlocking your rate if your closing date becomes unknown or uncertain and won't occur on or before the rate lock expiration date. You can relock in 14 calendar days or less at your original rate and loan terms. If you relock after 14 calendar days, you'll receive a new current market interest rate and rate lock expiration date. Contact your home mortgage consultant or private mortgage banker for help with this option.
  - **You may cancel/withdraw** your loan application. If you cancel/withdraw your loan application and then decide you want to move forward, you can reactivate your application in 14 calendar days or less and retain your original rate, loan terms, and rate lock expiration date. If you want to move forward after 14 calendar days, you will need to start a new application and obtain a new rate lock.
- If the market improves prior to closing your loan, you can pay a fee and relock at a lower interest rate. This is called "repricing" your loan.
- Refer to your Understanding Interest Rate Lock Options document in your initial disclosure package for additional details on rate lock and rate lock expirations.

## Additional information about this agreement

- The interest rate and terms displayed in the above table may change in some situations. These may include, but are not limited to:
  - If your loan is an adjustable-rate mortgage (ARM). In this case, the rate listed is the initial interest rate.
  - The type of loan you are applying for changes.
  - Your down payment amount changes.
  - Your requested loan amount increases or decreases after you initially locked your loan, which raises or lowers your loan-to-value (LTV) ratio.
  - The appraised value of the property is different than the value used when you initially locked your loan.
  - Your credit profile or qualifying income changes between the time you initially locked your loan and the loan closing.
  - Some of your income information, such as bonus or overtime income, cannot be verified.
- Refer to your Understanding Rate Lock Options document in your initial disclosure package for additional information on changes that may impact your interest rate.
- This agreement is not a commitment to lend. We will need to verify your information and review your financial documentation before we make a decision on your application. A loan commitment also depends on property eligibility, including the appraisal and title report. Please refer to your Loan Estimate for information about other closing costs you may need to pay in connection with this proposed loan.

## We're here for you

Thank you for the opportunity to help you reach your home financing goals. If you have any questions, please contact me.

Sincerely,

Harry Kalvonjian
Private Mortgage Banker
NMLSR ID: 409745
212-214-7780
Harry.Kalvonjian@wellsfargo.com

CONFIDENTIAL

WF000552
USAO_00000020



_____ April 10, 2019
Liz Bryant
Retail National Sales Manager

**Date**

© 2018 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801



CONFIDENTIAL

USAO_00000021

*Your actual rate, payment, and costs could be higher.*
*Get an official Loan Estimate before choosing a loan.*



# Interest Rate Lock Agreement

April 3, 2019

Seth Andrew and Lana Zak
622 MARYLAND AVE
WASHINGTON, DC 20002

Subject: **Your Interest Rate Lock Agreement**
Loan Number: XXXXXX5888
Property Address: 370 Central Park West, Apt 601, NEW YORK, NY 10025

Dear Seth and Lana:

We're writing to provide you with updated interest rate details for your proposed loan from Wells Fargo. We're required to send you a new agreement when your loan terms or closing date changes.

## Your interest rate lock details

The interest rate and terms stated below may change in some situations. See page two of this document for additional information.

| | | | |
|---|---|---|---|
| **Interest rate** | 3.250% | **Expiration date of rate lock** | July 19, 2019 |
| Annual percentage rate (APR)[1] | 3.921% | Rate lock period | 120 days |
| Principal amount of loan | $1,776,000.00 | Estimated principal and interest | $7,729.27 |
| Loan term | 360 months | Type of loan | ARM |
| Term of interest rate lock | 120 months | Index | 1 Year WSJ LIBOR |
| Origination charges | $4,261.00 | Margin | 2.250% |
| Discount points | 0.00 | Initial rate cap | 5.250% |
| Discount point fee included in total origination charges (loan amount x discount points) | $0.00 | Lifetime cap | 8.250% |

[1] This annual percentage rate (APR) is an estimate based on information we have at this time. It may change based on factors such as changes in third party fees or the terms of your loan. APR is the cost of credit expressed as a yearly rate. It includes the prepaid interest rate, discount points, fees, and other credit charges you are required to pay, and it's a more complete measure of a loan's cost than the interest rate alone. The loan's interest rate, not its APR, is used to calculate the monthly principal and interest payment.

CONFIDENTIAL



USAO_00000022

## Rate lock and expiration information

- This rate lock is scheduled to expire on **July 19, 2019**. A rate lock on a mortgage loan means that your interest rate won't change between the offer and closing, as long as you close within the specified time frame and there are no changes to your application.
- If your rate lock will expire before your loan closing date, you have three choices:
  - **You can extend your rate lock** for a fee, which is a percentage of your final loan amount. If Wells Fargo is primarily responsible for the delay, you will not be charged a fee.
  - **You may return to float** by unlocking your rate if your closing date becomes unknown or uncertain and won't occur on or before the rate lock expiration date. You can relock in 14 calendar days or less at your original rate and loan terms. If you relock after 14 calendar days, you'll receive a new current market interest rate and rate lock expiration date. Contact your home mortgage consultant or private mortgage banker for help with this option.
  - **You may cancel/withdraw** your loan application. If you cancel/withdraw your loan application and then decide you want to move forward, you can reactivate your application in 14 calendar days or less and retain your original rate, loan terms, and rate lock expiration date. If you want to move forward after 14 calendar days, you will need to start a new application and obtain a new rate lock.
- If the market improves prior to closing your loan, you can pay a fee and relock at a lower interest rate. This is called "repricing" your loan.
- Refer to your Understanding Interest Rate Lock Options document in your initial disclosure package for additional details on rate lock and rate lock expirations.

## Additional information about this agreement

- The interest rate and terms displayed in the above table may change in some situations. These may include, but are not limited to:
  - If your loan is an adjustable-rate mortgage (ARM). In this case, the rate listed is the initial interest rate.
  - The type of loan you are applying for changes.
  - Your down payment amount changes.
  - Your requested loan amount increases or decreases after you initially locked your loan, which raises or lowers your loan-to-value (LTV) ratio.
  - The appraised value of the property is different than the value used when you initially locked your loan.
  - Your credit profile or qualifying income changes between the time you initially locked your loan and the loan closing.
  - Some of your income information, such as bonus or overtime income, cannot be verified.
- Refer to your Understanding Rate Lock Options document in your initial disclosure package for additional information on changes that may impact your interest rate.
- This agreement is not a commitment to lend. We will need to verify your information and review your financial documentation before we make a decision on your application. A loan commitment also depends on property eligibility, including the appraisal and title report. Please refer to your Loan Estimate for information about other closing costs you may need to pay in connection with this proposed loan.

## We're here for you

Thank you for the opportunity to help you reach your home financing goals. If you have any questions, please contact me.

Sincerely,

Harry Kalvonjian
Private Mortgage Banker
NMLSR ID: 409745
212-214-7780
Harry.Kalvonjian@wellsfargo.com

CONFIDENTIAL

WF000555
USAO_00000023



_____          April 3, 2019
Liz Bryant                                **Date**
Retail National Sales Manager

© 2018 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801


EQUAL HOUSING
**LENDER**

HCFG-00038

Interest Rate Lock Agreement

CONFIDENTIAL

USAO_00000024

*Your actual rate, payment, and costs could be higher.*
*Get an official Loan Estimate before choosing a loan.*



# Interest Rate Lock Agreement

April 3, 2019

Seth Andrew and Lana Zak
622 MARYLAND AVE
WASHINGTON, DC 20002

Subject: **Your Interest Rate Lock Agreement**
Loan Number:     XXXXXX5888
Property Address:     370 Central Park West, Apt 601, NEW YORK, NY 10025

Dear Seth and Lana:

We're writing to provide you with updated interest rate details for your proposed loan from Wells Fargo. We're required to send you a new agreement when your loan terms or closing date changes.

## Your interest rate lock details

The interest rate and terms stated below may change in some situations. See page two of this document for additional information.

| | | | |
|---|---|---|---|
| **Interest rate** | 3.250% | **Expiration date of rate lock** | July 19, 2019 |
| Annual percentage rate (APR)[1] | 3.921% | Rate lock period | 120 days |
| Principal amount of loan | $1,776,000.00 | Estimated principal and interest | $7,729.27 |
| Loan term | 360 months | Type of loan | ARM |
| Term of interest rate lock | 120 months | Index | 1 Year WSJ LIBOR |
| Origination charges | $4,261.00 | Margin | 2.250% |
| Discount points | 0.00 | Initial rate cap | 5.250% |
| Discount point fee included in total origination charges (loan amount x discount points) | $0.00 | Lifetime cap | 8.250% |

[1] This annual percentage rate (APR) is an estimate based on information we have at this time. It may change based on factors such as changes in third party fees or the terms of your loan. APR is the cost of credit expressed as a yearly rate. It includes the prepaid interest rate, discount points, fees, and other credit charges you are required to pay, and it's a more complete measure of a loan's cost than the interest rate alone. The loan's interest rate, not its APR, is used to calculate the monthly principal and interest payment.

CONFIDENTIAL



USAO_00000025

## Rate lock and expiration information

- This rate lock is scheduled to expire on **July 19, 2019**. A rate lock on a mortgage loan means that your interest rate won't change between the offer and closing, as long as you close within the specified time frame and there are no changes to your application.
- If your rate lock will expire before your loan closing date, you have three choices:
  - **You can extend your rate lock** for a fee, which is a percentage of your final loan amount. If Wells Fargo is primarily responsible for the delay, you will not be charged a fee.
  - **You may return to float** by unlocking your rate if your closing date becomes unknown or uncertain and won't occur on or before the rate lock expiration date. You can relock in 14 calendar days or less at your original rate and loan terms. If you relock after 14 calendar days, you'll receive a new current market interest rate and rate lock expiration date. Contact your home mortgage consultant or private mortgage banker for help with this option.
  - **You may cancel/withdraw** your loan application. If you cancel/withdraw your loan application and then decide you want to move forward, you can reactivate your application in 14 calendar days or less and retain your original rate, loan terms, and rate lock expiration date. If you want to move forward after 14 calendar days, you will need to start a new application and obtain a new rate lock.
- If the market improves prior to closing your loan, you can pay a fee and relock at a lower interest rate. This is called "repricing" your loan.
- Refer to your Understanding Interest Rate Lock Options document in your initial disclosure package for additional details on rate lock and rate lock expirations.

## Additional information about this agreement

- The interest rate and terms displayed in the above table may change in some situations. These may include, but are not limited to:
  - If your loan is an adjustable-rate mortgage (ARM). In this case, the rate listed is the initial interest rate.
  - The type of loan you are applying for changes.
  - Your down payment amount changes.
  - Your requested loan amount increases or decreases after you initially locked your loan, which raises or lowers your loan-to-value (LTV) ratio.
  - The appraised value of the property is different than the value used when you initially locked your loan.
  - Your credit profile or qualifying income changes between the time you initially locked your loan and the loan closing.
  - Some of your income information, such as bonus or overtime income, cannot be verified.
- Refer to your Understanding Rate Lock Options document in your initial disclosure package for additional information on changes that may impact your interest rate.
- This agreement is not a commitment to lend. We will need to verify your information and review your financial documentation before we make a decision on your application. A loan commitment also depends on property eligibility, including the appraisal and title report. Please refer to your Loan Estimate for information about other closing costs you may need to pay in connection with this proposed loan.

## We're here for you

Thank you for the opportunity to help you reach your home financing goals. If you have any questions, please contact me.

Sincerely,

Harry Kalvonjian
Private Mortgage Banker
NMLSR ID: 409745
212-214-7780
Harry.Kalvonjian@wellsfargo.com

CONFIDENTIAL

WF000558
USAO_00000026



_____   April 3, 2019
Liz Bryant                         **Date**
Retail National Sales Manager

© 2018 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

HCFG-00038
Interest Rate Lock Agreement

2019040317.1.0.4574-J20180529Y

CONFIDENTIAL

USAO_00000027



# Interest Rate Lock Agreement

April 2, 2019

Seth Andrew and Lana Zak
622 MARYLAND AVE
WASHINGTON, DC 20002

| Subject: | **Your Interest Rate Lock Agreement** |
| --- | --- |
| | Loan Number: XXXXXX5888 |
| | Property Address: 370 Central Park West, Apt 601, NEW YORK, NY 10025 |

Dear Seth and Lana:

We're writing to provide you with updated interest rate details for your proposed loan from Wells Fargo. We're required to send you a new agreement when your loan terms or closing date changes.

## Your interest rate lock details

The interest rate and terms stated below may change in some situations. See page two of this document for additional information.

| | | | |
| --- | --- | --- | --- |
| **Interest rate** | 3.250% | **Expiration date of rate lock** | July 19, 2019 |
| Annual percentage rate (APR)[1] | 3.921% | Rate lock period | 120 days |
| Principal amount of loan | $1,776,000.00 | Estimated principal and interest | $7,729.27 |
| Loan term | 360 months | Type of loan | ARM |
| Term of interest rate lock | 120 months | Index | 1 Year WSJ LIBOR |
| Origination charges | $4,261.00 | Margin | 2.250% |
| Discount points | 0.00 | Initial rate cap | 5.250% |
| Discount point fee included in total origination charges (loan amount x discount points) | $0.00 | Lifetime cap | 8.250% |

[1] This annual percentage rate (APR) is an estimate based on information we have at this time. It may change based on factors such as changes in third party fees or the terms of your loan. APR is the cost of credit expressed as a yearly rate. It includes the prepaid interest rate, discount points, fees, and other credit charges you are required to pay, and it's a more complete measure of a loan's cost than the interest rate alone. The loan's interest rate, not its APR, is used to calculate the monthly principal and interest payment.

CONFIDENTIAL



USAO_00000028

## Rate lock and expiration information

- This rate lock is scheduled to expire on **July 19, 2019**. A rate lock on a mortgage loan means that your interest rate won't change between the offer and closing, as long as you close within the specified time frame and there are no changes to your application.
- If your rate lock will expire before your loan closing date, you have three choices:
  - **You can extend your rate lock** for a fee, which is a percentage of your final loan amount. If Wells Fargo is primarily responsible for the delay, you will not be charged a fee.
  - **You may return to float** by unlocking your rate if your closing date becomes unknown or uncertain and won't occur on or before the rate lock expiration date. You can relock in 14 calendar days or less at your original rate and loan terms. If you relock after 14 calendar days, you'll receive a new current market interest rate and rate lock expiration date. Contact your home mortgage consultant or private mortgage banker for help with this option.
  - **You may cancel/withdraw** your loan application. If you cancel/withdraw your loan application and then decide you want to move forward, you can reactivate your application in 14 calendar days or less and retain your original rate, loan terms, and rate lock expiration date. If you want to move forward after 14 calendar days, you will need to start a new application and obtain a new rate lock.
- If the market improves prior to closing your loan, you can pay a fee and relock at a lower interest rate. This is called "repricing" your loan.
- Refer to your Understanding Interest Rate Lock Options document in your initial disclosure package for additional details on rate lock and rate lock expirations.

## Additional information about this agreement

- The interest rate and terms displayed in the above table may change in some situations. These may include, but are not limited to:
  - If your loan is an adjustable-rate mortgage (ARM). In this case, the rate listed is the initial interest rate.
  - The type of loan you are applying for changes.
  - Your down payment amount changes.
  - Your requested loan amount increases or decreases after you initially locked your loan, which raises or lowers your loan-to-value (LTV) ratio.
  - The appraised value of the property is different than the value used when you initially locked your loan.
  - Your credit profile or qualifying income changes between the time you initially locked your loan and the loan closing.
  - Some of your income information, such as bonus or overtime income, cannot be verified.
- Refer to your Understanding Rate Lock Options document in your initial disclosure package for additional information on changes that may impact your interest rate.
- This agreement is not a commitment to lend. We will need to verify your information and review your financial documentation before we make a decision on your application. A loan commitment also depends on property eligibility, including the appraisal and title report. Please refer to your Loan Estimate for information about other closing costs you may need to pay in connection with this proposed loan.

## We're here for you

Thank you for the opportunity to help you reach your home financing goals. If you have any questions, please contact me.

Sincerely,

Harry Kalvonjian
Private Mortgage Banker
NMLSR ID: 409745
212-214-7780
Harry.Kalvonjian@wellsfargo.com

CONFIDENTIAL

WF000561

USAO_00000029



_____  April 2, 2019
Liz Bryant                               **Date**
Retail National Sales Manager

© 2018 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801



EQUAL HOUSING
**LENDER**

HCFG-00038
Interest Rate Lock Agreement

2019040217.1.0.4574-J20180529Y

337743919202

Page 3 of 3

CONFIDENTIAL

USAO_00000030

*Your actual rate, payment, and costs could be higher.*
*Get an official Loan Estimate before choosing a loan.*



# Interest Rate Lock Agreement

March 23, 2019

Seth Andrew and Lana Zak
622 MARYLAND AVE
WASHINGTON, DC 20002

Subject:      **Your Interest Rate Lock Agreement**
         Loan Number:      XXXXXX5888
         Property Address:      370 Central Park West, Apt 601, NEW YORK, NY 10025

Dear Seth and Lana:

We're writing to confirm the interest rate for your proposed loan from Wells Fargo. We based your rate on information we received from you or your representative.

## Your interest rate lock details

The interest rate and terms stated below may change in some situations. See page two of this document for additional information.

| **Interest rate** | 3.250% | **Expiration date of rate lock** | July 19, 2019 |
|---|---|---|---|
| Annual percentage rate (APR)[1] | 3.931% | Rate lock period | 120 days |
| Principal amount of loan | $1,776,000.00 | Estimated principal and interest | $7,729.27 |
| Loan term | 360 months | Type of loan | ARM |
| Term of interest rate lock | 120 months | Index | 1 Year WSJ LIBOR |
| Origination charges | $2,041.00 | Margin | 2.250% |
| Discount points | 0.00 | Initial rate cap | 5.250% |
| Discount point fee included in total origination charges (loan amount x discount points) | $0.00 | Lifetime cap | 8.250% |

[1] This annual percentage rate (APR) is an estimate based on information we have at this time. It may change based on factors such as changes in third party fees or the terms of your loan. APR is the cost of credit expressed as a yearly rate. It includes the prepaid interest rate, discount points, fees, and other credit charges you are required to pay, and it's a more complete measure of a loan's cost than the interest rate alone. The loan's interest rate, not its APR, is used to calculate the monthly principal and interest payment.

CONFIDENTIAL



USAO_00000031

## Rate lock and expiration information

- This rate lock is scheduled to expire on **July 19, 2019**. A rate lock on a mortgage loan means that your interest rate won't change between the offer and closing, as long as you close within the specified time frame and there are no changes to your application.
- If your rate lock will expire before your loan closing date, you have three choices:
  - **You can extend your rate lock** for a fee, which is a percentage of your final loan amount. If Wells Fargo is primarily responsible for the delay, you will not be charged a fee.
  - **You may return to float** by unlocking your rate if your closing date becomes unknown or uncertain and won't occur on or before the rate lock expiration date. You can relock in 14 calendar days or less at your original rate and loan terms. If you relock after 14 calendar days, you'll receive a new current market interest rate and rate lock expiration date. Contact your home mortgage consultant or private mortgage banker for help with this option.
  - **You may cancel/withdraw** your loan application. If you cancel/withdraw your loan application and then decide you want to move forward, you can reactivate your application in 14 calendar days or less and retain your original rate, loan terms, and rate lock expiration date. If you want to move forward after 14 calendar days, you will need to start a new application and obtain a new rate lock.
- If the market improves prior to closing your loan, you can pay a fee and relock at a lower interest rate. This is called "repricing" your loan.
- Refer to your Understanding Interest Rate Lock Options document in your initial disclosure package for additional details on rate lock and rate lock expirations.

## Additional information about this agreement

- The interest rate and terms displayed in the above table may change in some situations. These may include, but are not limited to:
  - If your loan is an adjustable-rate mortgage (ARM). In this case, the rate listed is the initial interest rate.
  - The type of loan you are applying for changes.
  - Your down payment amount changes.
  - Your requested loan amount increases or decreases after you initially locked your loan, which raises or lowers your loan-to-value (LTV) ratio.
  - The appraised value of the property is different than the value used when you initially locked your loan.
  - Your credit profile or qualifying income changes between the time you initially locked your loan and the loan closing.
  - Some of your income information, such as bonus or overtime income, cannot be verified.
- Refer to your Understanding Rate Lock Options document in your initial disclosure package for additional information on changes that may impact your interest rate.
- This agreement is not a commitment to lend. We will need to verify your information and review your financial documentation before we make a decision on your application. A loan commitment also depends on property eligibility, including the appraisal and title report. Please refer to your Loan Estimate for information about other closing costs you may need to pay in connection with this proposed loan.

## We're here for you

Thank you for the opportunity to help you reach your home financing goals. If you have any questions, please contact me.

Sincerely,

Harry Kalvonjian
Private Mortgage Banker
NMLSR ID: 409745
212-214-7780
Harry.Kalvonjian@wellsfargo.com

CONFIDENTIAL

WF000564
USAO_00000032



_____    March 23, 2019
Liz Bryant                           **Date**
Retail National Sales Manager

© 2018 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

HCFG-00038
Interest Rate Lock Agreement

2019032417.1.0.4574-J20180529Y

293034519202

Page 3 of 3

CONFIDENTIAL



USAO_00000033

*United States v. Andrew*, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT T

## SUNY Charter Schools Institute Records — Verbatim Excerpts

Establishing (i) Pre-Transfer Dissolution of DPC, DPH, DPE; and (ii) Escrow Accounts Sat on SCHOOLS' Books

This Exhibit T comprises verbatim excerpts from publicly-filed SUNY Charter Schools Institute ("CSI") regulatory records, Annual Financial Reports, and Independent Auditor reports for the Democracy Prep network entities.

### Use of This Exhibit

These excerpts establish, as part of the publicly-filed regulatory record, (i) the pre-transfer dissolution dates of DPC (Democracy Preparatory Charter School), DPH (Democracy Prep Harlem Charter School), and DPE (Democracy Prep Endurance Charter School); and (ii) that the escrow / reserve accounts at issue sat on the SCHOOLS' books and not on DPPS's books — material to the *Kousisis* materiality and inducement analysis.

### Materiality

**Material to:** Motion Grounds Four (Factual Innocence) and Five (Failure to Investigate); Memorandum §§ II.B(1) (*Kousisis*), VII (Factual Innocence). Supports first-stage Rule 6 discovery.

### CLAIM (B) — DPC, DPH, and DPE Were Formally Dissolved Before the 2019 Transfers

#### B-1. AFR FY18 Note 1 — "Organization and Tax Status," p. 9:

*"Effective July 1, 2017, DPCS, DPH and HPCS merged into a single legal entity under BPCS. BPCS was renamed Democracy Prep New York Charter Schools also effective July 1, 2017. DPCS, DPH and HPCS were dissolved and ceased to exist as legal entities in conjunction with the merger. The plan of merger was approved by the New York State Board of Regents on April 4, 2017."*

Source: Democracy-Prep-New-York-Charter-Schools-Merged-Ed-Corp_2017-18-AFR-2.pdf (audited financial report, Note 1, p. 9).

#### B-2. Combined Audit FY19, Notes 1 + 17 (Subsequent Events), pp. 11–12:

*"DPCS, DPH and HPCS were dissolved and ceased to exist as separate legal entities in conjunction with the merger. The plan of merger was approved by the New York State Board of Regents on April 4, 2017."*

*"Effective July 1, 2019, Democracy Preparatory Endurance Charter School ('DPE') merged into the School. DPE ceased to exist as a separate legal entity in conjunction with the merger. The plan of merger was approved by the New York State Board of Regents."*

Source: Democracy-Prep-NY-Combined.pdf (audited financial report, Notes 1 and 17).

#### B-3. SUNY DPE Renewal Report, p. 1:

*"The State University of New York Board of Trustees ... and the Board of Regents approved a merger of Democracy Prep Endurance into the SUNY authorized Democracy Prep New York Charter Schools ... effective July 1, 2019. ... Democracy Prep New York was formed on July 1, 2017 through the merger of Democracy Prep Harlem Charter School ... Democracy Preparatory Charter School ... and Harlem Prep Charter School ... into Bronx Preparatory Charter School ..."*

Source: IIIA3_Dem_Prep_Endurance_Renewal_Report.pdf, p. 1.

### CLAIM (A) — Dissolution-Escrow Funds Were Held by the SCHOOLS, Not by DPPS

#### A-1. AFR FY18 Note 2 — "Restricted Cash" Accounting Policy, p. 11:

*"Under the provisions of its charter, the School established an escrow account to pay for legal and audit expenses that would be associated with a dissolution, should it occur."*

**Note:** "the School" in this audit is the merged charter entity (formerly BPCS, renamed Democracy Prep New York Charter Schools) — not DPPS. The escrow was a charter-school asset, established under each charter's own terms, not a CMO asset.

Source: AFR FY18, Note 2, p. 11.

### A-2. AFR FY18 Note 14 — "Merger Information," p. 17 (opening balances July 1, 2017):

*"Below is a summary of opening balances as of July 1, 2017 for DPCS, DPH and HPCS: ... Restricted cash — DPCS $71,632 | DPH $70,521 | HPCS $75,548 | Total $217,701"*

Each dissolved charter carried its OWN dissolution-escrow restricted-cash balance on the charter's books at the instant of merger. The $217,701 rolled up onto the surviving merged School — never onto DPPS.

Source: AFR FY18, Note 14, p. 17.

### A-3. AFR FY18 Statement of Financial Position, June 30, 2018, p. 3:

*"ASSETS ... Cash and cash equivalents $2,713,448 ... Restricted cash $217,700 ... Total assets $29,305,670"*

The escrow appears on the SCHOOL's balance sheet. The audit describes DPPS separately as "an affiliate ... a New York State not-for-profit charter management organization, which provides management services to the School" (Combined audit Note 7, p. 13). DPPS is a separately incorporated CMO whose own balance sheet is not these statements.

Source: AFR FY18, Statement of Financial Position, p. 3; Combined Audit Note 7.

### A-4. ProPublica IRS Form 990 (DPNY merged entity, FY18), Part X and Schedule D Part IV:

*"Part IV — Escrow and Custodial Arrangements ... 2a Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? ... [Part X Line 21: BLANK]"*

The merged School (1767 Park Avenue) reports the restricted cash as an ASSET on Part X (line 8/15), NOT a custodial liability owed to or held for DPPS. DPPS files its own separate Form 990 and does not carry these escrows on its balance sheet.

Source: Democracy Prep New York Charter Schools — Full Filing — Nonprofit Explorer — ProPublica.pdf (Form 990 FY18; Part X p. 11; Schedule D Part IV p. 21).

### A-5. Combined Audit FY19 Statement of Financial Position & Cash Flows, pp. 3, 5:

*"Restricted cash — June 30, 2019: $0 — June 30, 2018: $217,700"*

By June 30, 2019, the restricted-cash line on the SCHOOL's balance sheet had been zeroed out. The dissolution-escrow funds moved off the (already-dissolved) charters' rolled-up books during FY19. If DPPS never carried these escrows before or after, the 2019 transfers at issue cannot have come from a DPPS-held escrow account.

Source: Combined Audit FY19, pp. 3, 5.

## Rule 6 Production Reference

Full source documents from which the above verbatim excerpts are drawn are public records of the SUNY Charter Schools Institute, the New York State Board of Regents, the New York State Education Department's charter-school authorizer files, and the IRS Form 990 public filings (via ProPublica Nonprofit Explorer). All seven are admissible under FRE 803(8) and self-authenticating under FRE 902(5).

### Source PDFs available for Rule 6 production:

• Democracy-Prep-New-York-Charter-Schools-Merged-Ed-Corp_2017-18-AFR-2.pdf (AFR FY18, 42 pp.)

• Democracy-Prep-NY-Combined.pdf (Combined Audit FY19 + FY18, 54 pp.)

• IIIA1_Democracy-Prep-New-York-Charter-Schools_2019-20RenewalRecommendationRpt-1.pdf (DPNY 2019-20 SUNY renewal report, 110 pp.)

• IIIA2_Democracy-Prep-Harlem-Charter-School_2019RenewalRecommendationRpt.pdf (DPH 2019 SUNY renewal report, 75 pp.)

• IIIA3_Dem_Prep_Endurance_Renewal_Report.pdf (DPE SUNY renewal report, 49 pp.)

• IV-A1_DemPrepNY_RenewalReport.pdf (DPNY renewal report, 86 pp.)

• Democracy Prep New York Charter Schools — Full Filing — Nonprofit Explorer — ProPublica.pdf (IRS Form 990 FY18, 38 pp.)

*United States v. Andrew*, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT U

## Wells Fargo — Petitioner's Contemporaneous Disclaimer of Personal Ownership

### April 10, 2019 and October 25, 2019 Wells Fargo Email Exchanges

This Exhibit U comprises Petitioner's contemporaneous email correspondence with Wells Fargo loan officers, recovered verbatim from Petitioner's personal Apple Mail archive. The April 10, 2019 thread captures Petitioner expressly disclaiming personal ownership of the nonprofit funds. The October 25, 2019 thread captures Petitioner asking the bank to locate the Democracy Prep escrow account on his behalf.

### Use of This Exhibit

This Exhibit creates a factual dispute as to materiality and inducement under *Kousisis v. United States*, 605 U.S. ___, 145 S. Ct. 1382 (2025). The emails show that Petitioner expressly disclaimed personal ownership of the nonprofit funds ("There IS NO OWNERSHIP of a non profit organization") and that Wells Fargo distinguished signing authority from ownership. The rate-lock and asset-verification records require authentication and explanation by Wells Fargo; pin-citation of rate/date/transfer is reserved for evidentiary hearing or Rule 6 discovery.

### Materiality

**Material to:** Memorandum § II.B(1) (*Kousisis* materiality and inducement); Motion Grounds Four (Factual Innocence) and Five (Failure to Investigate); § 455 Reassignment Motion. Authenticated by Petitioner under penalty of perjury (Ex. P ¶ 28(g)).

### Verbatim Excerpts — April 10, 2019 Wells Fargo Thread

Subject: *Re: Verification of Relationship Balance / Request for WF Accounts*. All emails sent by Petitioner from sandrew@democracybuilders.org to Harry Kalvonjian (harry.kalvonjian@wellsfargo.com), Wells Fargo Private Mortgage Banker.

**April 10, 2019 — 16:15 EST**
**From:** Seth Andrew
**To:** Harry Kalvonjian
**Subject:** Re: Verification of Relationship Balance/Request for WF Accounts

> You may need to escalate this to a senior leader at WF. I'm going to send you more stuff...but the point of this incentive is relationship banking. Democracy Prep is A $200m year non profit operation. Today you have $140k. If WF wants the relationship. You probably should count any account on which I'm the singer or that $140k will go right back to BOA/Chase.
>
> I can move over the 529 that isn't a non profit we can still get to $1m but I won't be happy about it. I did lots of work for that last few moves...
>
> Can you remind me, what's the .125 worth monthly on our payment?
>
> S

**April 10, 2019 — 16:25 EST**
**From:** Seth Andrew
**To:** Harry Kalvonjian
**Subject:** Re: Verification of Relationship Balance/Request for WF Accounts

so $14k over 10 years... worth it, but frustrating.

s

**April 10, 2019 — 16:27 EST**
**From:** Seth Andrew
**To:** Harry Kalvonjian
**Subject:** Re: Verification of Relationship Balance/Request for WF Accounts

There IS NO OWNERSHIP of a non profit organization. that's the definition of a non profit. I have 100% signer authority over these accounts.

s

**April 10, 2019 — 17:00 EST**
**From:** Seth Andrew
**To:** Harry Kalvonjian
**Subject:** Re: Verification of Relationship Balance/Request for WF Accounts

I get the difference...I also get that if WF wants to potentially win a $200m/year non-profit banking relationship, this isn't the way to do it. our deposits at Democracy Prep are no less valuable to WF than my LLC's deposits...the difference is one is likely 2,000 times larger...

s

## Verbatim Excerpts — October 25, 2019 Wells Fargo Thread

Subject: *Democracy prep escrow account.* Petitioner to Joshua Carrick (joshua.carrick@wellsfargo.com), Wells Fargo Private Mortgage Banker. Petitioner asks Wells Fargo to locate the Democracy Prep escrow account — further evidence that Petitioner viewed the funds as institutional (Democracy Prep's) rather than personal.

**October 25, 2019 — 17:39 EST**
**From:** Seth Andrew
**To:** Joshua Carrick
**Subject:** Democracy prep escrow account

I'm confused. When I log into the WF account I don't see it. Should have $144,000 in it. Last four are x5430.

Why can't I see it?

S

--

@SethAndrew

**October 25, 2019 — 17:42 EST**
**From:** Seth Andrew
**To:** Joshua Carrick
**Subject:** Re: Democracy prep escrow account

found it. I may be moving it to another bank...or bringing those funds to you. haven't finalized.

## Authentication and Source

All six emails above are reproduced verbatim from Petitioner's personal Apple Mail archive (.emlx files preserved). Petitioner authenticates these emails under penalty of perjury (Ex. P ¶ 28(g)). The full .emlx files (with headers and original metadata) are available for Rule 6 production from Petitioner's archives, and for production from

Wells Fargo's own records.

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit U • Filed pro se pursuant to Rules Governing § 2255 Proceedings

*United States v. Andrew*, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT V

## Probation Form 35 + USAO Opposition + Cronan Order Denying Early Termination

February 21, 2025 – April 2, 2025 • Procedural Context for Diligence and Reassignment

This Exhibit V comprises (i) the U.S. Probation Department's February 21, 2025 Form 35 / Court Action Request recommending early termination of supervised release; (ii) the March 7, 2025 letter from AUSA Ryan B. Finkel opposing early termination; and (iii) the Court's April 2, 2025 Order (Doc. 58, Cronan, J.) denying early termination.

### Use of This Exhibit

The Government's opposition, filed during Mr. Kim's leadership of SDNY, is offered **only as procedural context** relevant to Petitioner's diligence, rehabilitation record, and the Reassignment Motion. **Petitioner does not ask the Court to infer, without discovery, that Mr. Kim personally directed or influenced the opposition**, only that there is a perception challenge that cannot be resolved without further diligence and conflict-screening discovery.

### Potential Witnesses — Limited Rule 6 Discovery

Petitioner reserves the right to identify the following U.S. Probation and Pretrial Services officers who supervised Petitioner across three districts as potential fact witnesses regarding Petitioner's state of mind, persistent insistence on innocence, post-conviction rehabilitation, and the procedural difficulty Petitioner faced when his former defense counsel became the office prosecuting him on appeal and post-conviction. These officers are identified for limited Rule 6 discovery (sworn affidavits, declarations, deposition testimony, or in-court testimony):

### District of Rhode Island — Pretrial Services (2021):

• **Timothy Donohue**, U.S. Pretrial Services Officer, District of Rhode Island (timothy_donohue@rip.uscourts.gov). Supervised Petitioner's pretrial conditions following the April 27, 2021 arrest and through the period leading to the January 14, 2022 plea.

### Southern District of New York — Pretrial & Probation (2021–January 2025):

• **Dominique Jackson**, U.S. Pretrial Services Officer, SDNY (dominique_jackson@nyspt.uscourts.gov). SDNY pretrial counterpart for the pre-plea period.

• **Michelle Millan**, U.S. Probation Officer, SDNY, 500 Pearl Street (michelle_millan@nysp.uscourts.gov). Authored the Presentence Investigation Report (draft March 10, 2022; final July 7, 2022); recipient of Petitioner's PSR-objection letters (see Ex. D).

• **Sandra Osman**, U.S. Probation Officer, SDNY. Initial post-release supervising officer (mid-2023).

• **Christopher Velez**, U.S. Probation Officer, SDNY. Earlier post-release supervising officer (summer 2023).

• **Andrew Leung**, Probation Services Technician, SDNY (andrew_leung@nysp.uscourts.gov). Effected the case reassignment to the Low Intensity Caseload in August 2023.

• **Brittany Valentine**, U.S. Probation Officer, SDNY Low Intensity Caseload (brittany_valentine@nysp.uscourts.gov). Supervised Petitioner from September 2023 to February 2025; **filed the February 21, 2025 Probation Form 35 / Court Action Request** recommending early termination of supervised release based on Petitioner's satisfactory adjustment and full payment of financial obligations.

• **Shawnte Lorick** and **Glen Spence**, U.S. Probation Officers, SDNY (shawnte_lorick@nysp.uscourts.gov; glen_spence@nysp.uscourts.gov). Covering / contact officers within the SDNY Low Intensity Caseload.

### Southern District of Iowa — Probation (post-January 17, 2025):

• **Katie Tady**, U.S. Probation Officer, Southern District of Iowa (katie_tady@iasp.uscourts.gov). Supervises Petitioner following the January 17, 2025 family relocation to Coralville, Iowa.

Each of the above officers may testify regarding (i) Petitioner's contemporaneous state of mind, including his persistent assertions of factual innocence; (ii) Petitioner's rehabilitation record; (iii) Petitioner's diligence and the procedural difficulty he faced when former defense counsel Edward Y. Kim became the office prosecuting him on appeal; and (iv) any communications received from or directed to the U.S. Attorney's Office concerning Petitioner's supervised release.

## Materiality

**Material to:** Motion § III (Timeliness/Diligence) and Memorandum § II.B(3) (*Holland* diligence); § 455 Reassignment Motion; Ex. P ¶¶ 11–15, 25, 27 (Petitioner's sworn diligence chronology).

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit V • Filed pro se pursuant to Rules Governing § 2255 Proceedings



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**PROBATION DEPARTMENT**

P# 7407851

**TO:**      Honorable John P. Cronan
          U.S. District Judge

**FROM:**   Marcela L. Tavarez
          Supervisory U.S. Probation Officer

Re: Seth Andrew
Dkt No.: 1:22 CR 0032 (JPC)

Enclosed is a matter from the U.S. Probation Department requesting consideration and/or review by Your Honor. **Also, please forward a copy of your response via email, so that we may take appropriate action.**

Respectfully submitted,

Joshua Sparks
Chief U.S. Probation Officer

By:       *Brittany Valentine*
          Brittany Valentine
          Probation Services Technician
          212-805-5107

Approved By:

_for_

Marcela L. Tavarez
Supervisory U.S. Probation Officer
212-805-5137
DATE: February 21, 2025

NY 201(a)



## REQUEST FOR COURT ACTION / DIRECTION

TO: Honorable John P. Cronan
U.S. District Judge

OFFENSE: Wire Fraud in violation of 18 USC 1343, a Class C Felony

FROM: Brittany Valentine
Probation Services
Technician

ORIGINAL SENTENCE: Three Hundred and Sixty-Six (366) Imprisonment; followed by Thirty-Six (36) Months' Supervised Release

SPECIAL CONDITIONS: Defendant must participate in an outpatient mental health treatment program approved by the Probation Officer. Defendant must continue to take any prescribed medications unless otherwise instructed by the mental health care provider.

RE: Seth Andrew
Docket # 1:22 CR 0032 (JPC)

AUSA: Ryan B. Finkel
DEFENSE COUNSEL: Edward Young Kyu Kim

MED: May 14, 2026

DATE OF SENTENCE: July 28, 2022

DATE: February 21, 2025

ATTACHMENTS: ☐ PSI ☐ JUDGMENT ☐ PREVIOUS REPORTS

REQUEST FOR: COURT DIRECTION

---

## EARLY TERMINATION

This petition is submitted to Your Honor to respectfully request early termination for Seth Andrew's 3-year term of supervision.

### SUPERVISION ADJUSTMENT

On July 28, 2022, Mr. Andrew was sentenced by Your Honor as indicted above, after pleading guilty to Wire Fraud in violation of 18 USC 1343, a Class C Felony. Mr. Andrew was sentenced to Three Hundred and Sixty-Six (366) Imprisonment; followed by Thirty-Six (36) Months' Supervised Release.

On May 15, 2023, Mr. Andrew commenced his three (3) year term of supervised release in the Southern District of New York. His adjustment to supervision has been satisfactory. He has completed one (1) year and eight (8) months of his supervision term. In addition to the standard and special conditions, the Court imposed a $100 special assessment, restitution in the amount of $218,005.00 and a $5,000.00 fine which have been satisfied. In addition, he satisfied his $5,000 crime victim fund. Your Honor ordered a special condition of home confinement and location monitoring for a period of four (4) months, which he successfully completed on May 19, 2023.

Mr. Andrew previously resided at 370 Central Park West, Apt# 601, New York, NY 10025 with his wife, Lana Zak and two children.

On January 17, 2025, Mr. Andrew and his family moved to Iowa due to his wife's employment. The primary residence is 2020 Forest Hill Trace, Coralville, Iowa 52241.  His wife is a news anchor for CBS news and signed a contract to relocate.

Mr. Andrews has maintained employment since his release from custody and is currently employed as an entrepreneur at the Follow Your Dream Foundation, where he works on projects for the justice involved. Mr. Andrews travels back and forth between Iowa and New York once a month for meetings. He works approximately forty (40) hours per week, earning a monthly salary of $15,000.00. Mr. Andrews has not incurred any new arrests during his period of supervision. Due to his positive adjustment to supervision, he is being supervised on our district's administrative caseload, where his reporting requirements are minimal, requiring monthly, online reports.

It is worthy to note that if an Early Termination is not granted, our office will request a pre-transfer investigation be conducted by the U.S. Probation Office in the Southern District of Iowa to determine if he represents a suitable supervision plan in that district. Mr. Andrew is scheduled to complete supervised release on **May 14, 2026**.

**Pursuant to 18 USC 3583(e)(1) the court may terminate a term of supervised release and discharge the defendant released at any time after the expiration of one (1) year of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation, if it is satisfied that such action is warranted by the conduct of the defendant in the interest of justice.**

**Moreover, as per the Guide to Judiciary Policy, Volume 8, Part E, § 360.20 Early Termination; at 18 months there is a presumption in favor of recommending early termination for persons who meet the following criteria**: **1) The person does not meet the criteria of a career drug offender or career criminal (as described in 28 U.S.C. § 994(h)) or has not committed a sex offense or engaged in terrorism; 2) The person presents no identified risk of harm to the public or victims; (3) The person is free from any court-reported violations over a 12-month period; (4) The person demonstrates the ability to lawfully self-manage beyond the period of supervision; (5) The person is in substantial compliance with all conditions of supervision; and (6) The person engages in appropriate prosocial activities and receives sufficient prosocial support to remain lawful well beyond the period of supervision… Lastly, officers should consider early termination for all persons who have been supervised for 12 months under *low-risk supervision* standards and who otherwise meet the eligibility criteria.**

## U.S. ATTORNEY'S POSITION

Assistant United States Attorney Ryan Finkel opposes this application and has indicated the following to our office: "Mr. Andrew should complete the remaining term of the sentence imposed by the Court."

## RECOMMENDATION

As validated by his progress over the course of supervision, the undersigned believes that it is in the interest of justice that Mr. Seth Andrew be granted an early termination. He has demonstrated having the necessary skill set to continue to be a productive member of society and the ability to lawfully self-manage beyond the period of supervision. We believe that we have provided him with the tools necessary to continue to succeed.

We stand ready to execute the orders of the Court and have attached a response page in order to facilitate Your Honor's reply. Additionally, should Your Honor grant our request, we request that Your Honor sign the attached Probation 35.

Respectfully submitted,
Joshua Sparks
Chief U.S. Probation Officer

by      *Brittany Valentine*
        Brittany Valentine
        Probation Services Technician
        212-805-5107

Approved By:

_____ for

Marcela L. Tavarez                    February 21, 2025
Supervisory U.S. Probation Officer    Date



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**PROBATION OFFICE**

*JUDICIAL RESPONSE*

**THE COURT ORDERS:**

☐     Early Termination of Supervised Release Approved

☐     Early Termination of Supervised Release Denied

☐     Other:


 

 

—————————————————————
Honorable John P. Cronan, U.S.D.J.


—————————————————————
Date

# UNITED STATES DISTRICT COURT
## for the
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

       v.                    Docket No.  1:22 CR 0032 (JPC)

    Seth Andrew

On May 15, 2023, the above-named individual was placed on Supervised Release for a period of Thirty-Six (36) Months. He has complied with the rules and regulations of Supervised Release and is no longer in need of supervision. It is accordingly recommended that Seth Andrew be discharged from Supervised Release.

Respectfully submitted,

*Brittany Valentine*

by           _____

Brittany Valentine
Probation Services Technician

## ORDER OF THE COURT

Pursuant to the above report, it is ordered that the defendant is discharged from Supervised Release and that the proceedings in the case be terminated.

Date this _____ day of _____ , 20 \_\_\_\_\_ .

_____

Honorable John P. Cronan
U.S. District Judge



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

March 7, 2025

**BY ECF**
Hon. John P. Cronan
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

     **Re:**    *United States v. Andrew*, **22 Cr. 32 (JPC)**

Dear Judge Cronan:

The Government respectfully submits this letter in response to the Court's February 21, 2025 order, Dkt. 55, and in opposition to the Probation Department's request for early termination of the defendant's supervised release.

## I.    Background

###     *a.  Offense Conduct*

Seth Andrew (the "defendant") founded the first Democracy Prep public school in 2005, becoming its superintendent and thereafter the *de facto* leader over all of Democracy Prep Public Schools ("DPPS"). In October 2012, the defendant announced he was leaving DPPS to begin work promoting another non-profit, Democracy Builders. (PSR ¶ 13.) Years later, the defendant used his previous relationship with DPPS to rob DPPS of more than $200,000.

The New York State Board of Regents requires that charter schools maintain an escrow account of at least approximately $75,000 that can be accessed only for certain reasons, such as to cover expenses should the school ever dissolve. (PSR ¶ 22.) On March 5, 2009, March 8, 2011, and March 26, 2013, DPPS opened escrow accounts for three schools in its network. (*See* PSR ¶¶ 22 – 26.) The defendant was identified in the opening paperwork for each of those three accounts.

Under the leadership of former executives, in late 2018 and early 2019, DPPS faced certain financial challenges. During this time, Andrew maintained contact with DPPS's then-CEO and opined how the issues should be resolved. In early 2019, the then-CEO was replaced. Apparently frustrated with decisions made by DPPS, and his inability to exercise control over the organization, Andrew sought to rejoin DPPS. Ultimately, Andrew sent DPPS leadership an email demanding a "$25k/month as salaried employee and basic frugal expenses would be covered . . . .  But every single day that goes by, this situation becomes exponentially more difficult and the ability to pull

March 7, 2025
Page 2

out of a nosedive becomes harder. So after 24 hours, my monthly salary expectation will go up every day that we're not under a signed contract." (Dkt. 43, Ex. B.) DPPS rejected Andrew's offer.

Days after the rejection, Andrew walked into a particular bank ("Bank-1") in Manhattan, and, without authorization from anyone, closed two of DPPS's escrow accounts and obtained checks totaling approximately $141,000. (PSR ¶¶ 28 – 29.) Andrew then opened accounts at another bank, deposited those checks, and laundered the stolen proceeds to accounts under his control. Approximately six months later, on October 17, 2019, Andrew returned to a Bank-1 branch and, without receiving authorization from anyone, closed out a third DPPS escrow account. (PSR ¶ 38.) This time the defendant collected a check in the amount of $75,481.10. Andrew laundered those funds too. Eventually, the stolen funds were used by another nonprofit Andrew started. Andrew also used the funds to obtain, as a collateral benefit, a discount on a personal mortgage.

### b. District Court Proceedings

Andrew was arrested on April 27, 2021, pursuant to a Complaint, which charged him with wire fraud, money laundering, and making false statements to a bank. On January 14, 2022, Andrew waived his right to an indictment and plead guilty to one count of wire fraud pursuant to a plea agreement, which stipulated to a Guidelines Range of 21 to 27 months. After pleading guilty, the defendant satisfied his restitution obligation to DPPS in the amount of $218,005 and satisfied his forfeiture obligation to the Government in the amount of $22,537.47

At sentencing, the defendant sought "a period of home confinement" followed by probation. The Government requested a sentence at the lower-end of the Stipulated Guidelines Range.

Before imposing sentence, this Court found, *inter alia*, that: (i) "it is a fair inference that the[ multiple financial] transactions were intended, at least in part, to conceal that the funds had any association with the Democracy Prep schools before the money arrived in" accounts under Andrew's control (Dkt. 51, at 40-41); (ii) Andrew's "motive is somewhat troubling . . . . This was not simply an ego-driven act of impulse. This wasn't a spur-of-the-moment act of frustration. There certainly was ego and frustration involved and a lot of arrogance, but it is also a very intentional and deliberate act against Democracy Prep;" (*id.*, at 41) (iii) "pilfering of the escrow account for these three Democracy Prep schools could have been disastrous for those schools and their status in New York State;" (*id.*, at 43) (iv) "there is still some degree of a need for deterrence in this case and for the sentence to promote respect for the rule of law. If this conduct were truly aberrant, Mr. Andrew could have corrected it by transferring the money back. He didn't—not the next week, not the next month, not even after a year;" (*id.*, at 44) (v) "as to more general deterrence, those who might be tempted to abuse a position of trust must realize that criminal activity will not be tolerated and will result in appropriate consequences;" (*id.*) (vi) "Mr. Andrew knew better, and made a very conscious decision to violate the law. There is no excuse for this conduct;" (*id.* at 45) (vii) "there is also no question that Mr. Andrew has done considerable good for much of his life. The government readily acknowledges this." (*id.* at 45.)

March 7, 2025
Page 3

Ultimately, the Court imposed a sentence of 366 days, a $5,000 fine, and three years supervised release.  (Dkt. 49.)

### c.  Andrew's Appeal

On August 11, 2022, Andrew filed a notice of appeal.  On May 16, 2023, the Government moved to dismiss Andrew's appeal. On October 31, 2023, the Second Circuit granted the Government's motion to dismiss to the extent Andrew challenges his sentence and his claim that the Government made a belated *Brady* disclosure.  The Second Circuit denied the Government's motion to the extent that Andrew challenged his conviction.  Specifically, Andrew argued in his *pro se* briefing that his conviction should be vacated in light of the Supreme Court's rejection of the right-to-control theory of wire fraud in *Ciminelli v. United States.*  In connection with that argument, Andrew contended that he did not "receive or spend" the money he stole; that Democracy Prep only suffered mere "political 'harm'" or "reputational 'harm'"; and he had the "right to control" the funds in the escrow account because he was still named as a signatory on the account in stark contrast to his allocution before this Court.  *See United States v. Andrew*, No. 22-1749, Dkt. 43, at 5-9 (2d Cir. Feb. 10, 2022).  On November 19, 2024, the Second Circuit affirmed this Court's verdict and sentence. (Dkt. 54.)

### d.  Andrew's Limited Incarceration

Bureau of Prisons information indicates that Andrew reported to FCI Ottsville as scheduled on September 22, 2022, to serve the Court-imposed sentence of 366 days.  Approximately three months later, on December 29, 2022, Andrew was released to a halfway house and it was determined that he was suitable to complete his sentence on home confinement as opposed to a BOP-managed facility.  BOP records do not list precisely where the defendant's home confinement was served but his residence as of the date of his release was his family residence on Central Park West in Manhattan.  Accordingly, it appears the defendant's home confinement was served there. Due to operation of first step act and good time credits, Andrew's home conferment concluded on May 15, 2023.

Andrew's supervised release began May 16, 2023, and is set to expire May 14, 2026.  On February 21, 2025, the Probation Department requested to terminate the defendant's supervised release due, in part, to the decision of Andrew's family to move to Iowa.

## II.    Discussion

The Court may, after considering certain of the 18 U.S.C. § 3553(a) factors, "terminate a term of supervised release . . . at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice."  18 U.S.C. § 3583(e)(1).  However, courts "do not order early termination of supervised release as a matter of course."  *United States v. Stein*, 09 Cr. 377 (RPK), 2020 WL 4059472, at *2 (E.D.N.Y. July 19, 2020).  Rather, such relief may "[o]ccasionally" be justified by "new and unforeseen circumstances," such as "exceptionally good behavior by the defendant" that "render[s] a previously imposed term or condition of release either too harsh or inappropriately

March 7, 2025
Page 4

tailored to serve the general punishment goals of section 3553(a)." *United States v. Lussier*, 104 F.3d 32, 36 (2d Cir. 1997).

In other words, "[a] defendant's faithful compliance with the terms of his supervision does not, by itself, entitle him to modification or termination of his term of supervised release." *United States v. Bouchareb*, 76 F. Supp. 3d 478, 479 (S.D.N.Y. 2014). That is because "full compliance with the terms of supervised release is what is expected . . . and does not warrant early termination." *Id.*; *see also United States v. Gonzales*, No. 94-CR-0134 (JSR), 2015 WL 4940607, at *1 (S.D.N.Y. Aug. 3, 2015) ("[F]ull compliance with the terms of supervised release is what is expected of [the defendant] . . . and does not warrant early termination.") (internal quotation marks omitted); *United States v. Medina*, 17 F. Supp. 2d 245, 247 (S.D.N.Y. 1998) ("While [the defendant's] post-incarceration conduct is apparently unblemished, this alone cannot be sufficient reason to terminate the supervised release since, if it were, the exception would swallow the rule."). Thus, "courts in this circuit have routinely declined to terminate supervised release based solely on compliance with the terms of supervision." *Stein*, 2020 WL 4059472, at *2 (collecting cases); *see also United States v. Rusin*, 105 F. Supp. 3d 291, 292 (S.D.N.Y. 2015) ("Early termination is not warranted where a defendant did nothing more than that which he was required to do by law.").

Early termination of supervised release is not appropriate in this case. Although the defendant has complied with the terms of supervised release, and satisfied his financial obligations, the defendant has done precisely what he is legally obligated to do. The fact that the defendant has thus far—for less than the first two years of his three-year supervision term—complied with his obligations is not by itself a reason to terminate his supervised release. Nor should the defendant's impending move be viewed as a "new and unforeseen circumstance" that would render the sentence that this Court imposed unduly harsh. *Lussier*, 104 F.3d at 36. The Southern District of Iowa's Probation Office is adequately equipped to supervise the defendant if this District is not. At bottom, the Court imposed a term of 366 days incarceration followed by three years of supervision. The defendant served approximately eight months in total—only approximately three months of which was incarceration and four months constituted home confinement apparently at his Central Park West residence.[1] Nothing extraordinary has occurred which warrants early termination here. Indeed, the Court's statements at sentencing that the defendant's conduct was "troubling," and that there is a need for both specific and general deterrence in this case, apply with equal force today.

---

[1] This is the same residence that the defendant purchased with the benefit of a mortgage discount he obtained because, as a result of the DPPS stolen funds, he qualified for a promotional interest rate. (Dkt. 51 at 37.)

March 7, 2025
Page 5

**III.    Conclusion**

For the foregoing reasons, request for early termination of supervise release should be denied.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York


By: /s/_____
Ryan Finkel
Assistant United States Attorney
(212) 637-6612


Cc:    USPO Sandra Osman (via email)
Seth Andrew (via the Probation Office)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                           :

UNITED STATES OF AMERICA,           :

    -v-                        :          22 Cr. 32 (JPC)

SETH ANDREW,                :

                    :          ORDER

              Defendant.       :

                    :

------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

The Probation Department has submitted a request that the Court grant early termination of Defendant Seth Andrew's supervised release.  In that request, the Probation Department indicated that the United States of America opposes early termination for Defendant.  In the event the Government opposes early termination, it shall file a letter with its position within two weeks of this Order.  If the Government opposes early termination, Defendant may file a response within two weeks of the Government's opposition.

        SO ORDERED.

Dated: February 21, 2025
       New York, New York                           JOHN P. CRONAN
                                         United States District Judge

*United States v. Andrew*, No. 1:22-cr-00032 (JPC) (S.D.N.Y.)

Petitioner's § 2255 Motion / § 455 Reassignment Motion

# EXHIBIT W

## Plea Agreement (January 3, 2022) — with IAC Carve-Out Clause

Highlighted IAC Carve-Out • Krieger Kim & Lewin LLP / SDNY

This Exhibit W is the January 3, 2022 Plea Agreement executed between Petitioner and the United States, with the ineffective-assistance-of-counsel (IAC) carve-out clause highlighted.

### Use of This Exhibit

The carve-out clause expressly preserves Petitioner's right to bring an ineffective-assistance-of-counsel claim notwithstanding the appeal and collateral-attack waiver elsewhere in the agreement. **This carve-out materially limits any plea-waiver argument as to Petitioner's ineffective-assistance claims.** Petitioner does not rely on the carve-out to preserve non-IAC claims except insofar as those claims are pleaded through IAC, plea validity, factual innocence, or prejudice.

### Materiality

**Material to:** Motion Grounds One, Two, Three, Four, and Five; Memorandum §§ IV–VIII. Authenticated by Petitioner (Ex. P ¶ 28).



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 3, 2022

**By Email**
Edward Young Kyu Kim, Esq.
Krieger Kim & Lewin LLP
500 Fifth Avenue, 34th Floor
New York, NY 10110
212-390-9550
edward.kim@kklllp.com

   **Re: *United States v. Seth Andrew*, 21 Cr. \_\_\_\_**

Dear Mr. Kim:

   On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Seth Andrew ("the defendant") to Count One of the above-referenced Information.

   Count One charges the defendant with wire fraud, in violation of Title 18, United States Code, Section 1343, and carries a maximum term of imprisonment of 20 years, a maximum term of supervised release of 3 years, a maximum fine of $250,000 or, pursuant to Title 18, United States Code, Section 3571 of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment.

   In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations, if any, as to which this Office cannot, and does not, make any agreement) for the conduct described in the Complaint, dated April 20, 2021, *United States v. Seth Andrew*, 21 Mag. 4262, as charged in Count One of the above-referenced Information and, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.* In addition, at the time of sentencing, the Government will move to dismiss any open Counts against the defendant. The defendant agrees that with respect to any and all dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

   The defendant further agrees to make restitution in the amount of $218,005 in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664. The defendant further agrees to pay the full amount of restitution on the date of sentencing.

2021.09.20

The defendant hereby admits the forfeiture allegation with respect to Count One of the Information and agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c) a sum of money equal to $240,542.47 in United States currency, representing proceeds traceable to the commission of said offense (the "Money Judgment"). It is further agreed that the defendant shall pay $22,537.47 on or before the date of sentencing, which the Government shall accept in full satisfaction of the Money Judgment. In the event that the defendant fails to remit the $22,537.47 payment and payment for the full amount of restitution on or before the date of sentencing, the full Money Judgment will remain due. It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture. The defendant consents to the entry of the Consent Order of Forfeiture annexed hereto as Exhibit A and agrees that the Consent Order of Forfeiture shall be final as to the defendant at the time it is ordered by the Court.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

**A. Offense Level**

1. The applicable Guidelines manual is the 2018 edition.

2. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven because the statutory maximum term of imprisonment for Count One is 20 years or more.

3. Pursuant to U.S.S.G. § 2B1.1(b)(1)(F), the offense level is increased by 10 levels because the actual or intended loss amount exceeded $150,000, but was not greater than $250,000.

4. Pursuant to U.S.S.G. § 2B1.1(b)(9), the offense level is increased by two levels because the offense involved a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency.

5. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 16.

2021.09.20

**B. Criminal History Category**

Based upon the information now available to this Office (including representations by the defense), the defendant has zero criminal history points.

In accordance with the above, the defendant's Criminal History Category is I.

**C. Sentencing Range**

Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 21 to 27 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 16, the applicable fine range is $10,000 to $95,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon new information that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the

determination of the proper Guidelines to apply to the facts.  In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court.  The defendant acknowledges that his entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive.  Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241, of any sentence within or below the Stipulated Guidelines Range of 21 to 27 months' imprisonment and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range.  This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein.  Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation.  The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case.  The defendant further agrees not to appeal or bring a collateral challenge of any term of supervised release that is less than or equal to the statutory maximum.  The defendant also agrees not to appeal or bring a collateral challenge of any fine that is less than or equal to $95,000, and the Government agrees not to appeal or bring a collateral challenge of any fine that is greater than or equal to $10,000.  The defendant also agrees not to appeal or bring a collateral challenge of any restitution amount that is less than or equal to $218,005, and the Government agrees not to appeal or bring a collateral challenge of any restitution amount that is greater than or equal to $218,005.  The defendant also agrees not to appeal or bring a collateral challenge of any forfeiture amount that is less than or equal to $240,542.47, and the Government agrees not to appeal or bring a collateral challenge of any restitution amount that is greater than or equal to $240,542.47.  The defendant also agrees not to appeal or bring a collateral challenge of any special assessment that is less than or equal to $100.  Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise.  Rather, it is expressly agreed that the defendant reserves those rights.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty.  By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act

material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, or impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his removal from the United States is presumptively mandatory and that, at a minimum, he is at risk of being removed or suffering other adverse immigration consequences. If the defendant is a naturalized citizen of the United States, he recognizes that pleading guilty may have consequences with respect to the defendant's immigration status. Under federal law, an individual may be subject to denaturalization and removal if his naturalization was procured by concealment of a material fact or by willful misrepresentation, or otherwise illegally procured. The defendant acknowledges that he has discussed the possible immigration consequences (including removal or denaturalization) of his guilty plea and conviction with defense counsel. The defendant affirms that he wants to plead guilty regardless of any immigration or denaturalization consequences that may result from the guilty plea and conviction, even if those consequences include denaturalization and/or removal from the United States. The defendant understands that denaturalization and other immigration consequences are typically the subject of a separate proceeding, and the defendant understands that no one, including his attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration or naturalization status. It is agreed that the defendant will have no right to withdraw his guilty plea based on any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge his conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from his guilty plea and conviction.

It is further agreed that should the conviction(s) following the defendant's plea(s) of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

   Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant.  No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

                                        Very truly yours,

                                        DAMIAN WILLIAMS
                                        United States Attorney


                          By: _____
                                        Ryan B. Finkel
                                        Assistant United States Attorney
                                        (212) 637-6612


                                        APPROVED:

                                        _____
                                        Christopher DiMase
                                        Timothy Howard
                                        Co-Chiefs, Complex Frauds and Cybercrime



AGREED AND CONSENTED TO:


_____          _____
Seth Andrew                                              DATE



APPROVED:



_____          _____
Edward Young Kyu Kim, Esq.                               DATE
Attorney for Seth Andrew



2021.09.20

# EXHIBIT X

## Reserved / Rule 6 Target: IRS Form 990 Records

Public IRS Form 990 Records for DPPS, DPC, DPH, and DPE

**Reserved:** IRS Form 990 records and other public documents are identified but not attached, and upon further discovery will be compiled.

## Scope and Use

This Exhibit X identifies the publicly-filed IRS Form 990 records for the four Democracy Prep-network entities relevant to the § 2255 Motion's Ground Four (Factual Innocence): Democracy Prep Public Schools (DPPS, EIN 20-2629354); Democracy Preparatory Charter School (DPC, EIN 20-3683193); Democracy Prep Harlem Charter School (DPH); and Democracy Prep Endurance Charter School (DPE).

These records, together with the SUNY Charter Schools Institute records (Exhibit T), are identified as a Rule 6 discovery target to authenticate the entity-dissolution dates, books-held status, and reserve / escrow accounting bearing on the materiality and inducement elements of *Kousisis*.

## Materiality

**Material to:** Motion Ground Four (Factual Innocence); Memorandum §§ II.B(1), VII. Supports first-stage Rule 6 discovery (Section XI, category (5)).

*Annexed in support of Petitioner's § 2255 Motion and Memorandum of Law*
Exhibit X • Filed pro se pursuant to Rules Governing § 2255 Proceedings

# COMPREHENSIVE CASE TIMELINE

## EXHIBIT A

### UNITED STATES v. SETH ANDREW, 22 Cr. 32 (JPC) (S.D.N.Y.)

*On Appeal: No. 22-1749 (2d Cir.)*

*Prepared by Seth Andrew (pro se) in support of 28 U.S.C. § 2255 motion*

*Revised May 14, 2026*

## PRO SE COMMENTARY DISCLAIMER

This Comprehensive Case Timeline is filed as Exhibit A to Petitioner's contemporaneously-filed Motion to Vacate under 28 U.S.C. § 2255. Petitioner is pro se. The Date and Event/Action columns are documentary and verified as best they can be under penalty of perjury, 28 U.S.C. § 1746. The Significance column is pro se editorial commentary submitted under the liberal-construction principles of *Haines v. Kerner*, 404 U.S. 519 (1972), and *Erickson v. Pardus*, 551 U.S. 89 (2007). Where a fact is not verified by primary record, it is labeled [Unverified].

## PURPOSE

This timeline supports the contemporaneously-filed Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 and the Motion for Reassignment under 28 U.S.C. § 455(a). It documents the foundational period, the operative conduct period, the investigation/arrest, plea negotiations and sentencing, the direct appeal, the defense-counsel migrations to government and judiciary, and the post-appeal procedural posture culminating in this § 2255 phase. Except where labeled [Information and belief], [Unverified], or [Rule 6 target], dates are drawn from the case record, the Second Circuit docket (No. 22-1749), the SDNY criminal docket (1:22-cr-00032-JPC), Department of Justice press releases, and contemporaneous documents attached as exhibits.

## LEGEND

| | |
|---|---|
| | DP Foundational period (2005–2018) —Founding, escrow-agent designation, bank signatory roles established, dissolution of DPC/DPH/DPE, Interagency White House service |
| | Operative conduct period (2019–2020) — fund transfers, mortgage application, rate lock, DPNY/DPPS board consultation, SUNY consultation, Accountant (CSBM) consultation |
| | Investigation and arrest (2021) – Retainer of Michael Yaeger, Carlton Fields.  Retainer of Ed Kim & Varun Gumaste, KKL. Presentment. |
| | Plea negotiations and sentencing (2021–2022) – Contemporaneous concerns regarding allocution, factual errors, complaint errors, and personal financial considerations |
| | Incarceration / home confinement / supervised release start (2022–2023) -- |
| | Direct appeal proceedings (2022–2024) |
| | Defense counsel migrations to government / judiciary (2017–2025) — Ground One conflict facts |
| | Post-appeal motions, supervised release, US Probation early-termination request and SDNY opposition (2025) |
| | Current § 2255 and § 455 phase (2026) |

## TIMELINE

| Date | Event / Action | Significance |
|---|---|---|
| 2005 | Andrew's sole application to found Democracy Prep Charter School (DPC) in Central Harlem approved. Board appoints him as fiduciary, escrow agent, and bank Signatory at Commerce Bank on 125th street for the school's regulatory reserve, dissolution, and operating accounts. He was never removed from these accounts despite his written request to his successor CEO do so. | Origin of escrow-agent role at issue in 2021 prosecution. In 2019, TD Bank, the successor to Commerce, later informs him that the DPC escrow account is scheduled to be returned to the NY Comptroller's "Lost money" fund because it has become dormant under the current DPC leadership. |
| 2006 | Democracy Prep's first public school opens; inaugural sixth-grade class begins. >25% special-needs; 95%+ low-income students of color. Democracy Builders founded to serve as a 501c3 fundraising vehicle for DPC students & alumni. | Demonstrates lawful, public-purpose origin of the dissolution escrow funds at issue. DPC becomes the highest performing public middle school in NYC in 2009 on the Chancellor's report Card and goes on to serve thousands of students. |
| 2007 | Andrew establishes regulatory-reserve escrow account for Democracy Prep Harlem (DPH) as a separate 501c3 entity. DPH was the new network's second school. DPH Board votes to appoint Andrew escrow agent, bank signatory, and fiduciary. | Second of three DP regulatory-reserve escrow accounts at issue. His continuous escrow-agent role was never formally revoked. Naming confusion begins with the renaming of Democracy Builders 501c3 into "Democracy Prep Public Schools." This confusion persists through the complaint, plea, sentencing, & appeal. |
| 2010 | Democracy Prep Endurance (DPE) planned and established and board votes to have Andrew establish regulatory-reserve dissolution account as fiduciary, escrow agent, and bank signatory. Authorization was never revoked. | Third of three DP regulatory-reserve escrow accounts at issue. The three accounts (DPC, DPH, DPE) are the eventually consolidated 'dissolution-escrow' source of funds referenced in the 2255 Motion and Memorandum. |
| 2012-2013 | South Korean Prime Minister Kim Hwang-sik visits Democracy Prep in Harlem and U.N. Secretary-General Ban Ki-moon accepts Andrew's invitation for role as first graduation speaker for DPC. | Widespread reporting and global recognition on Democracy Prep Public Schools' success leads to Andrew's consideration for the Obama US Department of Education as Senior Advisor to the Secretary and Superintendent in Residence. |
| July 1, 2013 | Andrew transitions out of operational leadership of Democracy Prep Public Schools (DPPS) — 'graduates' alongside the inaugural senior class. Katie Duffy named successor as Chief Executive Officer of DPPS. Andrew remains on staff and payroll as Founder and Superintendent Emeritus. | Continuity of Petitioner's founder/escrow-agent role under the Founder & Emeritus designation. Establishes the institutional posture under which Petitioner continued to act as escrow-agent through 2019 and signatory on the DPC/DPH/DPE regulatory-reserve accounts. See The 74 'Democracy Prep founder coverage and Education Next Q&A. |
| 2014 | Andrew founds Alumni Revolution, a new 501c3, later renamed "Democracy Builders Fund" which in 2019 became the custodian of dissolution funds as required by SUNY regulations after DPC, DPH, and DPE were dissolved. | Naming confusion continues. The Docket is littered with erroneous references to distinct legal entities, indicating a fundamental misunderstanding of charter school regulation and laws. No single entity called "Democracy Prep" ever exists. |
| 2015 | Andrew selected as Senior Adviser to the US CTO, Office of Science and Technology Policy (OSTP) in the Executive Office of the President. As founder he brings over 200 students & alumni to visit the White House. | Andrew continues his role in the Obama Administration while on an Interagency Personnel Agreement from DPPS. Katie Duffy continues as day-to-day CEO of DPPS while Andrew continues as advisor & named Superintendent Emeritus. |
| 2016 | Andrew creates Vote.gov as part of his White House responsibilities; assists | Andrew's involvement creating Vote.Gov impacts his later participation with |

| | | |
|---|---|---|
| | with millions of 2016 voter registrations--becomes politically notable. | related other non-profits like Vote America and Degrees of Freedom (DOF). |
| 2017 | Andrew leaves White House and founds Washington Leadership Academy (WLA) as an unpaid volunteer board role and wins the Emerson Collective XQ Prize which provided funding for Democracy Builders Fund (DBF) and DOF. | After the end of the IPA, Andrew begins a new role at New Globe schools helping to build dozens of public charter schools in Libera and across the world. |
| 2017 | Edward Y. Kim leaves the SDNY U.S. Attorney's Office (where he had served since 2008, most recently as Chief of the Complex Frauds & Cybercrime Unit, 2016–2017). Co-founds Krieger Kim & Lewin LLP. | Significance for later conflict claim: Kim's first SDNY tenure was leading the same Unit that would prosecute Andrew four years later and that he would return to as Chief, Deputy, and eventually Acting US Attorney overseeing Andrew's appeal. |
| 2017–2019 | Andrew continues to advise Democracy Prep as Superintendent Emeritus (unpaid). Duffy authorized Andrew to maintain his DemocracyPrep.org email. Regularly visits schools & HQ while leading Democracy Builders Fund & conceiving Degrees of Freedom. | Continued affiliation with Democracy Prep; maintains escrow accounts at issue and communicates with DPPS, DPNY, and other board members and staff daily. |
| Apr 4, 2017 | New York State Board of Regents approves dissolution of Democracy Preparatory Endurance Charter School (DPE) and merger of into Democracy Prep New York (DPNY); also approves authorizer change for DPC/DPH from NYC Department of Education to SUNY Board of Trustees. | Public-record BoR action — the regulatory predicate for the dissolution and entity-level consolidation events (effective dates below) that produced the dissolution-escrow disputes and reserves at issue. (Source: NY State Education Department actions; nysed.gov.) |
| Jul 1, 2017 | Effective date — authorizer change for Democracy Prep New York Charter Schools (encompassing DPC and DPH) from NYC DOE to SUNY Board of Trustees. As of this date, the dissolution fund accounts become dormant. | Operative date for the regulatory-status change that contributed to the dissolution-escrow consolidation Petitioner addressed in 2019. (Source: nysed.gov; newyorkcharters.org.) |
| 2018 – 2019 | Andrew speaks weekly with outgoing DPPS CEO Katie Duffy regarding DPPS transitions, including the dissolution-escrow accounts. | Independent corroboration of pre-transfer consultation. Material to Memorandum § VII.A and Motion Ground Five. |
| Jan – Feb 2019 | Andrew consults Dr. Robert North, DPNY Board Chair and founding board member of DPCS, DPH, DPE, and DPPS (the sole director with full historical context). Petitioner states, based on personal knowledge, that Dr. North gave verbal authorization on multiple occasions to consolidate and protect the dissolution-escrow funds. | Single most important factual-innocence fact: contemporaneous verbal authorization from the sole surviving director with full historical context. Specific authorization to transfer and consolidate funds to avoid loss was not required, but it was provided verbally by four relevant individuals including Dr. North. |
| Jan – Mar 2019 | Andrew consults the DPPS Acting CFO (a contractor from Alvarez & Marsal) on multiple occasions regarding the planned consolidation of dissolution-escrow funds and ; Petitioner states, based on personal knowledge, that he received verbal approval to transfer the funds. [Information and belief / Rule 6 target]. | Independent corroboration of consultation pattern with the contemporaneous DPPS finance function. |
| Jan – Sep 2019 | Andrew consults Raj Thakkar and CSBM staff (accountant/bookkeeper for DPPS, DPNY, and DBF) and his deputies on numerous occasions regarding fund consolidation, including from Spain in September 2019 immediately before the third (DPE-related) transfer. | Independent corroboration of good-governance consultation pattern. Material to Memorandum § VII.A and Motion Ground Five. See Ex. Q; additional @csbm.com correspondence is identified as available for Rule 6 production. |

| | | |
|---|---|---|
| **2019 (early)** | Andrew consults SUNY Charter Schools Institute General Counsel and Executive Director regarding the regulatory reserve. Confirmed: DPPS/DPNY were already out of compliance with the $75,000-per-school reserve requirement. Funds at TD Bank at risk of loss. | Direct evidence that the transfer was a fiduciary-act-to-preserve, not theft. Occurred primarily via phone. Movement of funds into interest-bearing accounts or CD recommended as best preservation measure. |
| **Mar 2019 – May 2020** | Period of conduct charged in Sealed Complaint 21 Mag. 4262 (the alleged 'scheme to defraud' window). | Government's stated charging window. |
| **Thu, March 7, 2019** | Joint DPPS and DPNY board meeting at Badger Park. Attendees: Dr. Robert North (DPNY Board Chair); Ryan Offutt (DPPS Board Chair); Christopher T. Kraus; Pallavi Verma; Roger E. Berg (Pillsbury); Natasha Trivers (Interim CEO); Kent Anker. Petitioner identifies the dissolution-escrow accounts at the meeting and at an immediate-following sidebar with Dr. North as an example of fiscal waste under the then-acting DPPS interim-CFO. | Foundational fact for actual-innocence claim: pre-transfer disclosure / authorization. Direct evidence against any 'inducement' or 'material misrepresentation' theory. Pre-transfer documented disclosure to DPPS/DPNY leadership. Anchor fact for Memorandum § VII.A and § VII.F(1). Followed by the Mar. 11, 2019 "URGENT Proposal" email (Ex. K). No objection raised. |
| **Mon, March 11, 2019 (5:34 AM EST)** | Petitioner emails Ryan Offutt (DPPS Board Chair) — cc'd to Christopher T. Kraus, Carlos Lejnieks, Dr. Robert North, and Pallavi Verma — subject "URGENT Proposal for next steps with DPPS." Andrew's email outlines DPPS failures in financial management, governance, and explicitly the dissolution-escrow accounts.  Email expressly identifies "financial controls (on issues like escrow accounts, that I will demonstrate to you immediately)" among the corrective actions he and the DPPS board needed to take immediately. | Contemporaneous written reference to escrow accounts from Petitioner to DPPS Board Chair, four days after the joint board meeting. Annexed as Ex. K. Supports Petitioner's claim that the concealment issue cannot be resolved against him without factual development. Background context for Offutt cooperation-proffer reference. Contrary to Judge Cronan's assertion in the Transcript at sentencing, no response was provided by Offutt prior to the transfers. No opposition was raised by any party. |
| **Wed, April 10, 2019 (3:02–7:21 PM EST)** | Petitioner exchanges multiple emails with Wells Fargo Private Mortgage Banker Harry Kalvonjian, Joshua Carrick, and Wesley Mantle regarding asset-verification for Petitioner's personal mortgage. Petitioner explicitly distinguishes the Democracy Prep / non-profit balances from his personal assets. The Wells Fargo bankers themselves require an underwriting "exception" for the non-profit funds. Annexed as part of Ex. U. | Creates a factual dispute as to whether Petitioner misrepresented non-profit balances as personal assets in connection with the Wells Fargo mortgage. The bankers' own underwriting documentation reflects awareness of the non-profit character of the funds. Material to actual-innocence on the bank-fraud theory and to the Kousisis "material misrepresentation / inducement" prong. |
| **Jul 1, 2019** | Effective date — Democracy Preparatory Endurance Charter School (DPE) merges into Democracy Prep New York Charter Schools; DPE ceases to exist as a separate legal entity. The DPE regulatory dissolution reserve had to be consolidated or returned to the state as "lost money." | Closes the operative-conduct window for DPE-related reserves. This date directly anchors the September 2019 third transfer referenced in the Complaint and 2255 Motion and undercuts the argument that the motive was ever personal or mortgage related, as the apartment purchase was complete. |
| **Oct 21, 2019** | Andrew physically goes to bank and opens new 'Democracy Builders Fund' bank account at Chase Bank. Endorses Check-3 ($75,481.10) into that account. | Specific transaction listed in Complaint at Para. 8.j. |
| **Fri, October 25, 2019** | Petitioner writes to Wells Fargo banker Joshua Carrick under the subject line "Democracy prep escrow account," stating: "When I log into the WF account I don't see it. Should have $144,000 in it. Last four are x5430." Follow-up: "I may be moving it to another bank..." (Ex. U). | Independent contemporaneous evidence that Petitioner himself labeled the account an "escrow account" — in his own email subject line — well before any government investigation or post-hoc characterization. Refutes any inference of concealment. Material to Ground Two (invalid plea, contradicts counsel's |

| | | allocution framing) and the Kousisis materiality prong. |
|---|---|---|
| Nov 19, 2019 | Andrew closes Account-1 at Wells Fargo; obtains certified Check-4 ($144,473.29).Deposits Check-5 into DBF Account for DPNY alumni. | Specific transaction listed in Complaint at Para. 8.k. |
| 2020 | Andrew retains Timothy C. Doherty, Jr. of Downs Rachlin Martin (Vermont) as civil counsel for Democracy Builders Fund / Degrees of Freedom Vermont matters. Doherty discloses his interest in seeking a federal appointment (judge or U.S. Attorney for Vermont) at this time — before Andrew's arrest. | Establishes that disclosure of federal-service aspirations during representation was customary and possible. Contrast with later silence by Kim and Gumaste. |
| 2020 | Democracy Builders Fund (DBF) purchases former Marlboro College campus in Vermont; Degrees of Freedom (DOF) program launched to benefit low-income, Pell-eligible first generation college students including those alumni from DPNY. | DPNY alumni attending DOF was the destination and repeatedly outlined future programmatic use for the funds; not a personal-enrichment scheme. However, no funds were ever removed from the Chase accounts. They remained in full, with interest at the time of Andrew's arrest. |
| 2020 – 2021 | DOF enrolls ~20 housing-insecure students and Democracy Prep alumni during COVID-19 as a pilot program; first full freshman class planned for September 2021. | DOF was an active charitable program; funds at issue were going to be directed to this program, but they were never used. Funds were never personally taken as both AUSA Finkel and Judge Cronan concede in the Sentencing transcript.. |
| Apr 20, 2021 | FBI Special Agent Melody Shen swears Sealed Complaint 21 Mag. 4262 before Magistrate Judge James L. Cott (S.D.N.Y.). Three counts: wire fraud (18 U.S.C. § 1343); bank fraud (§ 1014); money laundering (§ 1956(a)(1)(B)(i)). AUSA Ryan B. Finkel approves. | Three-count complaint; combined statutory maximum cited at 70 years. |
| Apr 27, 2021 | Remote presentment before Magistrate Judge Gabriel W. Gorenstein. Initial defense counsel: Michael L. Yaeger (Carlton Fields P.A.), former EDNY AUSA, former Alito clerk. Andrew released on conditions and wife's passport withheld. | Yaeger has material knowledge; would later argue and win Percoco v. United States, 598 U.S. 319 (2023). The transcript does not reflect a Rule 5(f) / DPPA Brady admonition; Petitioner offers this as support for the Brady/IAC prejudice analysis, not as a standalone dispositive ground. |
| Apr 27, 2021 | U.S. Attorney's Office issues press release; Andrew paraded in handcuffs. | Pretrial publicity / public-perception context. |
| Apr 27, 2021 (~6:05 a.m.) | Andrew arrested at his Manhattan residence by armed FBI agents with wife present. No prior target letter; no pretrial conference offered. | Context for Petitioner's coercion/prejudice argument; not offered as an independent constitutional ground. |
| May 2021 | Andrew retains Krieger Kim & Lewin LLP (KKL); Edward Y. Kim becomes lead counsel. KKL was recommended by Michael Bosworth, former Deputy Counsel to the President and also a former SDNY AUSA. Co-counsel: Varun A. Gumaste (KKL associate), Timothy C. Doherty, Jr. (Downs Rachlin Martin PLLC, Vermont). Andrew's prior counsel Michael L. Yaeger (Carlton Fields) — who later won Percoco v. United States at SCOTUS — is replaced. | Yaeger had no apparent federal-service aspirations and would later win a landmark wire-fraud reversal. The Bosworth referral itself reflects revolving-door SDNY dynamics between lucrative private practice and public service roles. Referral context for the later conflict narrative; does not independently establish conflict absent discovery. |
| May 28, 2021 | Andrew writes to lead counsel Edward Y. Kim and Vermont co-counsel Timothy C. Doherty, Jr.: "I can't / won't plea to something I didn't do. I had | Anchor fact for Motion Ground Two (invalid plea) and Ground One adverse effect. Documents that the counsel-shaped allocution worked against Petitioner's |

| | | |
|---|---|---|
| | authority..." (Ex. C). Earliest contemporaneous record of Petitioner's resistance to the plea theory counsel ultimately pursued. | contemporaneous understanding of his authority. Cited in 2255 Motion § II.A and Memorandum § V. |
| Nov 2021 – Jan 2022 | During plea negotiations, Andrew objects in writing — more than a dozen times — to factual and legal characterizations advanced by counsel. Andrew refuses to admit conduct he believes is untrue or non-criminal. Kim drafts allocution language Andrew disputes. Counsel describes Andrew contemporaneously as 'relentless' and 'having no quit.' Andrew separately proposes cooperation discussions with the Government, in writing and on multiple occasions; counsel declines to pursue. | Critical facts for Ground Three (plea invalidity) and Ground One adverse effects. Documented in contemporaneous emails, notes, and writings produced in Exhibits and further explored if provided a limited evidentiary hearing. |
| Dec 28, 2021 | Draft Allocution.003 circulated (Ex. B). Petitioner's redlines narrow his admissions to "written authorization" only — preserving the unrevoked-escrow-agent / verbal-authorization defense. Counsel rejects the narrowing in the version ultimately presented at the plea hearing. | Documentary cornerstone of Ground Two: counsel's allocution shaped admissions to a theory Petitioner had resisted in writing for seven months. Cited in 2255 Motion § II.A and Memorandum § V; Ex. B reflects Petitioner's narrowing. |
| Nov 1, 2021 | USAO sends first formal plea offer letter to Edward Y. Kim. Single-count Information charging wire fraud only. | First plea draft. |
| Jan 3, 2022 | Plea Agreement IV (Final) circulated. | Final plea agreement. Expressly preserves IAC claims (Section 6). |
| Jan 5, 2022 | Lead counsel Edward Y. Kim emails Petitioner the version of the allocution counsel intended to present at the plea hearing (Ex. C). The Kim draft removed the "written authorization" qualifier Petitioner had inserted into Draft Allocution.003. | Direct documentary evidence that counsel — not Petitioner — controlled the dispositive admission language. Ground Two (invalid plea) and Ground One adverse effect. |
| Jan 14, 2022 | At recommendation of Counsel, Andrew waives indictment. Pleads guilty to one count of wire fraud before Hon. John P. Cronan. At the plea hearing, Cronan discloses on the record that he and lead defense counsel Edward Y. Kim were colleagues at SDNY and 'remained friends since he left the office.' (Per Andrew's personal knowledge from contemporaneous statements by counsel, the friendship extends to counsel's attendance at the Court's wedding.) No motion for recusal; no separate inquiry of Andrew. Andrew orally modifies the prepared allocution at the colloquy rather than reading the version counsel drafted. Consent Preliminary Order of Forfeiture entered: $240,542.47. | Cornerstone fact for Ground One, Layer 1 conflict claim and Ground Three plea invalidity. Plea Tr. (Doc. 32) at 3. The plea/sentencing framework required restitution, forfeiture, and a fine; Petitioner contends those payments were imposed despite his position that the funds were preserved and not personally taken. Counsel advised that if he paid the totality of the funds immediately, they would be issued to DPNY and they would impact his sentencing favorably, likely yielding a short period of home confinement. |
| Feb 16, 2022 | Dr. Robert North (DPNY Board Chair; founding board member of DPCS, DPH, DPE, and DPPS) issues a statement that Petitioner deserved "a slap on the hand" — that the appropriate disposition should not involve incarceration. (Ex. R.) | Brady-favorable statement from the sole director with full historical context. Partially retracted after Board pressure to speak with "a unified voice" (per USAO Apr 7–8, 2022 letter). Material to Motion Ground One adverse effect (counsel's failure to interview/depose Dr. North) and Ground Three Brady context. |
| Mar 11 – Jul 13, 2022 | Andrew and counsel circulate more than 13 distinct internal iterations of | Documentary contradiction of Kim's "None from the defense, your Honor" at |

| | | |
|---|---|---|
| | written PSR objection letters (drafts 003 → 013), in addition to separate exchanges with Probation Officer Michelle Millan and AUSA Ryan Finkel. | sentencing. Material to Memorandum § V.11 and Motion Ground One adverse effect. |
| Mar 11, 2022 | USAO discloses Dr. North's February 16, 2022 statement and February 28, 2022 retraction, including board-level mitigation language and a possible 'unified voice' explanation. | First wave of post-plea Brady disclosures and demonstration of Dr. North's wavering sense of the facts of the case and the motives outlined by the government in press releases. Counsel fails to interview or depose Dr. North. . |
| Mar 16, 2022 | Defense letter (Kim) to AUSA Finkel re *Brady* issues. | Defense begins addressing *Brady* gaps after plea. |
| Mar 21, 2022 | Defense letter to Probation re PSR objections. | Pre-sentencing dispute documentation. |
| Apr 1, 2022 | Defense follow-up letter to USAO re identities of board and *Brady* scope. | Continued *Brady* dispute. |
| Apr 7–8, 2022 | USAO response to defense *Brady* letter. Refuses to identify all board members supporting leniency. Confirms Dr. Robert North may have retracted his statement because the Board wanted to speak with 'a unified voice.' | Brady / failure-to-investigate dispute: counsel had notice of potentially favorable board-member views but did not develop testimony before sentencing. |
| Jun 30, 2022 | U.S. Supreme Court grants certiorari in Ciminelli v. United States, No. 21-1170 — directly raising the right-to-control theory central to Petitioner's later appellate and plea-advice arguments. | Pre-sentencing on-notice fact for Ground Two (failure to advise / pause plea). Andrew was never made aware of the pendency of Ciminelli. He only learned of the relevance of the case while incarcerated at FCI Otisville. |
| Jul 7, 2022 | Presentence Investigation Report filed by USPO Michelle Millan (revised from Mar 10, 2022 draft). | PSR confirms key terms of contemplated sentence. |
| Jul 14, 2022 | Defense Sentencing Memorandum (Doc. 42) filed: 31-page memo signed by Kim, 57 letters of support from family, friends, colleagues. | Defense pre-sentencing submission. |
| Jul 20, 2022 | USAO supplemental Brady release: FBI letter acknowledging errors in original Form 302 memorandum re Wells Fargo Retail Business Banker interview. The correction supports a factual dispute over what Wells Fargo was told about Petitioner's escrow-agent, signatory, and fiduciary status. | Critical *Brady* disclosure requiring follow up by counsel before sentencing; Andrew unable to meaningfully process or depose bankers before sentencing. |
| Jul 21, 2022 | Government Sentencing Memorandum (Doc. 43) filed by AUSA Finkel. | Government pre-sentencing submission. |
| Jul 24, 2022 | Approximately four days before sentencing, USAO produces more than 700 pages of financial materials as supplemental Brady. Petitioner contends that he and counsel lacked meaningful time to review and use the production before the July 28 sentencing; Counsel does not request a continuance. | Independent IAC ground (sentencing-stage *Brady* not reviewed, no continuance sought). Reinforces invalid-plea claim. Material to Memorandum § III.G and Motion Ground Three. |
| Jul 27, 2022 | Government response to defense objections. | Final pre-sentencing filing. |
| Jul 28, 2022 | SENTENCE imposed: 366 days imprisonment + 36 months supervised release + $5,000 fine + $218,005 restitution + $240,542.47 forfeiture + $100 special | Conviction and sentence entered; Court's own contemporaneous observation of plea-stage distress preserved in sentencing record. AUSA Finkel and the Court |

| | | |
|---|---|---|
| | assessment. At sentencing, Judge Cronan acknowledges on record (Sentencing Tr. at 48) that Andrew was 'quite distraught at that plea' but had not sought personal financial gain. | acknowledged the absence of Lamborghini/Seychelles-type personal-enrichment spending and that Petitioner did not pocket the funds. |
| Aug 11, 2022 | KKL (Kim) files Notice of Appeal on Andrew's behalf with the Second Circuit (Case 22-1749). Docketing fee paid. | Appellate jurisdiction triggered. |
| Aug 16, 2022 | Andrew files declaration via Kim signaling intent to proceed pro se; Andrew indicates plan to retain new counsel or seek IFP or CJA appointment. | Beginning of pro se phase. |
| Aug 18–19, 2022 | Motion to be relieved as counsel filed by KKL (cured after defective filing). | Procedural transition from counseled to pro se. |
| Aug 25, 2022 | 2d Cir. grants KKL motion to be relieved. Kim terminated as attorney of record. Pro se instructional packet sent to Andrew. | Kim's appellate representation formally ends. |
| Sep 22 – Dec 29, 2022 | Andrew incarcerated at FCI Otisville, released to Home Confinement early on grounds of CARES Act, good behavior, and First Step credits. | Incarcerated portion of sentence. |
| Nov 15, 2022 | Pro se T-1080 motion: 120-day extension of appeal-brief deadline (submitted via wife with power of attorney while Andrew at FCI Otisville). | First T-1080 / IFP-type filing. |
| Nov 18, 2022 | Motion to extend time filed. | Continued appellate filings. |
| Dec 1, 2022 | 2d Cir. grants motion to extend (in part): brief due Jan 27, 2023. No further extensions. | Court sets firm appellate deadline. |
| Dec 29, 2022 | Andrew released to halfway-house / home confinement with ankle monitor, monitoring phone, drug testing, and regular halfway house check-ins. | Custody continued in halfway-house/home-confinement setting; relevant to § 2255 custody and diligence chronology. |
| Dec 29, 2022 – May 15, 2023 | Andrew on home confinement. | Custodial portion continued at halfway house and family residence. |
| Jan 27, 2023 | Andrew files Initial Appeal Brief (pro se). Also files motion to hold appeal in abeyance pending *Ciminelli*. | Substantive direct-appeal challenge filed. |
| Jan 31, 2023 | 2d Cir. denies motion to hold appeal in abeyance. | Court refuses to await SCOTUS *Ciminelli* ruling. |
| Feb 10, 2023 | Initial Appeal Brief cover letter dated. | Brief on file. |
| May 11, 2023 | U.S. Supreme Court decides *Ciminelli v. United States*, 598 U.S. 306 (2023) — unanimous; rejects right-to-control theory. | Substantive ruling Andrew sought; argued to be applicable to his case. |
| May 12, 2023 | 2d Cir. (Nardini, J.) denies Andrew's pro se motion to proceed in forma | IFP denial — central diligence/tolling fact. |

| | | |
|---|---|---|
| | pauperis and for appointment of counsel. | |
| **May 16, 2023** | Home confinement concludes (per BOP records) and supervised release begins (36-month term). | End of custodial portion of sentence. Custody relevant to § 2255 continues via supervised release. |
| **May 18, 2023** | *Percoco v. United States* decided by U.S. Supreme Court (also unanimous). Michael L. Yaeger of Carlton Fields was lead Supreme Court counsel. | Same firm and lawyer who first represented Andrew successfully argued and won wire-fraud case at SCOTUS. |
| **Sep 8-12, 2023** | Aiello, Binday, and other post-*Ciminelli* briefs filed (companion cases). | Supplemental authority for Ciminelli claim. |
| **Sep 15, 2023** | Andrew Reply Brief V.15 submitted; affirmation supporting oversize reply. | Continued pro se litigation. |
| **Oct 31, 2023** | 2d Cir. preserves Ciminelli challenge to conviction but holds plea waiver bars sentencing challenges and most *Brady* claims (excepting factual-innocence). | Critical 2d Cir. ruling establishing what survives plea waiver — Critical plea-waiver ruling; IAC availability is separately supported by the Plea Agreement's express IAC carve-out, Ex. W. |
| **2023–2024** | Varun A. Gumaste sworn in as Assistant U.S. Attorney for S.D.N.Y. by U.S. Attorney Damian Williams. KKL LinkedIn announcement notes 'sworn in yesterday' as the sixth and seventh KKL alumni at SDNY. Petitioner seeks Rule 6 discovery into whether employment discussions, conflict screening, or recusal analysis overlapped with Petitioner's appeal or post-conviction posture. Gumaste has remained an AUSA at SDNY through 2026 — continuing in federal service after Kim's own departure from the Acting U.S. Attorney role in March, 2025. | Ground One, Layer 3 conflict. Gumaste's continued federal service after Kim's departure supports the inference that the SDNY-job seeking behavior and eventual migration was systemic, not aberrant. |
| **Dec 21, 2023** | Bloomberg Law reports that Edward Y. Kim will return to SDNY as Chief Counsel under U.S. Attorney Damian Williams. Public-record start of Kim's reentry into SDNY. | § 2255(f)(4) candidate trigger date for Layer 2 conflict claim. Kim now part of the SDNY leadership team during pendency of Andrew's appeal |
| **Dec 29, 2023** | Government appellate brief filed by AUSA Ryan B. Finkel (with AUSA Nathan Rehn, on the brief). | Government's principal opposition brief. |
| **Jan 18, 2024** | Andrew files affidavit re reply brief size and *Brady* issues. | Continued pro se appellate filings. |
| **Jun 3, 2024** | DOJ press release announces Edward Y. Kim's promotion to Deputy U.S. Attorney for S.D.N.Y. | Kim now #2 of SDNY during Andrew's appeal. |
| **Sep 17, 2024** | Oral argument before Second Circuit panel (Lynch, Robinson, Merriam, JJ.). | Pro se oral argument. Kim's role at SDNY overseeing Finkel, Rehn, Sasson and others. Petitioner later learned of Kim's SDNY leadership role during the period when the Government's appellate defense was pending. |
| **Sep 26, 2024** | Second Circuit panel affirms by Summary Order. Lynch, Robinson, Merriam, JJ. | Panel decision foreclosing freestanding *Ciminelli* claim. |

| | | |
|---|---|---|
| | Holds Andrew's conviction was 'not predicated on the right-to-control theory.' | |
| Nov, 2024 | Mandate issues from Second Circuit. | Petitioner retained Alexandra Shapiro for limited certiorari-related consultation and continued seeking pro bono or affordable post-conviction counsel. Andrew seeks pro-bono supreme court barred counsel from dozens of lawyers without success, some citing Kim's role at SDNY |
| Nov 27, 2024 | Vermont Governor Phil Scott announces appointment of Timothy C. Doherty, Jr. — Andrew's Vermont co-counsel — to the Vermont Superior Court. Doherty's federal-court bar admissions (D. Vt. and N.D.N.Y.) continues. | Ground One, Layer 4 conflict — but with the important contrast that Doherty did disclose, both before and during representation. Demonstrates that disclosure was customary and possible. |
| Dec 13, 2024 | Edward Y. Kim becomes Acting U.S. Attorney following Damian Williams's resignation; this is a conflict-discovery and counsel-retention fact. | Layer 2 conflict apex. Kim now heads the office defending Andrew's conviction on collateral attack. |
| Jan 16, 2025 | Andrew family sells their apartment to pay legal debts and raise funds for post-conviction representation. | Diligence / equitable-tolling fact. |
| Jan 17, 2025 | Andrew files sworn affidavit re T-1080 Motion for Rehearing En Banc with the Second Circuit (post-mandate). Records his inability to retain counsel; states intent to attempt to retain post-conviction counsel for a § 2255 motion. | Express on-record diligence statement. |
| Jan 17, 2025 | Andrew family moves to Coralville, Iowa. Andrew now supervised by U.S. Probation, S.D. Iowa (transferred). | Custody continues under supervised release. |
| Feb 21, 2025 | U.S. Probation Office (S.D.N.Y.) files Probation Form 35 / Court Action Request RECOMMENDING early termination of supervised release. Andrew's adjustment described as 'satisfactory'; financial obligations fully paid. | Probation department's professional view: Andrew has done what is required and more. |
| Feb 21, 2025 | Judge Cronan issues Order (Doc. 55) requesting the Government's position on early termination. | Court invites adversarial briefing from SDNY while former defense counsel's SDNY roles and successor SDNY leadership remained relevant to Petitioner's reassignment and diligence arguments as they serve in leadership roles at SDNY and oversee Ryan Finkel. |
| Mar 2025 | Court denies early termination of supervised release. | Andrew's supervised release continues. |
| Mar–Dec 2025 | Andrew, in Iowa, continues supervised release; attempts to retain post-conviction counsel for § 2255 motion; multiple attorneys declined; Petitioner attributes some declinations to the institutional complications created by former defense counsel's SDNY role. See Ex. P. | Equitable-tolling diligence period. |
| Mar 7, 2025 | USAO opposition letter filed (by AUSA Ryan B. Finkel, under Acting U.S. Attorney Matthew Podolsky's letterhead.) | Government opposes despite no new conduct; cites earlier sentencing rhetoric. Offered as procedural context, not proof that Mr. Kim personally directed or |

| | | |
|---|---|---|
| | | influenced the opposition without diligence. |
| May 22, 2025 | U.S. Supreme Court decides *Kousisis v. United States*, 145 S. Ct. 1382 (2025) — unanimous, Justice Barrett. Wire fraud may attach without economic loss, but only where a 'materially' false representation induced the victim to part with money or property. Materiality is 'demanding,' measured by *Universal Health Services v. Escobar* standard. | Kousisis rejects an economic-loss requirement but focuses the analysis on material misrepresentation and inducement; Petitioner contends Exs. H, S, and U create factual disputes requiring Wells Fargo authentication and explanation. |
| May 2026 | Petitioner files pro se § 2255 Motion, Memorandum, Reassignment Motion, Sworn Declaration, and Exhibits A–X to preserve jurisdiction before the scheduled expiration of supervised release. | Protective filing strategy. |

## COURT OPINIONS CITED

***Substantive Wire-Fraud Doctrine:***

Ciminelli v. United States, 598 U.S. 306 (2023);
Kousisis v. United States, 145 S. Ct. 1382 (2025);
Percoco v. United States, 598 U.S. 319 (2023);
United States v. Diaz, 797 F.3d 159 (2d Cir. 2015);
United States v. Doe, 537 F.3d 204 (2d Cir. 2008);
United States v. Tetzlaff, 896 F.3d 873 (7th Cir. 2018);

***Custody & Jurisdiction:***

Jones v. Cunningham, 371 U.S. 236 (1963);
Scanio v. United States, 37 F.3d 858 (2d Cir. 1994);
Earley v. Murray, 451 F.3d 71 (2d Cir. 2006);
Maleng v. Cook, 490 U.S. 488 (1989);

***Timeliness & Equitable Tolling:***

Clay v. United States, 537 U.S. 522 (2003);
Dodd v. United States, 545 U.S. 353 (2005);
Holland v. Florida, 560 U.S. 631 (2010);
Doe v. Menefee, 391 F.3d 147 (2d Cir. 2004);
Maples v. Thomas, 565 U.S. 266 (2012);

***Procedural Default, Gateway & Massaro:***

Massaro v. United States, 538 U.S. 500 (2003);
Coleman v. Thompson, 501 U.S. 722 (1991);
Edwards v. Carpenter, 529 U.S. 446 (2000);
Murray v. Carrier, 477 U.S. 478 (1986);
McQuiggin v. Perkins, 569 U.S. 383 (2013);
Schlup v. Delo, 513 U.S. 298 (1995);
Bousley v. United States, 523 U.S. 614 (1998);

***IAC — Strickland Framework:***

Strickland v. Washington, 466 U.S. 668 (1984);
Wiggins v. Smith, 539 U.S. 510 (2003);
Pavel v. Hollins, 261 F.3d 210 (2d Cir. 2001);
Glover v. United States, 531 U.S. 198 (2001);

***Conflict of Interest & Adverse Effect:***

Cuyler v. Sullivan, 446 U.S. 335 (1980);
Wood v. Georgia, 450 U.S. 261 (1981);
Holloway v. Arkansas, 435 U.S. 475 (1978);
Mickens v. Taylor, 535 U.S. 162 (2002);
Armienti v. United States, 234 F.3d 820 (2d Cir. 2000);
United States v. Schwarz, 283 F.3d 76 (2d Cir. 2002);
People v. Dennis, 2015 NY Slip Op 25089 (Sup. Ct. 2015);

***Plea Validity & IAC at Plea:***

Hill v. Lockhart, 474 U.S. 52 (1985);
Lee v. United States, 582 U.S. 357 (2017);
Padilla v. Kentucky, 559 U.S. 356 (2010);
Brady v. United States, 397 U.S. 742 (1970);
Boykin v. Alabama, 395 U.S. 238 (1969);
Blackledge v. Allison, 431 U.S. 63 (1977);

***Brady & Plea-Stage Disclosure:***

Brady v. Maryland, 373 U.S. 83 (1963);
United States v. Ruiz, 536 U.S. 622 (2002);
Puglisi v. United States, 586 F.3d 209 (2d Cir. 2009);

***Sentencing as Critical Stage:***

Mempa v. Rhay, 389 U.S. 128 (1967);
Gardner v. Florida, 430 U.S. 349 (1977);

***Cumulative Error & Harmless Error:***

Brecht v. Abrahamson, 507 U.S. 619 (1993);
Williams v. Taylor, 529 U.S. 362 (2000);
United States v. Caracappa, 614 F.3d 30 (2d Cir. 2010);

***§ 2255(b) Hearing & Rule 6 Discovery:***

Chang v. United States, 250 F.3d 79 (2d Cir. 2001);
Bracy v. Gramley, 520 U.S. 899 (1997);
Harris v. Nelson, 394 U.S. 286 (1969);

***Recusal & Appearance of Partiality (§ 455):***

Liljeberg v. Health Servs., 486 U.S. 847 (1988);
Liteky v. United States, 510 U.S. 540 (1994);
In re Drexel Burnham, 861 F.2d 1307 (2d Cir. 1988);
Apple v. Jewish Hosp., 829 F.2d 326 (2d Cir. 1987);

***Post-Vacatur Remedy:***

Nelson v. Colorado, 581 U.S. 128 (2017);

***Liberal Pro Se Construction:***

Haines v. Kerner, 404 U.S. 519 (1972);
Erickson v. Pardus, 551 U.S. 89 (2007);
Triestman v. Fed. BOP, 470 F.3d 471 (2d Cir. 2006);
Mayle v. Felix, 545 U.S. 644 (2005).

## PRIMARY SOURCES

Criminal docket, United States v. Andrew, 1:22-cr-00032-JPC (S.D.N.Y.) — Plea agreements I–IV; Plea transcript (Doc. 32); Sentencing transcript; Sentencing memoranda (Docs. 42, 43); Doc. 55 Order requesting Government position; Doc. 58 Memorandum Opinion and Order denying early termination; Probation Form 35 (USPO Brittany Valentine, Feb. 21, 2025).

Appellate docket, United States v. Andrew, No. 22-1749 (2d Cir.) — CourtListener: Appellant brief; Government brief; Summary Order; Mandate (Nov. 19, 2024).

Sealed Complaint 21 Mag. 4262 (S.D.N.Y. April 20, 2021) (FBI SA Melody Shen affidavit) — court file.

Remote presentment transcript, April 27, 2021 (before Magistrate Judge Gabriel W. Gorenstein) — court file.

DOJ press release: U.S. Attorney Damian Williams Announces Selection of Deputy U.S. Attorney and Executive Staff (June 3, 2024) — Kim as Deputy U.S. Attorney.

DOJ press release: U.S. Attorney Damian Williams Announces Anticipated Resignation (Nov. 25, 2024) — Kim as Acting U.S. Attorney effective Dec. 13, 2024.

Bloomberg Law, 'Former Federal Prosecutor to Return to SDNY as Chief Counsel' (Dec. 21, 2023).

Above The Law, 'Elite Boutique Firm Partner Departs For USAO Leadership Team' (Feb. 2024).

Office of the Governor of Vermont (Phil Scott), 'Governor Phil Scott Appoints Four Superior Court Judges' (Nov. 27, 2024).

Downs Rachlin Martin PLLC, 'Timothy C. Doherty, Jr. Appointed by Governor Phil Scott to Vermont Superior Court.'

Carlton Fields, Michael L. Yaeger biographical profile — confirming prior EDNY AUSA service and Alito clerkship.

Carlton Fields, 'Supreme Court Unanimously Overturns Conviction of Carlton Fields Client' — Yaeger as lead Supreme Court counsel in Percoco v. United States.

Krieger Kim & Lewin LLP — Edward Y. Kim biographical profile.

New York State Education Department / SUNY Charter Schools Institute — Board of Regents merger actions (April 2017); DPE merger into Democracy Prep NY (effective July 1, 2019).

The 74 Million — coverage of Democracy Prep founding and 2013 leadership transition; Education Next Q&A with Seth Andrew.

## PRO SE POSTSCRIPT

Petitioner reiterates that the Significance column is pro se commentary submitted under the Haines/Erickson/Triestman liberal-construction principles. The Date and Event/Action columns attempt to be documentary and verified in Exhibits attached or to be provided with limited discovery under Rule 6. Petitioner reserves the right to refile this Timeline in a counsel-stripped form (events and dates only) if such form would be more useful to the Court at any stage, or to supplement it with additional declarations, affidavits, and primary-source attachments upon evidentiary hearing or amendment under Mayle v. Felix, 545 U.S. 644 (2005).

**/s/ Seth Andrew**

Seth Andrew, Petitioner-Movant, pro se

*Compiled May 14, 2026.*